UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
02 NOV -1  PM 3:20
U.S. _____ ___ ___
N.D. OF ALABAMA

GLENDA CARNEGIE and )
IDA LEE JOHNSON, on behalf of )
themselves and all others similarly )
situated, )
 )
  Plaintiffs, )
 )
v. )
 )
MUTUAL SAVINGS LIFE )
INSURANCE COMPANY, )
 )
  Defendant. )

Civil Action No. CV-99-S-3292-NE

ENTERED

NOV - 1 2002

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

## MEMORANDUM OPINION

This action was commenced by two plaintiffs, Glenda Carnegie and Ida Lee Johnson, who are American citizens with African ancestors. These ladies instituted suit on behalf of themselves, as well as a putative class of allegedly similarly-situated persons.[1] The original complaint has been twice amended, and the most recent amendment names only Ida Lee Johnson as plaintiff.[2] For simplicity, therefore, this court will employ the term "plaintiff," and the singular possessive form of that noun, when referring to the claims for which class certification is sought.

The case presently is before the court on plaintiff's motion for class certification. Plaintiff alleges that defendant violated the civil rights of persons such as herself by pricing insurance on the basis of race, in violation of 42 U.S.C. §§ 1981 and 1982.[3] She seeks certification of the following

---

[1] See doc. no. 1 (Complaint).

[2] See doc. no. 53 (Third Amended Class Action Complaint) ¶ 1.

[3] In the third amended complaint filed April 5, 2002, plaintiff alleged claims based upon race discrimination under 42 U.S.C. §§ 1981 and 1982 (Counts I and II), breach of fiduciary duty (Count III), fraudulent inducement (Count IV), and negligent misrepresentation (Count V), and sought declaratory and injunctive relief (Count VI) and reformation (Count VII). Doc. no. 53 (Third Amended Class Action Complaint). Plaintiff did not pursue class certification of claims based on state law. See doc. nos. 59 (Memorandum in Support of Motion for Class Certification) and 69 (Reply to Opposition to Class Certification), at 1 ("As made clear in the Motion for Class Certification, Plaintiff seeks certification



class:

> African Americans who own or had an ownership interest in "colored cash" or "colored burial" policies that were issued at higher substandard rates or as substandard plans and, in addition, any policies that Mutual Savings has identified to the State of Alabama Insurance Department as being issued as race-based policies.[4]

## I. FACTUAL BACKGROUND

Plaintiff contends that "[f]or at least thirty-five years, Defendant Mutual Savings Life Insurance Company[5] . . . discriminated against African Americans, charging them higher premiums for inferior life insurance products."[6]  Mutual Savings sold so-called "industrial life insurance"[7] policies to both African American and Caucasian American consumers, but maintained separate "colored cash," "white cash," "colored burial," and "white burial" premium structures.[8]  Plaintiff alleges that, during the relevant time period, African Americans could purchase only policies

of discrimination claims brought under 42 U.S.C. §§ 1981 and 1982 and of a class-wide punitive damages claim based on decades of intentional racial discrimination by Mutual Savings.").

[4]Transcript of class certification hearing conducted July 9, 2002 ("Tr."), at 3-4.

[5]Mutual Savings was acquired by Primesco during December of 1998. Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison), at 32.

[6]Doc. no. 59 (Memorandum in Support of Motion for Class Certification), at 2.  Plaintiff maintains that the policies sold to African Americans were "more expensive" — *i.e.,* those policies required higher premiums and a longer premium payment period than policies issued to Caucasians that provided similar benefits.  *See* Plaintiff's Evidentiary Submission, Ex. C (Expert declaration of Terry M. Long), at 2-3.

[7]According to one standard authority, so-called "industrial life insurance"

> is also known as burial insurance.  This type of insurance is seen much less commonly today than in decades past, [and] is intended for people with little money and property.  Industrial or burial insurance involves the payment by one person (the insured) of a fairly small sum to a party, sometimes one engaged in the undertaking business, in exchange for that party's furnishing of the necessary burial services upon the death of the insured.  The premium is commonly payable in small installments, and at short intervals, and the issuance of this variant of life insurance is not accompanied by the type of formal assessment and health investigations involved in other forms of life insurance.

1 Couch on Insurance § 1:42 (3d ed. 1997), at 1-63 (footnotes omitted).  The Alabama Code defines "industrial life insurance" as "that form of life insurance written under policies of face amount to $2,500.00 or less bearing the words 'industrial policy' imprinted on the face thereof as part of the descriptive matter and under which premiums are payable monthly or more often." Ala. Code § 27-16-1 (1975).

[8]Don Morrison, Senior Vice President of Operations and Secretary of Mutual Savings, testified in deposition that "white cash" referred to those policies sold to white clients, and "colored cash" referred to those issued to African American clients.  Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison), at 149.

designated as "colored," for which the premiums were higher than those for the "white" plans.[9]
According to plaintiff, the rate differential between the two types of plans — *i.e.*, "white" versus
"colored" — was based solely on race.  Mutual Savings continued to employ differential premium
structures until the late 1960s, and sold "industrial" policies until 1980 or 1981.[10]  All of the "colored
cash" policies were industrial policies.[11]  Based upon a report generated by Mutual Savings, at least
7,018 "colored cash" policies sold between 1945 and 1967 remain in force.[12]  Plaintiff offers the
following example of the rate differential:

> Mutual Savings offered both a "White Life" and a "Series C" version of their [sic]
> 20 Payment Life and 10 Payment Life products.  African-Americans were relegated
> to the "Series C" products solely because of their race.  The premiums for a $1,000
> "Series C" 20 Payment Life policy were, depending on the issue age, 15% to 32%
> greater than the premiums for a $1,000 "White Life" 20 Payment Life Policy.  The
> premiums for a $1,000 "Series C" 10 Payment Life policy were, depending on issue
> age, 11% to 22% greater than the premiums for a $1,000 "White Life" 10 Payment
> Life policy.  The "White Life" policies also had better disability benefits.
> Accordingly, a 45-year-old African-American who purchased a $1,000 20 Payment
> Life policy from Mutual Savings would pay $1,560 more than a Caucasian for the
> same amount of life insurance and accidental death benefit insurance (and lower
> disability benefits) solely because of his race.[13]

Mutual Savings was aware that African Americans were charged higher rates, but did not inform its

---

[9]Morrison stated that "blacks were charged more" than white policy-holders.  *Id.* at 151.

[10]Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison), at 58.  Until 1971, Mutual Savings's application forms requested that the applicant specify his or her race.  *Id.* at 171.

[11]*Id.* at 149.

[12]*Id.* at 168.  In addition to policies issued by Mutual Savings, those policies acquired by Mutual Savings from the following companies are at issue: Homeland (acquired in 1940); United Service (acquired in 1954); Southern Benefit (acquired in 1958); Memorial Service (acquired in 1960); Stonewall (acquired in 1961); Alliance (acquired in 1961); Life of Alabama (acquired in 1962); Gulf States (acquired in 1962); Kentucky Central (acquired in 1962); Lincoln Income (acquired in 1964); Peoples Protective (acquired in 1965); Life of Florida (acquired in 1966); Palmetto State (acquired in 1967); Standard Life (acquired in 1968); Greater United (acquired in 1969); Security Life (acquired in 1971); Public National (acquired in 1972); Greater Mississippi (acquired in 1975); Southern United (acquired in 1987); Delta Life (acquired in 1987); and Georgia Life (acquired in 1987).  Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison) at Ex. 7.

[13]Doc. no. 59 (Memorandum in Support of Motion for Class Certification), at 4-5.

African American policy-holders of the rate disparity.[14] Moreover, Mutual Savings has not adjusted premiums for those policies still in force, nor has it adjusted the benefits paid on the allegedly discriminatory policies.

The 1959 rate book published by Mutual Savings for use by its agents to service policy-holders contains separate premium tables for "white life" and "Series C" policies.[15] Moreover, the 1959 rate book describes benefits pursuant to its "General Accident Policies," for which the premium was the same for both "white life" and "Series C" policy-holders (*i.e.*, ten cents per week) as follows:

### WHITE LIFE BENEFITS

### PLAN GA

The principal sum or benefit is $1,000 during the first policy year and increases $100.00 each year for ten policy years, thereafter the principal sum remains $2,000 until age sixty-five. (Benefits cease on the anniversary of the policy after the Insured's sixty-fifth birthday.)

. . . .

### SERIES C BENEFITS

### PLAN AC

The General Accident policy is issued on Colored lives at 10¢ per week. The policy does not increase in benefits year by year but the principal sum remains at $1,000.00.[16]

According to Mutual Savings, the "white life" and "Series C" labels were discontinued during the 1960s. Plaintiff contends, however, that race-distinct rates were not eliminated. As demonstrated by its 1969 rate book, Mutual Savings issued policies under three sets of premiums, designated as Standard ("S"), Regular ("R"), and Acceptable ("A"). Mutual Savings's Vice President of

---

[14]Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison), at 153-54.

[15]*See generally* Defendant's Ex. 1 (admitted into evidence during hearing conducted on July 9, 2002).

[16]*Id.* at "RATES 2370."

Operations confirmed that "S is for the standard rate. And the R would be a substandard rate."[17] Those designations — *i.e.*, "S" and "R" — were used during the period in which Mutual Savings sold "colored cash" policies.[18]

Plaintiff Ida Johnson currently is a resident of Bartow, Florida. She attended only elementary school and is able to read "[a] little bit."[19] She purchased an "Industrial Weekly Whole Life Policy" from Mutual Savings in 1962, when she was thirty-seven years old. Ms. Johnson then resided in Marietta, Georgia, in a government-subsidized housing project.[20] Her policy was designated a "colored cash" policy, and its face value is $1,000, with a weekly premium of $0.96 ($49.92 annually), payable during her lifetime. Initially, the premiums were collected on a weekly basis by Mutual Savings agents, who came to plaintiff's home.[21] Ms. Johnson presently pays her insurance premiums by mail.[22] The amount of the premium has not changed, however, and as of the date of

---

[17]Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison), at 182.

[18]*Id.* at 184. The 1969 rate book applicable to ordinary life insurance, intermediate life insurance, hospital & accident insurance, and industrial life insurance provides the following guidance for Mutual Savings agents:

The agent should use the following as a basis for determining the premium classification:

1.  **Occupation.** "S" occupations include professional workers for which a college degree is usually required for their work, office workers, salesmen, mailmen, individual proprietors except those owning places which serve alcoholic beverages, and skilled workers.

    Person [sic] engaged in occupations such as the following and their families should be quoted "R" rates:

    Busboys, Dishwashers, Car washers, Domestic Maids, Farm Laborers, Garbage Collectors, Handymen, Yardmen, Janitors, Sweepers, Locker Room and Wash Room Attendants, Pulp Wood Workers, Sewage Workers, Street Sweepers, Tavern Employees, Unskilled Laborers.

Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison), at deposition exhibit 10, at K-4. Plaintiff contends that these occupational classifications were used as a proxy for race.

[19]Doc. no. 65, Ex. 8 (Deposition of Ida Johnson), at 19.

[20]*Id.* at 107.

[21]Doc. no. 1 (Complaint) ¶ 45.

[22]*Id.* ¶ 46.

5

filing the third amended complaint, April 5, 2002, Ms. Johnson had paid a total of $1,884.48 in premiums for a life insurance policy that will pay death benefits of only $1,000.

Mutual Savings also sold "burial" policies in Alabama, but has not sold those policies since 1973.[23] Mutual Savings presently sells various types of insurance policies in Alabama, Mississippi, Tennessee, and Georgia, and previously has sold policies in Florida and Louisiana.[24] The company has twenty-eight district offices, located in the states of Alabama, Mississippi, and Georgia, and employs approximately 500 agents.[25]

Plaintiff seeks class certification for the claims based upon 42 U.S.C. §§ 1981 and 1982: *i.e.*, the claims seeking declaratory and injunctive relief, disgorgement of the differential in premiums collected for "colored" versus "white" policies, reformation of the existing policies, punitive damages, and, of course, attorneys' fees and costs.

## II. DISCUSSION

### A.    The Legal Basis of Plaintiff's Federal Claims

#### 1.    Section 1981

To establish a prima facie case of non-employment discrimination under § 1981, a plaintiff must demonstrate that: "(1) he or she is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute. . . .  The critical element . . . is the second." *Rutstein v. Avis Rent-A-Car Systems, Inc.*, 211 F.3d 1228, 1235 (11th Cir. 2000) (citations omitted).

The second requirement is more demanding that any of the requirements imposed on

---

[23]Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison), at 26, 63.
[24]*Id.* at 47-48.
[25]*Id.* at 51, 53.

6

[individual] plaintiffs in a *McDonnell Douglas* [employment discrimination] case, requiring, as it does, that the plaintiff bring forth evidence of actual intent on the part of the defendant.  A finding that [a defendant] has a policy or practice of discrimination could not possibly function as a meaningful substitute for the establishment of an actual intent to discriminate against an individual plaintiff on the basis of his or her [protected characteristic: here, race].

*Id.* at 1239.

### 2.    Section 1982

Section 1982 protects the property rights of those citizens who are not descendants of white English, Scotch, Irish, or European stock: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982.  The statute evolved from the Thirteenth Amendment, which abolished slavery.[26]

> Negro citizens, North and South, who saw in the Thirteenth Amendment a promise of freedom — freedom to "go and come at pleasure" and to "buy and sell when they please" — would be left with "a mere paper guarantee" if Congress were powerless to assure that a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a white man.  At the very least, the freedom that Congress is empowered to secure under the Thirteenth Amendment includes the freedom to buy whatever a white man can buy, the right to live wherever a white man can live.  If Congress cannot say that being a free man means at least this much, then the Thirteenth Amendment made a promise the Nation cannot keep.

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 443, 88 S. Ct. 2186, 2205, 20 L. Ed. 2d 1189 (1968) (footnotes omitted).

In order to support a claim under § 1982, a plaintiff "must allege with specificity facts

---

[26]The Thirteenth Amendment to the United States Constitution reads as follows:

> **Section 1.**  Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

> **Section 2.**  Congress shall have power to enforce this article by appropriate legislation.

sufficient to show or raise a plausible inference of (1) the defendant's racial animus; (2) intentional discrimination; and (3) that defendant deprived plaintiff of his rights because of race." *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 797 (3d Cir. 2001).

**B.     The Requirements for Class Certification**

Rule 23 of the Federal Rules of Civil Procedure governs the certification of class actions. District courts are required to conduct a "rigorous analysis" of that rule's requirements. *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 161, 102 S. Ct. 2364, 2372, 72 L. Ed. 2d 740 (1982). A district court retains broad discretion in deciding whether to certify a class. *See, e.g., Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 101 S. Ct. 2193, 2200, 68 L. Ed. 2d 693 (1981).

The party seeking class certification bears the burden of proof. *See Falcon*, 457 U.S. at 161, 102 S. Ct. at 2372. Rule 23(a) states four threshold requirements applicable to all class actions: (1) numerosity ("the class is so numerous that joinder of all parties is impracticable"); (2) commonality ("there are questions of law or fact common to the class"); (3) typicality (the named parties' claims or defenses "are typical . . . of the class"); and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class").

In addition to satisfying all prerequisites of Rule 23(a), parties seeking class certification must show that the action is maintainable under at least one of the three categories of Rule 23(b). Here, plaintiff seeks certification under Rule 23(b)(2) or, alternatively, 23(b)(3). Additionally, she asserts that a class may be certified under Rule 23(b)(1)(B) for punitive damages.

**1.     Rule 23(a) prerequisites**

**a.     Standing**

Mutual Savings contends that a class action cannot be maintained because plaintiff lacks

Article III standing.  The Eleventh Circuit has observed that

> [i]t is well-settled that prior to the certification of a class, and technically
> speaking before undertaking any formal typicality or commonality review, the district
> court must determine that at least one named class representative has Article III
> standing to raise each class subclaim.  "[A]ny analysis of class certification must
> begin with the issue of standing." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir.
> 1987); *see also Brown v. Sibley*, 650 F.2d 760, 771 (5th Cir. Unit A, July 1981)[27]
> (stating that the "constitutional threshold [of standing] must be met before any
> consideration of the typicality of claims or commonality of issues required for
> procedural reasons by Fed.R.Civ.P. 23").  "Only after the court determines the issues
> for which the named plaintiffs have standing should it address the question whether
> the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert
> the rights of others."  *Griffin*, 823 F.2d at 1482.  It is not enough that a named
> plaintiff can establish a case or controversy between himself and the defendant by
> virtue of having standing as to one of many claims he wishes to assert.  Rather, "each
> claim must be analyzed separately, and a claim cannot be asserted on behalf of a class
> unless at least one named plaintiff has suffered the injury that gives rise to that
> claim."  *Id.* at 1483.

*Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279-80 (11th Cir. 2000).  Mutual Savings's

main contention is that plaintiff lacks standing to serve as a class representative because her personal

claims are time barred.

Even though there are no administrative prerequisites to the commencement of an action or

claim based upon § 1981, a plaintiff still must file suit within the applicable statute of limitations.

Unlike Title VII, however, § 1981 does not contain an express statute of limitations.  As a result, the

Supreme Court instructs district courts to "select the most appropriate or analogous state statute of

limitations" from the state in which the allegedly discriminatory act occurred.  *Goodman v. Lukens*

*Steel Co.*, 482 U.S. 656, 660-61, 107 S. Ct. 2617, 2620, 2621, 96 L. Ed. 2d 572 (1987); *see also*

*Wilson v. Garcia*, 471 U.S. 261, 266-68, 105 S. Ct. 1938, 1941-43, 85 L. Ed. 2d 254 (1985).  In

---

[27]While decisions of the Unit A panel of the former Fifth Circuit entered after October 1, 1981 are not binding
precedent in the Eleventh Circuit, such decisions, nevertheless, are "persuasive." *United States v. Chapman*, 866 F.2d
1326, 1332 (11th Cir. 1989) (citing *Matthews v. United States*, 713 F.2d 677, 683 n.1 (11th Cir. 1983), and *Stein v.
Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir. 1982)).

Alabama, that limitations period is two years. *See Peterson v. BMI Refractories*, 132 F.3d 1405, 1414 n.16 (11th Cir. 1998) (holding that § 1981 intentional discrimination claims arising out of acts occurring in Alabama are governed by Alabama Code § 6-2-38(l) (1975), the state's general, two-year limitations period applicable to personal injury actions); *see also Goodman*, 482 U.S. at 661-64, 107 S. Ct. at 2620-22 (holding that the court of appeals correctly applied Pennsylvania's two year statute of limitations for personal injury actions to § 1981 claims).

"Federal law determines when a federal civil rights action accrues. The general federal rule is that 'the statute [of limitations] does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" *Rozar v. Mullis*, 85 F.3d 556, 561-62 (11th Cir. 1996) (quoting *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987)); *see also, e.g., Stafford v. Muscogee County Board of Education*, 688 F.2d 1383, 1390 (11th Cir. 1982) ("The limitations period for § 1981 employment discrimination cases 'commences when the plaintiff knows or reasonably should know that the discriminatory act has occurred, the same point from which the Title VII 180-day limitations period runs.'") (quoting *McWilliams v. Escambia County School Board*, 658 F.2d 326, 330 (5th Cir., Unit B 1981)[28]); *Welch v. Delta Air Lines, Inc.*, 978 F. Supp. 1133, 1137 (N.D. Ga. 1997) (holding that a plaintiff's § 1981 racially hostile work environment claim was governed by Georgia's two-year statute of limitations for personal injury actions, and that the statute began to run "when the plaintiff-employee knew or reasonably should have known that the discriminatory act occurred.").

In support of its contention that plaintiff's claims are barred by the applicable statute of

---

[28]In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent all decisions of the Unit B panel of the former Fifth Circuit handed down after September 30, 1981. *McWilliams v. Escambia Co. School Board* was such a decision, since it was decided October 5, 1981.

limitations borrowed from state law, Mutual Savings cites plaintiff's deposition testimony on cross-examination.  In essence, Ms. Johnson indicated that she was not sure of the date on which she first formed the opinion that race affected her insurance rates and policy benefits.  She testified that it "might have been" ten years before the date on which she was deposed.[29]  Mutual Savings also points to her deposition testimony on direct examination, in which she stated that she learned "not too long" ago that race may have been a factor considered by Mutual Savings, and confirmed her attorney's suggestion that it was "within the last three years"[30] — *i.e.*, approximately the time this action was filed.

The court agrees with Mutual Savings that, focusing solely upon the deposition testimony of this elderly and poorly educated lady, there is some question as to when she had notice of her claims.  In view of Ms. Johnson's age, limited education, and obvious confusion at various points during the deposition, however, the court concludes that the inquiry should not be restricted solely to her testimony.

Plaintiff also has presented on this issue the deposition testimony of Don Morrison, Senior Vice President of Operations and Secretary of Mutual Savings.  Mr. Morrison testified as follows:

> Q.     Do you think many of those people [who bought policies designated as "colored"] were aware of how premiums were determined for life insurance products?
>
> A.     I don't know if anybody other than actuaries know exactly how premiums are determined.
>
> Q.     Unless somebody told you [,] or you made the comparison yourself between what is in the rate books for a white plan and what is in the rate books for a colored plan, would you be able to tell with all your experience in the insurance business whether an insurance premium is race-based?

---

[29]Defendant's Ex. 8 (Deposition of Ida Lee Johnson), at 158.
[30]*Id.* at 144.

A.      By just looking at a premium?

Q.      Yes, sir.

A.      I have no idea.[31]

Morrison further testified that, to the best of his knowledge, African American policy holders were
not informed of Mutual Savings's dual rate plan.[32]

Mutual Savings submitted more than fifty articles that were published in newspapers and
business journals, a transcript from a "Sixty Minutes" television program which aired in 1978, and
legislative materials relating to congressional hearings on "Nondiscrimination in Insurance."[33] Those
submissions largely address the pervasive failure of "white" insurance companies to sell policies to
African Americans, leading to the development of insurance companies owned by African
Americans, catering to the needs of members of that race, and, so-called "deceptive practices" of
insurance companies with respect to industrial policies.   None of the submissions specifically
mention Mutual Savings, however, and few discuss racially discriminatory rates.   The print-media
articles appeared in such publications as the *Wall Street Journal*, the *Philadelphia Inquirer*, the
*Tennessean*, *Black Enterprise*, and the *Washington Post*.   While some of these submissions arguably
touch on the basis of the claims asserted in this action, the court cannot conclude on the basis of such
submissions that Mutual Savings's allegedly discriminatory dual rate system was widely known.[34]
*See, e.g., Congregacion del la Mission Provincia de Valenzuela v. Curi*, 978 F. Supp. 435, 445

---

[31]Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison), at 239.

[32]*Id.* at 240.

[33]Appendix D to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Class Certification.

[34]Indeed, a survey conducted among students at fifty "elite" colleges and universities confirmed that even basic
historical facts are not widely known.  *See* Elite College History Survey, conducted by the Center for Survey Research
and Analysis, for the American Council of Trustees and Alumni, available at http://www.goacta.org (last visited October
4, 2002).

(E.D.N.Y 1997) ("[T]he limitations period is triggered only if the information plaintiff receives is directly related to the conduct alleged in the complaint and concerns the activities of the particular defendants being sued.").

Additionally, plaintiff has alleged that Mutual Savings fraudulently concealed its racially discriminatory rates. In particular, she contends that

> 30. Beginning in or about 1941, at the behest of insurance companies including Mutual Savings, mortality tables were constructed that expressly used race as a factor in rate setting, the purpose and effect of which were to discriminate between African-Americans and Caucasians in the sale of life insurance. Mutual Savings employed these mortality tables as justification to charge higher premiums and to pay comparatively lower cash values and death benefits to its African-American policyowners than to its Caucasian policyowners. Mutual Savings also used the mortality tables as a pretext to justify offering certain, higher quality insurance products to Caucasians only. However, neither the mortality tables themselves, nor the fact that the tables included factoring based on race, were disclosed to prospective African-American policyholders.

> 31. In later years, rather than relying on overtly different rate books for Caucasians and African-Americans, Mutual Savings substituted practices that were designed to appear neutral but were in fact a pretext for continued racial discrimination. Mutual Savings did so by creating a type of policy intended to be offered primarily or exclusively in African-American communities that was more expensive than the type offered primarily or exclusively in Caucasian communities. The change from racially discriminatory to racially neutral practices that carried out Mutual Savings' discriminatory goals was intended to conceal from African-American policyowners the discriminatory rates charge[d] to them. Moreover, Mutual Savings used nomenclature for its policy types to conceal from policyowners that the policy types were merely a pretext for applying racially discriminatory rates.[35]

Under Alabama law, from which the applicable tolling principles are borrowed, as modified by countervailing policies of federal law, "the statute of limitations does not begin to run until the plaintiff, utilizing ordinary care, should have discovered the fraudulent concealment." *Moore v. Liberty National Insurance Co.*, 108 F. Supp. 2d 1266, 1273 (N.D. Ala. 2000) (citing *Lott v. Tarver*,

---

[35]Doc. no. 53 (Third Amended Class Action Complaint) ¶¶ 30 & 31, at 10.

741 So.2d 394, 397 (Ala. 1999)), *aff'd*, 267 F.3d 1209 (11th Cir. 2001).

At this stage of the proceedings, therefore, and for the limited purpose of deciding plaintiff's motion for class certification, the court concludes that plaintiff has made a sufficient showing that her claims were asserted within the period of the applicable statute of limitations. Accordingly, she has "standing" to sue. Other aspects of Mutual Savings's arguments with respect to plaintiff's standing also are relevant to the issue of whether plaintiff is an adequate representative of the class, however, and will be discussed below.[36]

### b.   Numerosity

The text of Rule 23(a) requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The reason for [the numerosity] requirement is obvious. Only when joinder is impracticable is there a need for a class action device." 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.01, at 3-4 (3d ed. 1992).

Mutual Savings does not appear seriously to contest that plaintiff has satisfied this requirement. The records of Mutual Savings show that thousands of African Americans bought its policies during the relevant time period, and that the policies were sold in Alabama, Mississippi, Tennessee, Georgia, and Louisiana. Moreover, the records of Mutual Savings demonstrate that more than 7,000 such policies still are in force. Accordingly, the court finds that plaintiff has met this requirement.

---

[36]*See infra* § II.B.1.e. Mutual Savings also argues that plaintiff's claims are barred by the Alabama common-law rule of repose, which bars claims that arise out of events that are more than twenty years old. "[T]he only element of the rule of repose is time." *Boshell v. Keith*, 418 So.2d 89, 91 (Ala. 1982). The Eleventh Circuit recently has held, however, that, in cases brought under federal civil rights statutes, "[c]ourts should not borrow Alabama's entirely distinct repose doctrine, as it is not necessary to apply this doctrine to effect the applicable state statute of limitations." *Moore v. Liberty National Life Insurance Co.*, 267 F.3d 1209, 1219 (11th Cir. 2001).

### c.   Commonality

Rule 23(a) also requires that there be "questions of law *or* fact common to the class" to justify certification. Fed. R. Civ. P. 23(a)(2). The commonality requirement, together with the numerosity test of Rule 23(a)(1), "form the underlying conceptual basis supporting class actions." *Newberg, supra* § 3.10, at 3-47.

> The class-action was designed as an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. . . . Class relief is peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class. . . . For in such cases, the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23.

*Falcon*, 457 U.S. at 155, 102 S. Ct. at 2369 (citations and internal quotation marks omitted). Rule 23(a)(2)'s requirement that there simply be "questions of law or fact common to the class" is less stringent than the demand of Rule 23(b)(3) that common questions "*predominate* over any questions affecting only individual members."[37] Thus, the commonality prerequisite of Rule 23(a)(2) is subsumed within Rule 23(b)(3)'s predominance determination. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 609, 117 S. Ct. 2231, 2243, 138 L. Ed. 2d 689 (1997).

Plaintiff has identified common questions of fact, including: whether Mutual Savings maintained a corporate practice or common course of conduct of race-based pricing of insurance policies sold to African Americans; whether Mutual Savings discriminated against class members by charging them higher premiums for their insurance policies than similarly situated Caucasians; whether Mutual Savings discriminated against class members by designing and offering products

---

[37]"The Rule 23(a)(2) prerequisite requires only a single issue common to the class." 1 *Newberg on Class Actions* § 3.12, at 3-69.

to class members that were more expensive than products available to Caucasians; whether Mutual Savings's discriminatory policy and practices were racially motivated; and whether Mutual Savings's discriminatory practices are continuing.

Additionally, plaintiff asserts that common questions of law include: whether Mutual Savings's conduct is actionable under § 1981; whether Mutual Savings's conduct is actionable under § 1982; whether Mutual Savings's conduct supports the issuance of injunctive relief; whether Mutual Savings's conduct supports an award of restitution, reformation, or other equitable relief; and whether Mutual Savings's conduct supports an award of punitive damages.

In response, Mutual Savings contends that plaintiff's class claims require individual determinations that, but for their race, each class member would have received more favorable rates, as well as individual determinations as to each class member's knowledge of his or her claims against Mutual Savings.[38] While the points raised by Mutual Savings are valid, the court concludes that they are more properly discussed in the context of whether certification under Rule 23(b)(3) is appropriate — *i.e.,* whether the questions of law or fact common to the members of the class predominate over any questions affecting only individual members.

The court is satisfied that plaintiff meets the threshold requirement of Rule 23(a)(2) that there be at least one question of fact or law common to the class.

### d.    Typicality

Rule 23(a) additionally requires that "the claims . . . of the representative parties [be] typical

---

[38]Mutual Savings also asserts that its class settlement and general release for burial and merchandise policies in *Gibson v. Mutual Savings*, No. CV-84-179-J affects the commonality of the class claims, because some claims may be barred by principles of claim preclusion. Plaintiff asserts that under *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222 (11th Cir. 1998), which focuses on the notice provided to class members in a prior action, claims by class members relating to burial or merchandise policies would not be barred. Although Mutual Savings's contention may have merit, it does not bear on whether a class should be certified; rather, it is relevant to whether particular members of the class may pursue their claims.

of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). Class representatives must possess the same interests, and suffer the same injuries, as class members. Typicality does not demand identical factual circumstances; even so, the claims of the named plaintiff and the class members must be based on the same legal or remedial theory. *See Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986).

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct. In other words, when such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to the class and that wrong includes the wrong to the plaintiff. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.

*Newberg, supra* § 3-13, at 3-76 (footnote omitted). In other words, when the interests of the representative party are sufficiently aligned with those of the putative class, then the named plaintiff, in pursuit of her personal claims, also will advance the interests of class members.

Plaintiff contends that her claims are typical of those of would-be class members because she is an African American who "was sold a more expensive 'colored cash' policy because of her race."[39] Mutual Savings disagrees, asserting that plaintiff's claims are not typical of those of the putative class because she does not seek certification of state law claims, or compensatory damages for mental anguish. This court agrees with plaintiff that her claims satisfy the "typicality" requirement, and concludes that Mutual Savings's arguments are more properly addressed as they relate to whether plaintiff is an adequate class representative.

### e. Adequacy of representation

Mutual Savings contends that plaintiff Ida Lee Johnson is not an adequate class

---

[39]Doc. no. 59 (Memorandum in Support of Motion for Class Certification), at 14.

representative. Specifically, Mutual Savings asserts that plaintiff's knowledge of the case, her willingness to participate actively in the prosecution of the claims, and her resources are insufficient. Moreover, Mutual Savings contends that because plaintiff does not seek certification of state law claims, or compensatory damages for mental anguish, her interests conflict with those of the class.

Rule 23(a)(4) allows certification only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Assessment of the adequacy of representation turns upon two subsidiary issues: (1) whether representative parties have common interests with unnamed class members; and (2) whether representative parties will vigorously prosecute the interests of the class through qualified and competent counsel. The Eleventh Circuit also has stated that,

> where the class is represented by competent and zealous counsel, class certification should not be denied simply because of a perceived lack of subjective interest on the part of the named plaintiffs unless their participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case.

*Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 728 (11th Cir. 1987).

The first criterion is synonymous with the typicality requirement of Rule 23(a)(3): *i.e.*, if the named plaintiff's claims are not typical of the class, then the representative parties cannot fairly and adequately protect the interests of absent class members. *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996) ("The adequate representation requirement overlaps with the typicality requirement because[,] in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members.").

There is no question here about the adequacy of counsel: plaintiff has demonstrated that class claims will be prosecuted vigorously by competent and experienced attorneys.[40] Moreover,

---

[40]*See* Plaintiff's Evidentiary Submission, Ex. G. For example, the law firm of Whatley Drake, L.L.C. has served

Mutual Savings does not contest that aspect of the "adequacy" requirement.  This court also is satisfied that plaintiff has demonstrated sufficient interest and participation in the action, in view of her age, health, and limited education.  As plaintiff's attorneys correctly observe, there is no requirement that plaintiff demonstrate that she personally is able to fund the litigation — indeed, one of the central purposes of Rule 23 is "the prospect of reducing . . . costs of litigation, particularly attorney's fees, by allocating such costs among all members of the class who benefit from any recovery."  *Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 338 n.9, 100 S. Ct. 1166, 1174 n.9, 63 L. Ed. 2d 427 (1980).

Mutual Savings's remaining argument — that plaintiff's failure to pursue compensatory damages, and failure to seek certification of state law claims, creates a conflict with potential class members — bears discussion.  In response to that argument, plaintiff states:

> Mutual Savings overlooks that, because it concealed its activities, Plaintiff and class members were unaware of its discriminatory actions until recently.  Moreover, because plaintiff does not seek certification [of] the state law claims, there is no "waiver" of these claims and absent class members can seek damages for emotional distress on such claims at their option.[41]

As support for its argument, Mutual Savings points to an Alabama Supreme Court decision, *Ex parte Russell Corporation*, 703 So.2d 953 (Ala. 1997), in which that Court granted the defendants' petition for writ of mandamus with respect to the trial court's certification of a class action.  The action involved the discharge of wastewater into a tributary of Lake Martin, allegedly causing carcinogenic contamination of lake water and sediment adjacent to the plaintiffs' real

---

as class counsel, liaison counsel, or co-counsel in twenty-five nationwide and four statewide class actions.  Likewise, the materials submitted by plaintiff demonstrate that the law firms of Watson Jimmerson Givhan Martin & McKinney, P.C.; Bonnett, Fairbourn, Friedman & Balint, P.C.; and Milberg Weiss Bershad Hynes & Lerach LLP have extensive experience in complex litigation generally, and class actions in particular.

[41]Doc. no. 69 (Reply to Opposition to Class Certification), at 10 n.17.

property. The plaintiffs amended their complaint to include class allegations almost three years after

the action had been filed. In order to maintain their choice of venue in the Circuit Court for Jefferson

County, Alabama, rather than in Tallapoosa County, where two defendants were major employers,

the plaintiffs did not seek injunctive relief. The Alabama Supreme Court observed that

> [g]iven [the complaint's] allegations, it is contradictory that the class representatives
> have sought economic damages because they say the contamination has caused them
> to lose the enjoyment of their property and to suffer mental anguish, yet have not
> sought to enjoin the defendants from continuing the discharges they complain of and
> have not sought medical monitoring of class members for the potential latent effects
> of exposure to the alleged cancer-causing contamination. . . . Thus, the decision of
> the class representatives to forgo seeking any form of injunctive relief is highly
> detrimental to the rights of the other class members.

*Id.* at 964. Even though the class had been certified under Rule 23(b)(3), providing the opportunity

to opt out of the class, the Court held that — because the plaintiffs failed to bring claims for

injunctive relief — they could not "fairly and adequately represent the interests of *all* members of

the class." *Id.* at 965 (emphasis in original).

This court is not bound by *Ex parte Russell Corporation,* and even if it were, the facts are

distinguishable. There, the Alabama Supreme Court found that it was "contradictory" for the

plaintiffs to forgo injunctive relief, in view of their claims for monetary damages arising from

defendants' ongoing discharge of allegedly contaminated wastewater. In contrast, it would be at

least somewhat contradictory for plaintiff to assert a claim for damages for emotional distress and

mental anguish here, where she must establish that her claim is not time barred: *i.e.*, that she knew

of her claim no more than two years prior to filing this action. In that connection, plaintiff also

asserts that Mutual Savings fraudulently concealed its dual rate system. Accordingly, at least to

some extent, assertion of a claim for damages for mental anguish and emotional distress would be

20

inconsistent with her theory of the case, and does not cause an insurmountable conflict with other members of the class. Moreover, because this class will be certified as one with the right to opt out of the class, any such conflicts are minimized. Accordingly, the court finds that plaintiff has demonstrated that she will fairly and adequately represent the interests of the class, and that she has satisfied all of the prerequisites of Rule 23(a).

### 2.    Rule 23(b)(2)

Rule 23(b)(2) permits the certification of a class where, after the requirements of Rule 23(a) have been satisfied, "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. . . ." Fed. R. Civ. P. 23(b)(2). The Advisory Committee's comments to the 1966 amendment of that rule explained that:

> This subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole is appropriate. Declaratory relief "corresponds" to injunctive relief when as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief. The subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages. Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class.
>
> Illustrative are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration. Subdivision (b)(2) is not limited to civil-rights cases. Thus an action looking to specific or declaratory relief could be brought by a numerous class of purchasers, say retailers of a given description, against a seller alleged to have undertaken to sell to that class at prices higher than those set for other purchasers, say retailers of another description, when the applicable law forbids such a pricing differential.

Fed. R. Civ. P. 23 advisory committee note, 1966 amendment.

Plaintiff maintains that certification under Rule 23(b)(2) is appropriate. Specifically, plaintiff states that, "[b]ecause Mutual Savings' uniform and systematic practices were directed at African Americans as a group, injunctive and equitable remedies will provide the most appropriate relief for the Class."[42]  Plaintiff seeks such "make whole" relief as:

> A permanent injunction prohibiting Mutual Savings from charging or collecting premiums in excess of the premiums that would have been charged in the absence of discrimination or engaging in any ongoing forms of racial discrimination.

> A mandatory injunction requiring Mutual Savings to reform or restructure in-force policies to increase death benefits, non-forfeiture or maturity values to levels that they would have obtained in the absence of discrimination.

> Equitable relief in the form of disgorgement and restitution of past premium overcharges[,] awards and payment of additional death, non-forfeiture, maturity or dividend benefits to Class Members.[43]

Mutual Savings contends that the injunctive relief sought will be of little value to those numerous class members whose policies have lapsed, or who have received the contractual death benefit.[44]  For that reason, and because plaintiff also seeks punitive damages, Mutual Savings argues that "money is the predominant relief sought here."[45]

As one distinguished commentator observed, however, "monetary relief has been granted on a classwide basis in Rule 23(b)(2) actions, provided that these awards are either (1) equitable in

---

[42]Doc. no. 59 (Memorandum in Support of Motion for Class Certification), at 7.

[43]*Id.*

[44]Doc. no. 73 (Mutual Savings Life Insurance Company's Supplemental Opposition to Plaintiff's Revised Class Definition and Class Claims), at 26-27.  Mutual Savings also argues that the injunction sought by plaintiff would do no more than require Mutual Savings to "obey the law."  Mutual Savings cites *Florida Association of Rehabilitation Facilities, Inc. v. State of Florida Department of Health and Rehabilitative Services*, 225 F.3d 1208, 1222 (11th Cir. 2000) in support of its argument.  In that case, however, and others cited by Mutual Savings, the Eleventh Circuit held that the injunction was defective because it lacked specificity.  *See id.* ("An injunction must be framed so that those enjoined know exactly what conduct the court has prohibited and what steps they must take to conform their conduct to the law.").  There is no such concern present here.

[45]Doc. no. 73 (Mutual Savings Life Insurance Company's Supplemental Opposition to Plaintiff's Revised Class Definition and Class Claims), at 18.

nature or (2) secondary or ancillary to the general scheme of injunctive or declaratory relief."

*Newberg, supra,* § 4.14, at 4-46 to -47.  The same commentator also has observed:

> Least settled is the common situation when both injunctive relief and damages are sought for the class, and both forms of relief are important and equally sought.  Most courts use a predominance test to determine which form of relief is primary and, in light thereof, whether Rule 23(b)(2) or (b)(3) applies.  Because the predominance test in this context is dependent on the exercise of sound discretion by the court, there is little doubt that reasonable courts can and do reach opposite results under similar circumstances.  No clear standards have been or could be developed to yield more predictable results in this area so pregnant with judicial discretion.

*Newberg, supra,* § 4.14, at 4-49.

### a.    Whether the monetary relief sought by plaintiff is "equitable"

Mutual Savings contends that the monetary relief sought by plaintiff—namely disgorgement and restitution of past premium overcharges, and payment of additional death, non-forfeiture, maturity or dividend benefits to class members — is not "equitable" in nature.[46]  Mutual Savings bases its argument on the Supreme Court's decision in *Great-West Life & Annuity Insurance Co. v. Knudson,* 534 U.S. 204, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002).  There, a woman injured in an automobile accident, whose medical expenses were covered by Great-West, settled tort claims against an automobile manufacturer.  Great-West sought to enforce the reimbursement provision of the employee benefits plan, which gave Great-West a lien on any recovery from a third party.  To that end, Great-West brought an action under § 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), which authorizes certain parties to file a civil action "to enjoin any act or practice which violates . . . the terms of the plan, or . . . to obtain other appropriate equitable

---

[46]There is no question that plaintiff's request for relief in the form of reformation or rescission of the more than 7,000 industrial policies, designated as "colored cash" or "colored burial" policies, that are still in force, is a request for equitable relief.  *See, e.g., Ivinson v. Hutton,* 98 U.S. 79, 25 L. Ed. 66 (1878); *Hearne v. Marine Insurance Co.,* 87 U.S. (20 Wall.) 488, 22 L. Ed. 395 (1874); *National Labor Relations Board v. Americana Health Care Center,* 782 F.2d 941, 946 (11th Cir. 1986).

relief (i) to redress such violations or (ii) to enforce any provisions of . . . the terms of the plan." 29

U.S.C. § 1132(a)(3). The Supreme Court characterized the "essence" of Great-West's claim as one

"to impose personal liability on respondents for a contractual obligation to pay money — relief that

was not typically available in equity." 534 U.S. at ___, 122 S. Ct. at 712-13.

In determining whether Great-West's claim was for equitable relief, the Supreme Court

examined whether each form of relief sought was typically available in equity. First, the Court

rejected Great-West's claim that specific performance was equitable relief in these circumstances.

While observing that in some, rare cases specific performance of a contract was an equitable remedy

— *e.g.*, "specific performance might be available to enforce an agreement to lend money when the

availability of alternative financing would leave the plaintiff with injuries that are difficult to value"

— the Court concluded that specific performance of a contract to pay money generally was not

available in equity. 534 U.S. at ___, 122 S. Ct. at 713 (quotation marks and citation omitted).

The Supreme Court also rejected Great-West's claim that its action could proceed under §

502(a)(3) because restitution was sought, saying that:

> [N]ot all relief falling under the rubric of restitution is available in equity. In the days
> of the divided bench, restitution was available in certain cases at law, and in certain
> others in equity. Thus, "restitution is a legal remedy when ordered in a case at law
> and an equitable remedy . . . when ordered in an equity case," and whether it is legal
> or equitable depends on "the basis for [the plaintiff's] claim" and the nature of the
> underlying remedies sought.
>
> In cases in which the plaintiff "could *not* assert title or right to possession of
> particular property, but in which nevertheless he might be able to show just grounds
> for recovering money to pay for some benefit the defendant had received from him,"
> the plaintiff had a right to restitution *at law* through an action derived from the
> common law writ of assumpsit. In such cases, the plaintiff's claim was considered
> legal because he sought "to obtain a judgment imposing a merely personal liability
> upon the defendant to pay a sum of money." Such claims were viewed essentially
> as actions at law for breach of contract (whether the contract was actual or implied).

24

In contrast, a plaintiff could seek restitution *in equity*, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession.  A court of equity could then order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner.  But where "the property [sought to be recovered] or its proceeds have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor," and the plaintiff "cannot enforce a constructive trust of or an equitable lien upon other property of the [defendant]."  Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.

534 U.S. at ____, 122 S. Ct. at 714-15 (citations omitted) (emphasis in original).  Applying those principles to the facts before it, the Supreme Court observed that the funds sought by Great-West were not in the Knudsons' possession; instead, the funds had been paid to a Special Needs Trust and to the Knudsons' attorney.  The Court concluded, therefore, that Great-West's claim that it was contractually entitled to be reimbursed by *some*, rather than *particular*, funds was "legal" restitution, and did not authorize an action under § 502(a)(3).

In a footnote, the majority discussed at some length Justice Ginsburg's observation in dissent that, in the context of Title VII of the Civil Rights Act of 1964, restitution, in the form of backpay, frequently has been treated as an equitable remedy.  *Id.* at ____ n.4, 122 S. Ct. at 717 n.4.  The Court emphasized that, in the cited cases, it had held that Title VII backpay — *i.e.*, restitution — was an "integral part of an equitable remedy."  *Id.*  The Court stated that, in contrast, "[t]he restitution sought here by Great-West is not that, but a freestanding claim for money damages.  Title VII has nothing to do with this case."  *Id.*

Mutual Savings focuses on the Supreme Court's language in Great-West that "[a]lmost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the

25

defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." *Id.* at ___, 122 S. Ct. at 713.  Mutual Savings contends that "[f]ederal courts have, in fact, regularly denied 23(b)(2) certification where a lawsuit's substantive aim was the return of money, even where the relief sought was formally equitable."[47]  Mutual Savings further asserts that the "true objective of the litigation" should be scrutinized.[48]

In support of its argument, Mutual Savings cites *Clay v. American Tobacco Co.*, 188 F.R.D. 483, 494 (S.D. Ill. 1999).  In *Clay*, plaintiffs sought certification of a nationwide class under Rule 23(b)(2) of their claims that defendants had illegally marketed and sold cigarettes to class members while they were minors.  Plaintiffs ostensibly sought to force the tobacco industry to cease its practice of marketing cigarettes to minors, and to prevent the industry from retaining profit from past illegal practices.  As relief, they sought the disgorgement of profits obtained from the illegal sale of cigarettes to class members while they were minors.  Those funds were to be used to develop smoking cessation programs and to fund research relating to the effects of cigarette smoking.  The plaintiffs also sought punitive damages.  The court rejected plaintiffs' argument that the class should be certified, finding that "[t]his case is, without a doubt, about money." *Id.* at 494.  In reaching this conclusion, the court observed that plaintiffs had failed even to include a specific prayer for injunctive relief in their complaint.

This court concludes that the Supreme Court's analysis in *Great-West* does not preclude certification under Rule 23(b)(2).  Even assuming that it is applicable in the class certification

---

[47]Doc. no. 73 (Mutual Savings Life Insurance Company's Supplemental Opposition to Plaintiff's Revised Class Definition and Class Claims), at 19.

[48]*Id.*

context, the facts are distinguishable. The type of restitution sought here is different from the "restitution" sought in *Great-West*. There, Great-West's claim for restitution was based on its perception that the recipients of its insurance benefits had breached the reimbursement provision of their contract. Here, while insurance contracts form the basis of this action, the restitution sought is not based on a breach of those contracts. Rather, plaintiff alleges that Mutual Savings priced its policies based solely on race, and that, in good conscience, certain portions of the premiums paid and Mutual Savings's profits from sale of those policies belong to the plaintiff class, and should be returned. Accordingly, the court finds that plaintiff seeks, through this action to "restore to the plaintiff particular funds or property in the defendant's possession," *Great-West*, 534 U.S. at ___, 122 S. Ct. at 715, such that the relief sought *can be* characterized as "equitable."

The present action also is distinguishable from *Clay*. *Clay* involved no true request for injunctive or equitable relief. The action sounded primarily in tort, where it is clear that the objective of the litigation was to obtain money damages. In contrast, here, plaintiff seeks to vindicate her civil rights through the use of a procedural tool, the Rule 23(b)(2) class action, created expressly for such purpose. While it safely can be said that money motivates the filing of most civil actions, that fact alone does not change the character of the relief requested by plaintiff. Accordingly, the court concludes that plaintiff's request for restitution is one for equitable relief.

This conclusion is bolstered by the fact that plaintiff alleges that Mutual Savings maintained a "fiduciary relationship of trust and confidence" with putative class members. *See, e.g., 3 Couch on Insurance 3d* § 46:27 (1997) ("The agent of the insured owes to him or her the duty to act loyally, sometimes characterized as in the capacity of a fiduciary. This is true even though the agent receives commissions from the insurer while acting as an agent for the insured in procuring the policy.")

27

(footnotes omitted).  Specifically, plaintiff's third amended complaint[49] states as follows:

> 48.  Mutual Savings has repeatedly acknowledged and affirmed its relationship of trust and confidence with its policyowners, including Plaintiff and Class Members. Mutual Savings held and holds a relationship of trust and confidence with Plaintiff and Class Members because:
>
> (a)  Mutual Savings as an insurer is subject to higher and more stringent standards of conduct than those normally arising out of contract.
>
> (b)  Mutual Savings cultivated a relationship of trust and confidence in Plaintiff and Class Members, through its debit collection system of visiting each Class Member at his or her home personally each week or month, and through, *inter alia*, its marketing sales literature and sales presentations and servicing of the Policies sold to Plaintiff and Class Members.
>
> (c)  The Policies sold to Plaintiff and Class Members were contracts of adhesion prepared by Mutual Savings and not subject to negotiation, as Mutual Savings knew that Plaintiff and Class Members did not possess bargaining power equal to it.
>
> (d)  Mutual Savings held itself out as an expert in life insurance which was knowledgeable about insurance policies, including the premium rates appropriate for insurance policies, the types of policies best suited for Plaintiff and the Class, and the advantages and disadvantages of purchasing certain of Mutual Savings' policies. Mutual Savings knew that the prospective policyowners on which it preyed had no knowledge of the sophisticated pricing structures used by Defendant, let alone Defendant's discriminatory practices.  Mutual Savings held itself out and encouraged Plaintiff and Class Members to rely on its expertise.  Moreover, Mutual Savings concealed its acts and knew or should have known that Plaintiff and Class Members reasonably had no way to determine and appreciate the inappropriate relationship of cost to benefit imbedded in the Policies or the unfair and discriminatory pricing used.[50]

While plaintiff does not seek class certification of her claim for breach of fiduciary duty, those allegations lend support to her contention that the monetary relief she seeks personally and on behalf of the class properly is characterized as "equitable."  *See, e.g., Bowerman v. Wal-Mart Stores, Inc.,* 226 F.3d 574, 592 (7th Cir. 2000) (In ERISA context, "when sought as a remedy for breach of

---

[49]Doc. no. 53.

[50]*Id.* at 14.

fiduciary duty, restitution is properly regarded as an equitable remedy because the fiduciary concept is equitable").

Even so, in view of plaintiff's request for punitive damages, the court must assess whether plaintiff's claims for money damages predominate over her claim for injunctive relief.

### b. Whether claims for money damages predominate

The Fifth Circuit addressed class certification of claims for both monetary and injunctive relief in *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998). The Court of Appeals developed a "predomination" standard for assessing such claims, stating that "monetary relief predominates in (b)(2) class actions unless it is *incidental* to requested injunctive or declaratory relief." *Id.* at 415 (emphasis supplied). Further, the Court of Appeals held that the monetary damages sought "should at least be capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances." *Id.* Discussing whether plaintiffs' claims for punitive damages were incidental to the injunctive relief sought by the class, the Fifth Circuit stated:

> Assuming punitive damages may be awarded on a class-wide basis, without individualized proof of injury, where the entire class or subclass is subjected to the same discriminatory act or series of acts, no such discrimination is alleged in this case. The plaintiffs challenge broad policies and practices, but they do not contend that each plaintiff was affected by these policies and practices in the same way. Indeed, the plaintiffs seek to certify a class of a thousand potential plaintiffs spread across two separate facilities, represented by six different unions, working in seven different departments, challenging various policies and practices over a period of nearly twenty years. Some plaintiffs may have been subjected to more virile discrimination than others: with greater public humiliation, for longer periods of time, or based on more unjustifiable practices, for example. Particular discriminatory practices may have gradually ameliorated over the twenty-year period. Some discriminatory policies may have been implemented more — or less — harshly depending on the department or facility involved.

*Id.* at 417.

The Second Circuit, examining a district court's order denying class certification for claims of "pattern-or-practice" disparate treatment brought under Title VII, rejected the "bright line" rule enunciated by the Fifth Circuit in *Allison. Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 164 (2d Cir. 2001). Instead, the Second Circuit adopted an ad hoc balancing approach:

> [B]efore allowing (b)(2) certification a district court should, at a minimum, satisfy itself of the following: (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits. Insignificant or sham requests should not provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery.

*Id.* (citation omitted).

In *Murray v. Auslander*, 244 F.3d 807 (11th Cir. 2001), the Eleventh Circuit reviewed the district court's certification of a class of developmentally disabled Medicaid participants under Rule 23(b)(2). The class members sought declaratory and injunctive relief, as well as compensatory damages under the Americans with Disabilities Act. The Eleventh Circuit observed:

> Monetary relief may be obtained in a Rule 23(b)(2) class action so long as the predominant relief sought is injunctive or declaratory. *See Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 411 (5th Cir. 1998); *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983). "[M]onetary relief predominates in (b)(2) class actions unless it is *incidental* to requested injunctive or declaratory relief." *Allison*, 151 F.3d at 415 (emphasis added); *see also Lemon v. Int'l Union of Operating Eng'rs.*, 216 F.3d 577, 581 (7th Cir. 2000); *Williams v. Owens-Illinois, Inc.*, 665 F.2d 918, 928-29 (9th Cir. 1982). Because the Eleventh Circuit has not yet established specific criteria for determining when monetary damages are incidental to equitable relief, we look to a Fifth Circuit case for guidance. In *Allison v. Citgo Petroleum Corp.*, the court explained:
>
> > By incidental, we mean damages that flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief. . . . Ideally, incidental damages should be only those to which class

30

> members automatically would be entitled once liability to the class (or subclass) as a whole is established. . . . Liability for incidental damages should not . . . entail complex individualized determinations. Thus, incidental damages will, by definition, be more in the nature of a group remedy, consistent with the forms of relief intended for (b)(2) class actions.

*Murray*, 244 F.3d at 812 (quoting *Allison*, 151 F.3d at 415). The Court of Appeals held that class members would not "automatically" be entitled to the damages they sought upon a finding of liability against the defendant — *i.e.*, compensatory damages for pain and suffering, mental anguish, and humiliation — and that, therefore, those damage claims predominated over its claims for equitable relief. The *Murray* Court concluded that the district court abused its discretion by not exempting the damages claim from class treatment under Rule 23(b)(2). *Id.* The Court of Appeals observed, however, that the district court had not made findings as to whether class claims for monetary damages could be asserted under Rule 23(b)(3), and directed the district court to make such findings, if, on remand, the court determined that the standing requirements had been satisfied. *Id.*

Rather than attempting to determine which is the predominant remedy sought — injunctive relief or monetary damages — the proper focus, and one consistent with the guiding principles set out above, is the requirement of Rule 23(b)(2) that the class be "homogeneous." As one district court addressing this issue in the context of a civil rights action has stated:

> In making the discretionary determination whether this "predominance" standard is satisfied in any given case, it is not particularly helpful to position the injunctive relief sought on one scale, the monetary relief on another, and then somehow attempt to ascertain which is the heavier scale. Indeed, this is an almost impossible exercise as the importance of eradicating discriminatory practices (and possibly initiating affirmative remedies) through injunctive relief is virtually immeasurable. Rather it is more helpful to return to the principles underlying the creation of the (b)(2) category.

*Barefield v. Chevron, U.S.A.*, No. C 86-2427 THE, 1988 WL 188433 (N.D. Cal. Dec. 6, 1988).

Courts that have rejected class certification under Rule 23(b)(2) have done so based on the plaintiffs' request for compensatory damages. *See Murray*, 244 F.3d at 812; *Allison*, 151 F.3d at 417. Those damages, which require, after liability has been established, particularized assessments of the harm caused, undermine the class "homogeneity" that Rule 23(b)(2) requires. However, the Eleventh Circuit's opinion in *Murray*, and the Fifth Circuit's opinion in *Allison*, upon which the Eleventh Circuit relied for guidance, did not entirely foreclose the possibility that a class claim for *punitive damages* could be maintained in a 23(b)(2) class action. *See Murray*, 244 F.3d at 812; *Allison*, 151 F.3d at 417 ("Assuming punitive damages may be awarded on a class-wide basis, without individualized proof of injury, where the entire class or subclass is subjected to the same discriminatory act or series of acts, no such discrimination is alleged in this case.").

As another district court has reasoned:

> A class claim for punitive damages does not detract from the homogeneity or cohesiveness of the class. Rather, it is consistent with the notion that the focus of a (b)(2) action is the defendant's conduct toward persons sharing a common characteristic. Because the purpose of punitive damages is not to compensate the victim, but to punish and deter the defendant, any claim for such damages hinges, not on facts unique to each class member, but on the defendant's conduct toward the class as a whole. The cohesive core of the (b)(2) action is thus maintained.

*Barefield v. Chevron, U.S.A.*, No. C 86-2427 THE, 1988 WL 188433, at *3 (N.D. Cal. Dec. 6, 1988). Such reasoning applies here. Plaintiff alleges that, during a certain period of time, Mutual Savings charged African Americans higher premiums, for which they received lower benefits, than its white policy holders, and that the sole reason for the dual rate system was race, and plaintiff seeks to punish Mutual Savings for that conduct. The court concludes that, in these circumstances, plaintiff's claim for punitive damages is in the nature of a "group remedy," "incidental" to her claim for injunctive and equitable relief. Accordingly, the class will be certified under Rule 23(b)(2).

32

### 3.    Rule 23(b)(3)

Rule 23(b)(3) requires the court to find that "the common questions of law *or* fact common to the members of the class *predominate* over any questions affecting only individual members, *and* that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis supplied).

Subdivision (b)(3) thus parallels subdivision (a)(2), in that both require the existence of common questions of law or fact.  Even so, subdivision (b)(3) contains the more stringent requirement:  common issues must "predominate" over individual issues.  Moreover, it adds the criterion of "superiority" to Rule 23's list of qualifications for certification.

> In adding "predominance" and "superiority" to the qualification-for-certification list, the Advisory Committee sought to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." . . . Sensitive to the competing tugs of individual autonomy for those who might prefer to go it alone or in a smaller unit, on the one hand, and systemic efficiency on the other, the Reporter for the 1966 amendments cautioned:  "The new provision invites a close look at the case before it is accepted as a class action. . . ."

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615, 117 S. Ct. 2231, 2246, 138 L. Ed. 2d 689 (1997) (citations omitted).

Rule 23(a)(2) "does *not* require that *all* . . . questions of law and fact raised by the dispute be common. *Cox v. American Cast Iron Pipe Co.*, 784 F.2d at 1557 (emphasis supplied).  Rather, the test for commonality "is qualitative rather than quantitative — that is, there need be only a single issue common to all members of the class." *Newberg, supra,* § 3.10, at 3-50.  Further, the rule "requires only that resolution of the common questions affect all or a substantial number of the class members." *Shipes v. Trinity Industries,* 987 F.2d 311, 316 (5th Cir.1993).

33

### a.   Predominance

There is no precise test for determining whether common questions of law or fact predominate over any issues affecting only individual members of the class. Rather, Rule 23(b)(3) requires a pragmatic assessment of the entire action: "That inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Amchem Products*, 521 U.S. at 623, 117 S. Ct. at 2249.[51]

"[W]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action will be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately." 7A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1778, at 529 (2d ed. 1986) (footnote omitted).

Ultimately, Rule 23(b)(3)'s predominance inquiry is designed to test "whether proposed classes are sufficiently *cohesive* to warrant adjudication by representation." *Amchem Products*, 521 U.S. at 623 & n.19, 117 S. Ct. at 2249 & n.19 (emphasis supplied). For example, Rule 23(b)(3)(A) instructs district courts to consider "the interest of members of the class in individually controlling the prosecution . . . of separate actions."

The Eleventh Circuit twice has rejected attempts to certify a Rule 23(b)(3) class for claims brought under 42 U.S.C. § 1981 outside the employment context. The case of *Jackson v. Motel 6*

---

[51] In a footnote to this statement, the Court added:

> In this respect, the predominance requirement of Rule 23(b)(3) is similar to the [typicality] requirement of Rule 23(a)(3) that "claims or defenses" of the named representatives must be "typical of the claims or defenses of the class." The words "claims or defenses" in this context — just as in the context of Rule 24(b)(2) governing permissive intervention — "manifestly refer to the kinds of claims or defenses that can be raised in courts of law as part of an actual or impending law suit." *Diamond v. Charles*, 476 U.S. 54, 76-77, 106 S. Ct. 1697, 1711, 90 L. Ed. 2d 48 (1986) (O'Connor, J., concurring in part and concurring in judgment).

*Amchem Products*, 521 U.S. at 623 n.18, 117 S. Ct. at 2249 n.18.

*Multipurpose, Inc.*, 130 F.3d 999 (11th Cir. 1997), addressed consolidated actions filed by putative or actual patrons of Motel 6 (the *Jackson* plaintiffs) and former Motel 6 employees (the *Petaccia* plaintiffs). The *Jackson* plaintiffs claimed that they either were denied accommodations at a Motel 6, or were provided substandard accommodations, based on the motel corporation's alleged nationwide practice or policy of refusing to rent vacant rooms to African Americans, segregating African American guests from white guests within a facility, and providing substandard housekeeping and other services to African American guests as compared to white guests. *Id.* at 1001. The *Petaccia* plaintiffs claimed that, when employed by Motel 6, they had been required to discriminate against African American guests, and suffered retaliation if they did not do so. The former employees' claim was based on a "hostile work environment" theory. *Id.* at 1002. The plaintiffs in both actions argued that the common issue — *i.e.*, "whether Motel 6 ha[d] a practice and policy of discriminating against patrons and employees on the basis of race — predominated over the legal and factual issues related to each plaintiff's and class member's individual claim. *Id.* at 1005.

With respect to the *Jackson* plaintiffs, the Eleventh Circuit rejected their contention that a class action could be certified under Rule 23(b)(3), remarking that:

> The *Jackson* plaintiffs' claims will require distinctly case-specific inquiries into the facts surrounding each alleged incident of discrimination. The issues that must be addressed include not only whether a particular plaintiff was denied a room, but also whether there were any rooms vacant when that plaintiff inquired; whether the plaintiff had reservations; whether unclean rooms were rented to the plaintiff for reasons having nothing to do with the plaintiff's race; whether the plaintiff, at the time that he requested a room, exhibited any non-racial characteristics legitimately counseling against renting him a room; and so on. Even more variegated issues would certainly be present in the claims of hundreds or even thousands of members of an improperly certified class. Furthermore, even factual issues that are common to many of the *Jackson* plaintiffs — such as whether any rooms were in fact available

35

> when a particular plaintiff inquired — will require highly case-specific
> determinations at trial. These issues are clearly predominant over the only issue
> arguably common to the class — whether Motel 6 has a practice or policy of racial
> discrimination. Indeed, we expect that most, if not all, of the plaintiffs' claims will
> stand or fall, no on the answer to the question whether Motel 6 has a practice or
> policy of racial discrimination, but on the resolution of these highly case-specific
> factual issues.

*Id.* at 1006. Likewise, the Court of Appeals held that the claims of the *Petaccia* plaintiffs were

"factually very diverse" — *e.g.*, one plaintiff witnessed, but was not required to participate in

discrimination; another was fired in retaliation for opposing discrimination — such that the common

question of whether Motel 6 had a practice or policy of racial discrimination in providing public

accommodations did not predominate.

In *Rutstein v. Avis Rent-a-Car Systems, Inc.,* 211 F.3d 1228 (11th Cir. 2000), the plaintiffs

alleged that Avis had a policy or practice of discriminating against Jewish customers by declining

to open corporate accounts for Jewish-owned businesses. *Id.* at 1231. The Court of Appeals

reversed the certification of a class for the same reasons it rejected certification in *Jackson*:

> Whether Avis maintains a policy or practice of discrimination may be
> relevant in a given case, but it certainly cannot establish that the company
> intentionally discriminated against every member of the putative class. The
> individual issues that must be addressed include not only whether Avis actually
> denied a particular plaintiff a corporate account, gave the plaintiff a less
> advantageous account, or cancelled the plaintiff's account, but also whether the
> particular plaintiff was of the age required by Avis to qualify for a corporate account;
> whether the plaintiff met the financial criteria for a corporate account; whether the
> nature of the plaintiff's expected use of Avis vehicles would make the transaction
> cost-justified for Avis; whether the plaintiff would be renting cars from Avis in a
> criminally high-risk or low-risk geographical area; whether the Avis employee who
> allegedly denied the plaintiff a corporate account judged the caller-applicant to be
> lying about his or her qualifications based on information not related to the caller's
> ethnicity; and so on, and so on. All of these issues are clearly case-specific, and they
> will all have to be addressed in one way or another in order for each plaintiff to
> demonstrate a *prima facie* case of intentional discrimination.

36

*Id.* at 1235. Also, because the plaintiffs sought compensatory and punitive damages, their claims required a further individualized inquiry, even if liability were established. *Id.* at 1239-40 ("[T]he establishment of a policy or practice of discrimination cannot trigger the defendant's liability for damages to all the plaintiffs in the putative class. To establish that they are entitled to compensation, plaintiffs will have to prove that they actually suffered some injury, whether it be emotional or otherwise."). The Court of Appeals held that those concerns led to a "complete lack of judicial economy in certifying [the] case as a class action." *Id.* at 1240. In sum, the Eleventh Circuit held:

> In the future, to determine whether class action status is appropriate, parties should look to the substantive law relating to the cause of action that is common to each class member, including whether the substantive law supports a "pattern or practice" theory of individual recovery, as well as to the type of relief sought and whether that relief is capable of class-wide resolution or is necessarily individualized.

*Id.* at 1241.

Here, Mutual Savings contends that the class cannot be certified because of the presence of individual issues — namely, those relating to the statute of limitations and to the number of different plans and policies issued by as many as twenty-two different insurance companies. While there is no question that individual issues are present here, there also is no question that the *central, overriding* issue is whether Mutual Savings maintained a dual rate system, charging African Americans higher premiums for inferior insurance products solely because of their race. Because that central, overriding issue is common to all members of the class, the concerns expressed by the Eleventh Circuit in *Jackson* and *Rutstein* with respect to the "factual diversity" of plaintiff's and class members' claims are minimal here.

Although plaintiff and each putative class member may have purchased a different policy, at a different age, with different benefits, resolution of the issue of damages, in the event liability is

established, is amenable to objective determination on a class-wide basis. Plaintiff has proposed alternative means of determining the measure of damages, using standard actuarial methods that Mutual Savings no doubt employed in the first instance to set the allegedly discriminatory rates.[52]

Accordingly, the court concludes that plaintiff has satisfied the "predominance" requirement of Rule 23(b)(3).

### b.    Superiority

This court also must determine under Rule 23(b)(3) whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." To aid in that determination, the rule lists four considerations:  (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action.

The first and second factors require basically the same inquiry:  whether there is any other pending litigation based on the same claims. Likewise, the third factor "is relevant only when other class litigation has already been commenced elsewhere." *Newberg, supra*, § 4.31, at 4-124. The parties have not directed the court to any other actions filed against Mutual Savings involving claims similar to those brought in this action. There is, however, a reference to other pending litigation contained in the Annual Statement for the Year 2001 of the Mutual Savings Life Insurance Company, Notes to Financial Statements. Under the heading "Contingencies," the following statement appears: "The Company is also a defendant in a suit filed on December 28, 2000, in

---

[52]Plaintiff's Evidentiary Submission, Ex. C, at 10-12.

Mississippi state court, on behalf of five individuals, containing similar allegations [as the present action] of discrimination."[53]

On this point, plaintiff contends that potential class members lack the incentive or ability to pursue individual actions against Mutual Savings, because, due to the low value of their claims, they would encounter difficulty in obtaining legal representation.[54] The court agrees that this factor weighs in favor of the conclusion that a class action is the superior method of ensuring that the controversy is fairly and efficiently adjudicated. The remedies sought by plaintiff — e.g., restitution of the premium differential, reformation of the insurance policies, and injunctive relief — have minimal or no monetary value. While plaintiff's claim for punitive damages has the potential to result in a large monetary recovery, that relief is highly speculative, and would not necessarily enhance the incentive or ability of individual class members to pursue individual actions.

The remaining factor is manageability. "It is only when [management] difficulties make a class action less fair and efficient than some other method, such as individual interventions or consolidation of individual lawsuits, that a class action is improper." Newberg, supra, § 4.32, at 4-125.

There is no question that this action, if certified, would present management difficulties. There are thousands of potential class members, who may reside throughout the United States. There no doubt will be some individual issues, class notice difficulties, and complications arising from these complex, novel (at least with respect to reported caselaw) claims. The court concludes, nevertheless, that those management issues, although substantial, do not counsel against certifying the class under Rule 23(b)(3). The court is satisfied that plaintiff has established the prerequisites

---

[53]Supplement to Plaintiff's Evidentiary Submission, Ex. L, ¶ 14.D, at 20.3.

[54]Doc. no. 59 (Memorandum in Support of Motion for Class Certification), at 24.

for certification under this subdivision.

### 4.    Rule 23(b)(1)(B)

Plaintiff alternatively urges the court to certify her claim for punitive damages under Rule 23(b)(1)(B), which permits an action to be maintained as a class action where the prerequisites of Rule 23(a) are satisfied, and where

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
>
> . . .
>
>> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

Fed. R. Civ. P. 23(b)(1)(B).  In support of her contention that the claim for punitive damages qualifies for certification under Rule 23(b)(1)(B), plaintiff states: "If any one individual obtains a substantial punitive damage verdict against Mutual Savings for the conduct alleged in this case, Mutual Savings will argue in subsequent cases that it has been punished enough."[55]  Plaintiff further contends that "the outcome in any one case will likely impair or impeded ability [sic] of other similarly situated persons to recover punitive damages, and at some point, such an outcome or outcomes will be dispositive of the ability to recover such damages."[56]  Plaintiff explains that,

> [i]n the case of mass purposeful and intentional harm, such as that presented by this litigation, some procedural mechanism must be applied to protect, reconcile, and harmonize the interests of victims (and society itself), in punishment and deterrence with the countervailing due process rights of Mutual Savings to avoid distinction in the name of atonement. Of all available procedural mechanisms, Rule 23(b)(1)(B) is the most comprehensive and fair. A mandatory punitive damages class is appropriate under Rule 23(b)(1)(B) when multiple victims of the same conduct

---

[55]*Id.* at 27.

[56]*Id.*

threaten to foreclose, or at least diminish, later punitive damages claims because the first claims may exhaust the substantive legal limits that the Supreme Court has set on permissible punishment. This is sometimes termed the "limited punishment theory."[57]

The Advisory Committee comments to Rule 23(b)(1)(B) provide the following guidance:

> In various situations an adjudication as to one or more members of the class will necessarily or probably have an adverse practical effect on the interests of other members who should therefore be represented in the lawsuit. This is plainly the case when claims are made by numerous persons against a fund insufficient to satisfy all claims. A class action by or against representative members to settle the validity of the claims as a whole, or in groups, followed by separate proof of the amount of each valid claim and proportionate distribution of the fund, meets the problem.

Fed. R. Civ. P. 23 advisory committee note, 1966 amendment. Commentary to the rule cites examples of the type of action suitable for certification as including an action by shareholders to compel the declaration of a dividend, or "an action which charges a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class of security holders or other beneficiaries, and which requires an accounting or like measures to restore the subject of the trust." *Id.*

In *Ortiz v. Fibreboard Corporation*, 527 U.S. 815, 119 S. Ct. 2295, 144 L. Ed. 2d 715 (1999), the Supreme Court considered class certification for purposes of settlement under Rule 23(b)(1)(B) in the context of mass tort asbestos litigation based upon a "limited fund" theory. In *Ortiz*, the Supreme Court observed that, in the examples identified by the Advisory Committee as appropriate for certification under this subdivision of Rule 23, "the shared character of rights claimed or relief awarded entails that any individual adjudication by a class member disposes of, or substantially affects, the interests of absent class members." *Id.* at 834, 119 S. Ct. at 2309. The Court identified common characteristics of "the cases forming [the] pedigree of the limited fund

---

[57]*Id.* at 29.

class action," and which are presumptively necessary to satisfy the limited fund rationale for a mandatory class action. *Id.* at 838, 842, 119 S. Ct. at 2311-12. First, "the totals of the aggregated liquid claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims." *Id.* at 838, 119 S. Ct. at 2311. Second, "the whole of the inadequate fund was to be devoted to the overwhelming claims." *Id.* at 839, 119 S. Ct. at 2311. Third, "the claimants identified by a common theory of recovery were treated equitably among themselves." *Id.*

*Ortiz* involved a departure from the traditional norm of limited fund cases, as it sought to aggregate unliquidated tort claims. *Id.* at 842-43, 119 S. Ct. at 2312-13. While observing the apparent flexibility inherent in the text of Rule 23, the Court determined that the "prudent course" was to adhere to the historical model. *Id.* at 842, 119 S. Ct. at 2312.

The Court next turned to an examination of whether the necessary characteristics were present in the action before it, and ultimately concluded that they were not. First, the Court criticized the "uncritical adoption by both the District Court and the Court of Appeals of figures agreed upon by the parties in defining the limits of the fund and demonstrating its inadequacy." *Id.* at 848, 119 S. Ct. at 2316 (footnotes omitted). The Court emphasized the necessity for an evidentiary showing of the limit and insufficiency of the fund, and for the district court to make detailed factual findings of those aspects. *Id.* at 849, 119 S. Ct. at 2316. The Court also found the certification defective, as it did not provide protection against class conflicts — *i.e.*, there was no assurance that the class members would be treated equitably, where some of the claims would not accrue, if at all, until some future time. *Id.* at 855-56, 119 S. Ct. at 2319. Finally, the Court observed that, under the class settlement, the fact that Fibreboard retained virtually all of its net worth "depart[ed] markedly from

the limited fund antecedents." *Id.* at 859, 119 S. Ct. at 2321. Although the Court declined to resolve whether this issue, in itself, would be fatal to the settlement agreement, it emphasized that "the arrangement seems irreconcilable with the justification of necessity in denying any opportunity for withdrawal of class members whose jury trial rights will be compromised, whose damages will be capped, and whose payments will be delayed." *Id.* at 860, 119 S. Ct. at 2321.

Here, plaintiff offers meager evidentiary support for her contention that a class should be certified on a "limited fund" or "limited punishment" theory. Indeed, all that the record contains is the declaration of Gene Marsh, law professor at the University of Alabama, in which he averred that cases involving relatively small overcharges in financial services and insurance products have resulted in multi-million dollar punitive damage awards,[58] and an analysis performed by R. Thomas Beason, a certified public accountant, concluding that, as of December 31, 2001, Mutual Savings had $22,793,811 in capital in excess of the regulatorily mandated level.[59] This evidence simply does not satisfy the requirement that the limit of the fund be defined and that its insufficiency be demonstrated. Certainly there is no basis for the court to make the detailed factual findings called for by the Supreme Court in *Ortiz*. Plaintiff's argument that a high punitive damage award in an individual action may exhaust the due process limits of the "fund" in the wake of *BMW of North America v. Gore*, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996), is appealing, but must fail. There simply is no way for the court to determine, at least at this stage of proceedings, the value of class members' claims, or what the due process limits of a punitive damage award might be. Accordingly, the court concludes that plaintiff has failed to satisfy the requirements for certification

---

[58]Plaintiff's evidentiary submission, Ex. H, at 4.

[59]*Id.*, Ex. I, at unnumbered page 2. The Annual Statement for the Year 2001 of the Mutual Savings Life Insurance Company submitted by plaintiff does not assist the court in determining the limit of the "fund" available to pay any punitive damage award. *See* Supplement to Plaintiff's Evidentiary Submission, Ex. L.

of a punitive damages class under Rule 23(b)(1)(B). This finding does not negate this court's conclusion that plaintiff's claim for punitive damages may be certified under Rule 23(b)(2) and (b)(3).

### III. CONCLUSION

In sum, the court has determined that plaintiff's motion for class certification of her federal claims — *i.e.*, those founded upon 42 U.S.C. §§ 1981 and 1982 — is due to be granted in part and denied in part. Plaintiff's request that a punitive damages class be certified under Rule 23(b)(1)(B) is due to be denied. The remaining aspects of her motion are due to be granted, and her claims will be conditionally certified, pursuant to Rule 23(c), under subdivisions (b)(2) and (b)(3) of Rule 23. *See Groover v. Michelin North America, Inc.*, 187 F.R.D. 662, 670 (M.D. Ala. 1999):

> If warranted by subsequent developments, the court may revisit its decision on class certification. Federal Rule of Civil Procedure 23(c)(1) states, "An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits." As noted by the Supreme Court, the flexibility afforded by conditional certification "enhances the usefulness of the class action device" so as to ensure the trial court that "actual, not presumed, conformity with Rule 23(a) exists." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 2372, 72 L. Ed. 2d 740 (1982).

An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this _1st_ day of November, 2002.

United States District Judge