FILED

2004 Nov-23  PM 03:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | |
|---|---|
| **GLENDA CARNEGIE and** ) | |
| **IDA LEE JOHNSON, on behalf of** ) | |
| **themselves and all others similarly** ) | |
| **situated,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **Civil Action No. CV-99-S-3292-NE** |
| ) | |
| **MUTUAL SAVINGS LIFE** ) | |
| **INSURANCE COMPANY,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

This action was commenced nearly five years ago, on December 13, 1999, by

two plaintiffs, Glenda Carnegie and Ida Lee Johnson, who are American citizens with

African ancestors. They instituted suit on behalf of themselves, as well as a putative

class of allegedly similarly situated persons. The original complaint was amended

two times, and the present complaint, filed April 5, 2002, names only Ida Lee Johnson

as plaintiff.[1]  She alleges that defendant, Mutual Savings Life Insurance Company

("Mutual Savings"), violated the civil rights of persons such as herself by pricing

insurance on the basis of race, in violation of 42 U.S.C. §§ 1981 and 1982.[2]  The

---

[1]Glenda Carnegie did not proceed as a plaintiff because it was learned through discovery that the policy she held had been issued at a lower, more favorable rate.

[2]The Fifth Circuit characterized a similar putative class action based upon this practice as

action presently is before the court on the parties' joint request for certification of a

stipulated class for settlement purposes only, and, for approval of a proposed

settlement of all claims that could be asserted by members of the stipulated class.

## I. FACTUAL BACKGROUND

This court recounted in detail the factual basis for plaintiff's claims in the

memorandum opinion accompanying the order granting plaintiff's motion for class

certification.[3]  To provide context for the present evaluation of the proposed

settlement, some of those facts are reiterated here:

> Plaintiff contends that "[f]or at least thirty-five years, Defendant
> Mutual Savings Life Insurance Company[4] . . . discriminated against
> African Americans, charging them higher premiums for inferior life
> insurance products."[5]  Mutual Savings sold so-called "industrial life
> insurance"[6] policies to both African American and Caucasian American

possibly "the ultimate negative value class action lawsuit." *In re Monumental Life*, 365 F.3d 408, 411 (5th Cir. 2004).

[3]See doc. no. 76 (Memorandum Opinion entered on November 1, 2002) and doc. no. 77 (Order of Conditional Class Certification entered on same date).

[4]Mutual Savings was acquired by Primesco during December of 1998. Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison), at 32.

[5]Doc. no. 59 (Memorandum in Support of Motion for Class Certification), at 2.  Plaintiff maintains that the policies sold to African Americans were "more expensive" — *i.e.,* those policies required higher premiums and a longer premium payment period than policies issued to Caucasians that provided similar benefits. *See* Plaintiff's Evidentiary Submission, Ex. C (Expert declaration of Terry M. Long), at 2-3.

[6]According to one standard authority, so-called "industrial life insurance"

> is also known as burial insurance.  This type of insurance is seen much less
> commonly today than in decades past, [and] is intended for people with little money
> and property.  Industrial or burial insurance involves the payment by one person (the
> insured) of a fairly small sum to a party, sometimes one engaged in the undertaking

consumers, but maintained separate "colored cash," "white cash," "colored burial," and "white burial" premium structures.[7]  Plaintiff alleges that, during the relevant time period, African Americans could purchase only policies designated as "colored," for which the premiums were higher than those for the "white" plans.[8]  According to plaintiff, the rate differential between the two types of plans — *i.e.*, "white" versus "colored" — was based solely on race.  Mutual Savings continued to employ differential premium structures until the late 1960s, and sold "industrial" policies until 1980 or 1981.[9]  All of the "colored cash" policies were industrial policies.[10]  Based upon a report generated by Mutual Savings, at least 7,018 "colored cash" policies sold between 1945 and 1967 remain in force.[11]  Plaintiff offers the following example

---

business, in exchange for that party's furnishing of the necessary burial services upon the death of the insured.  The premium is commonly payable in small installments, and at short intervals, and the issuance of this variant of life insurance is not accompanied by the type of formal assessment and health investigations involved in other forms of life insurance.

1 *Couch on Insurance* § 1:42 (3d ed. 1997), at 1-63 (footnotes omitted).  The Alabama Code defines "industrial life insurance" as "that form of life insurance written under policies of face amount to $2,500.00 or less bearing the words 'industrial policy' imprinted on the face thereof as part of the descriptive matter and under which premiums are payable monthly or more often." Ala. Code § 27-16-1 (1975).

[7]Don Morrison, Senior Vice President of Operations and Secretary of Mutual Savings, testified in deposition that "white cash" referred to those policies sold to white clients, and "colored cash" referred to those issued to African American clients.  Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison), at 149.

[8]Morrison stated that "blacks were charged more" than white policy-holders. *Id.* at 151.

[9]Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison), at 58. Until 1971, Mutual Savings's application forms requested that the applicant specify his or her race. *Id.* at 171.

[10]*Id.* at 149.

[11]*Id.* at 168.  In addition to policies issued by Mutual Savings, those policies acquired by Mutual Savings from the following companies are at issue:  Homeland (acquired in 1940); United Service (acquired in 1954); Southern Benefit (acquired in 1958); Memorial Service (acquired in 1960); Stonewall (acquired in 1961); Alliance (acquired in 1961); Life of Alabama (acquired in 1962); Gulf States (acquired in 1962); Kentucky Central (acquired in 1962); Lincoln Income (acquired in 1964); Peoples Protective (acquired in 1965); Life of Florida (acquired in 1966); Palmetto State (acquired in 1967); Standard Life (acquired in 1968); Greater United (acquired in 1969); Security Life (acquired in 1971); Public National (acquired in 1972); Greater Mississippi

of the rate differential:

> Mutual Savings offered both a "White Life" and a "Series C"
> version of their [sic] 20 Payment Life and 10 Payment Life
> products. African-Americans were relegated to the "Series C"
> products solely because of their race. The premiums for a $1,000
> "Series C" 20 Payment Life policy were, depending on the issue
> age, 15% to 32% greater than the premiums for a $1,000 "White
> Life" 20 Payment Life Policy. The premiums for a $1,000 "Series
> C" 10 Payment Life policy were, depending on issue age, 11% to
> 22% greater than the premiums for a $1,000 "White Life" 10
> Payment Life policy. The "White Life" policies also had better
> disability benefits. Accordingly, a 45-year-old African-American
> who purchased a $1,000 20 Payment Life policy from Mutual
> Savings would pay $1,560 more than a Caucasian for the same
> amount of life insurance and accidental death benefit insurance
> (and lower disability benefits) solely because of his race.[12]

Mutual Savings was aware that African Americans were charged higher
rates, but did not inform its African American policy-holders of the rate
disparity.[13] Moreover, Mutual Savings has not adjusted premiums for
those policies still in force, nor has it adjusted the benefits paid on the
allegedly discriminatory policies.

   The 1959 rate book published by Mutual Savings for use by its
agents to service policy-holders contains separate premium tables for
"white life" and "Series C" policies.[14] Moreover, the 1959 rate book
describes benefits pursuant to its "General Accident Policies," for which
the premium was the same for both "white life" and "Series C" policy-
holders (*i.e.*, ten cents per week) as follows:

---

(acquired in 1975); Southern United (acquired in 1987);  Delta Life (acquired in 1987); and Georgia
Life (acquired in 1987). Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison)
at Ex. 7.

   [12]Doc. no. 59 (Memorandum in Support of Motion for Class Certification), at 4-5.

   [13]Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison), at 153-54.

   [14]*See generally* Defendant's Ex. 1 (admitted into evidence during hearing conducted on July
9, 2002).

## WHITE LIFE BENEFITS

## PLAN GA

The principal sum or benefit is $1,000 during the first policy year and increases $100.00 each year for ten policy years, thereafter the principal sum remains $2,000 until age sixty-five. (Benefits cease on the anniversary of the policy after the Insured's sixty-fifth birthday.)

. . . .

## SERIES C BENEFITS

## PLAN AC

The General Accident policy is issued on Colored lives at 10¢ per week. The policy does not increase in benefits year by year but the principal sum remains at $1,000.00.[15]

According to Mutual Savings, the "white life" and "Series C" labels were discontinued during the 1960s. Plaintiff contends, however, that race-distinct rates were not eliminated. As demonstrated by its 1969 rate book, Mutual Savings issued policies under three sets of premiums, designated as Standard ("S"), Regular ("R"), and Acceptable ("A"). Mutual Savings's Vice President of Operations confirmed that "S is for the standard rate. And the R would be a substandard rate."[16] Those designations — *i.e.*, "S" and "R" — were used during the period in which Mutual Savings sold "colored cash" policies.[17]

---

[15]*Id.* at "RATES 2370."

[16]Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison), at 182.

[17]*Id.* at 184. The 1969 rate book applicable to ordinary life insurance, intermediate life insurance, hospital and accident insurance, and industrial life insurance provides the following guidance for Mutual Savings agents:

The agent should use the following as a basis for determining the premium

5

Plaintiff Ida Johnson currently is a resident of Bartow, Florida. She attended only elementary school and is able to read "[a] little bit."[18] She purchased an "Industrial Weekly Whole Life Policy" from Mutual Savings in 1962, when she was thirty-seven years old. Ms. Johnson then resided in Marietta, Georgia, in a government-subsidized housing project.[19] Her policy was designated a "colored cash" policy, and its face value is $1,000, with a weekly premium of $0.96 ($49.92 annually), payable during her lifetime. Initially, the premiums were collected on a weekly basis by Mutual Savings agents, who came to plaintiff's home.[20] Ms. Johnson presently pays her insurance premiums by mail.[21] The amount of the premium has not changed, however, and as of the date of filing the third amended complaint, April 5, 2002, Ms. Johnson had paid a total of $1,884.48 in premiums for a life insurance policy that will pay death benefits of only $1,000.

Mutual Savings also sold "burial" policies in Alabama, but has

---

classification:

1.    **Occupation.** "S" occupations include professional workers for which a college degree is usually required for their work, office workers, salesmen, mailmen, individual proprietors except those owning places which serve alcoholic beverages, and skilled workers.

Person [sic] engaged in occupations such as the following and their families should be quoted "R" rates:

Busboys, Dishwashers, Car washers, Domestic Maids, Farm Laborers, Garbage Collectors, Handymen, Yardmen, Janitors, Sweepers, Locker Room and Wash Room Attendants, Pulp Wood Workers, Sewage Workers, Street Sweepers, Tavern Employees, Unskilled Laborers.

Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison), at deposition exhibit 10, at K-4. Plaintiff contends that these occupational classifications were used as a proxy for race.

[18]Doc. no. 65, Ex. 8 (Deposition of Ida Johnson), at 19.
[19]*Id.* at 107.
[20]Doc. no. 1 (Complaint) ¶ 45.
[21]*Id.* ¶ 46.

6

not sold those policies since 1973.[22] Mutual Savings presently sells various types of insurance policies in Alabama, Mississippi, Tennessee, and Georgia, and previously has sold policies in Florida and Louisiana.[23] The company has twenty-eight district offices, located in the states of Alabama, Mississippi, and Georgia, and employs approximately 500 agents.[24]

Plaintiff seeks class certification for the claims based upon 42 U.S.C. §§ 1981 and 1982: *i.e.*, the claims seeking declaratory and injunctive relief, disgorgement of the differential in premiums collected for "colored" versus "white" policies, reformation of the existing policies, punitive damages, and, of course, attorneys' fees and costs.

Plaintiff's motion for class certification was granted on November 1, 2002, and

the following class was certified under Rules 23(b)(2) and 23(b)(3):

African Americans who own or had an ownership interest in "colored cash" or "colored burial" policies that were issued at higher substandard rates or as substandard plans and, in addition, any policies that Mutual Savings has identified to the State of Alabama Insurance Department as being issued as race-based policies.

Mutual Savings moved for reconsideration, but the parties subsequently asked

the court to withhold a ruling, to allow the parties an opportunity to attempt a

negotiated settlement. The parties met in Dallas, Texas during March of 2003, to

explore the complex issues presented by identification of, and potential relief to, a

class of persons with interests in Mutual Savings industrial life, merchandise burial,

---

[22]Plaintiff's Evidentiary Submission, Ex. A (Deposition of Don Morrison), at 26, 63.
[23]*Id.* at 47-48.
[24]*Id.* at 51, 53.

7

and socioeconomic policies. A two-day mediation with a mutually selected mediator

was productive, but also made plain the daunting task of establishing and

administering class-wide relief. Representatives of the parties investigated various

alternative proposals, using information from similar class-wide settlements involving

other, significantly larger, insurance companies. Following months of intense

negotiations supervised by the mediator, the parties agreed to the terms of a proposed,

class-wide settlement. The proposal was presented to the court on May 24, 2004,

preliminarily approved on June 7, 2004, and was the subject of a fairness hearing

conducted on August 30, 2004. The proposed settlement class is defined as follows:

> **THE CLASS:** For purposes of this Settlement Agreement only, the parties hereby stipulate to certification of the following Settlement Class: All natural persons who ever purchased, paid for, owned, were insured under, or had any ownership, beneficiary, or other legal interest of any kind in any **Race-Distinct**[25] or **Higher-Priced Socioeconomic**[26] Life Insurance Policy, **Accident Policy**,[27]

---

[25]This term is defined as follows in the stipulation of settlement:

"Race-Distinct" or "Race-Distinct Policies" means those policies issued to members of Racial Minorities at dual rate or dual benefit structures based upon the race of the insured, with Racial Minorities being charged higher rates or receiving plans with lower benefits than similarly situated Caucasian insureds. Generally, Race-Distinct Policies were last insured on or about December 31, 1965. Only Policies issued at higher rates (or lower benefits) to Racial Minorities are Race-Distinct Policies for purposes of this Settlement, and such Race-Distinct Policies are included in the Class and eligible for relief as set forth in the Settlement.

Stipulation of Settlement § II.A. at 7-8.

[26]Higher-priced socioeconomic policies were defined as those

8

> **Endowment Policy,**[28] **Merchandise Burial Insurance Policy**[29] or other **Race-Distinct** or **Higher-Priced Socioeconomic** insurance policy issued or assumed by Mutual Savings Life Insurance Company and insuring a member of a **Racial Minority**.[30]

The class thus includes policies initially sold under two, "dual-rate" pricing structures: the first, under which African Americans were charged higher rates, or were sold policies with lower total benefits, than Caucasians, based solely and explicitly on race; and, the second, under which rates and benefits were based on socioeconomic factors, such as the policyholder's occupation and income.

The principal terms of the settlement proposal provide for enhancement of benefits for race-based policies by as much as twenty-five percent (25%), and for higher-priced socioeconomic policies by as much as 11.7%. The particulars are as

---

which were issued to members of Racial Minorities on dual rates or dual benefit structures based upon the income, economic condition, or living conditions of the insured. Only such policies issued to Racial Minorities and which were also issued at a higher rate or the reduced benefit level ("**Higher-Priced Socioeconomic**" or "**Higher-Priced Socioeconomic Policies**") are included in the Class and eligible for relief hereunder. Generally, Socioeconomic Policies were issued during the period between January 1, 1966 and December 31, 1986. Not all policies issued or assumed by the Company during that time were Higher-Priced Socioeconomic Policies.

*Id.* at 8.

[27]"[A] policy providing benefits only for accidental death or accidental injury." *Id.* at 4.

[28]"[A]n insurance policy that provides a death benefit for a stated period of time or a cash payment to the owner if the insured survives said stated period." *Id.* at 6.

[29]"[T]hose policies which, as originally written and issued, provided for benefits in the form of any combination of burial services (such as a funeral or the services of a funeral director) or burial merchandise (such as a casket, a monument, a burial vault, a suit or dress, or similar items)." *Id.* at 7.

[30]A member of "any race other than Caucasian." *Id.* at 8.

follows:

### A. Race-Distinct and Higher-Priced Socioeconomic Policies which are In-Force.

If this **Settlement Agreement** is finally approved and becomes effective, then except as otherwise provided herein, each otherwise eligible **Class Member's Race-Distinct Policy** which is still **In-Force**[31] as of the **Eligibility Date**[32] shall be eligible to receive up to a 25 percent increase in the past or future **Contractual Death Benefit**[33] of each **Race-Distinct** Life Insurance Policy, up to a 25 percent increase in the past or future **Contractual Endowment Benefit**[34] of each **Race-Distinct Endowment Policy**, up to a 25 percent increase in the past or future **Contractual Accident Benefit**[35] of each **Race-Distinct Accident Policy**, an increase of up to 25 percent of the **Original Wholesale Merchandise Burial Cost Obligation**[36] for each **Race-**

---

[31]"[A] policy as to which all premiums due on the policy as of the Eligibility Date have been paid and which is not an Estate Policy or Matured Policy, and which has not lapsed, been surrendered, or been converted to Extended Term or Reduced Paid Up status." *Id.* at 6-7.

[32]"[T]he latter of (a) the expiration of time to appeal from the trial court entry of a Final Judgment, or (b) the date all such appeals have been fully and finally exhausted and disposed of . . . . This is the date as of which individual's eligibility for relief under this Settlement will be judged." *Id.* at 6.

[33]"[T]he face amount of each benefit stated in a Life Insurance Policy under the terms of the policy as originally issued, as determined on the Eligibility Date." *Id.* at 5.

[34]"[E]ach benefit stated in a policy providing for a cash endowment at a specified maturity or endowment date, as determined on the Eligibility Date." *Id.*

[35]"[E]ach monetary benefit stated in a policy providing coverage only for accidental injury or death, as determined on the Eligibility Date." *Id.*

[36]That term is defined as

the amount upon which a reserve was based as stated in the merchandise burial policy as originally issued, without regard to any subsequent increases or additions from whatever source or for whatever reason. This amount is generally significantly less than the stated retail value of the merchandise and services set forth in the policy as originally written, since under merchandise burial policies the Company was essentially agreeing to furnish goods and services at its wholesale cost, rather than purchasing such goods and services on the retail market.

**Distinct Merchandise Burial Policy**, and up to a 25 percent increase in the past or future benefits stated in the original policy for any other type of **Race-Distinct Policy**. If this **Settlement Agreement** is approved and becomes effective, then except as otherwise provided herein, each otherwise eligible **Class Member** who owns a **Higher-Priced Socioeconomic Policy** which is **In-Force** as of the **Eligibility Date** shall be eligible to receive up to a 11.7 percent increase in the past or future **Contractual Death Benefit** of each **Higher-Priced Socioeconomic** Life Insurance Policy, up to a 11.7 percent increase in the past or future **Contractual Endowment Benefit** of each **Higher-Priced Socioeconomic Endowment Policy**, up to a 11.7 percent increase in the past or future **Contractual Accident Benefit** of each **Higher-Priced Socioeconomic** [Accident Policy], an increase of up to 11.7 percent of the **Original Wholesale Merchandise Burial Cost Obligation** of each **Higher-Priced Socioeconomic Merchandise Burial Policy**, and up to a 11.7 percent increase in the past or future benefits stated on the original policy for any other type of **Higher-Priced Socioeconomic Policy**. In each case, the obligation to pay any remaining premiums due under the policy as stated in the written policy (and the consequences of failing to pay such past or future premiums) shall continue, and shall not be waived or otherwise reduced or affected by this **Settlement Agreement**. Nor shall the parties' obligations or liabilities with respect to any loans or automatic premium loans which have been or may be taken with respect to such policies be affected by this **Settlement Agreement**.

### B. Race-Distinct and Higher-Priced Socioeconomic Policies Which Have Lapsed to Extended Term Status.[37]

*Id.* at 7.

[37]The stipulation of settlement explains this term as follows:

Some but not all of the Policies included in the Class provide that if the named insured stops paying premiums before the end of the premium-paying period stated in the policy, but after the policy has accumulated some cash value, the policy may be converted to a term insurance policy. When this happens, the policy is said to be in force in Extended Term Status.

If this Settlement is finally approved and becomes effective, then except as otherwise provided herein, each otherwise eligible **Class Member's Race-Distinct Policy** which is in **Extended Term Status** as of the **Eligibility Date** shall be eligible to receive up to a 25 percent increase in the past or future **Contractual Death Benefit** of each such **Race-Distinct** Life Insurance Policy, up to a 25 percent increase in the past or future **Contractual Endowment Benefit** of each such **Race-Distinct Endowment Policy**, up to a 25 percent increase in the **Original Wholesale Merchandise Burial Cost Obligation** of each such **Merchandise Burial Policy**, up to a 25 percent increase in the past and future **Contractual Accident Benefit** of each **Race-Distinct** Life Insurance Policy, and up to a 25 percent increase in the past or future benefits stated in the original policy for any other type of **Race-Distinct Policy**. If this Settlement is finally approved and becomes Effective, then except as otherwise provided herein, each otherwise eligible **Class Member's Higher-Priced Socioeconomic Policy** which is in **Extended Term Status** as of the **Eligibility Date** shall be eligible to receive up to a 11.7 percent Increase in the past or future **Contractual Death Benefit** of each such **Higher-Priced Socioeconomic** Life Insurance Policy, up to a 11.7 percent Increase in the past or future **Contractual Endowment Benefit** of each such **Higher-Priced Socioeconomic Endowment Policy**, up to a 11.7 percent Increase in the past or future **Contractual Accident Benefit** of each such **Higher-Priced Socioeconomic Accident Policy**, up to a 11.7 percent Increase in the **Original Wholesale Merchandise Burial Cost Obligation** of each such **Merchandise Burial Policy**, and up to a 11.7 percent increase in the past or future benefits stated in the original policy for any other type of **Higher-Priced Socioeconomic Policy**. In each case, the length of the policy's **Extended Term** coverage period shall not change, and the original obligation to pay any remaining premiums under the policy as stated in the written policy (and the consequences of failing to pay those premiums in the past or in the future) shall not be altered by this **Settlement Agreement**. Nor shall the parties' obligations with respect to any loans or automatic premium loans which have been or may be taken with respect to such policies be affected by this **Settlement**

*Id.* at 6.

12

**Agreement**.

### C. Race-Distinct and Higher-Priced Socioeconomic Policies Which Have Been Converted to Reduced Paid-Up Status.[38]

If this **Settlement Agreement** is approved and becomes Effective, then except as otherwise provided herein, each otherwise eligible **Class Member's Race-Distinct Policy** which is in **Reduced Paid Up** status as of the **Eligibility Date** shall be eligible to receive up to a 25 percent increase in the **Reduced Paid Up** Benefit of each such policy, and each otherwise eligible **Class Member's Higher-Priced Socioeconomic Policy** which is in a **Reduced Paid Up** status as of the **Eligibility Date** shall be eligible to receive up to a 11.7 percent increase in the **Reduced Paid Up** Benefit of each such policy. In each case, the original obligation of the named insured to pay any remaining premiums under the policy as stated in the written policy (and the consequences of failing to timely pay those premiums in the past or in the future) shall not be altered by this **Settlement Agreement**. Nor shall the parties' obligations with respect to any loans or automatic premium loans which have been or may be taken with respect to such policies be affected by this **Settlement Agreement**.

### D. Race-Distinct and Higher-Priced Socioeconomic Policies Terminated[39] on or Before the Eligibility Date.

---

[38]"Reduced Paid Up Status" means:

Some but not all Policies included in the Class provide that if the named insured stops paying premiums before the end of the premium-paying period stated in the policy, but after the policy has accumulated some cash value, the policy may be converted to "Reduced Paid Up Status" under the terms of the policy, which means that the policy is deemed in force and paid up, but the Death Benefit or other benefits of the policy are automatically reduced to a lesser amount than originally stated in the policy (the "**Reduced Paid Up** Benefit"). The nature and amount of the **Reduced Paid Up** Benefit is unique to the terms of each policy and each named insured's policy and premium payment history.

*Id.* at 8.

[39]Terminated policies are defined as:

1. If this **Settlement Agreement** is approved and becomes effective, then except as otherwise provided herein, the named insured under each eligible **Race-Distinct** or **Higher-Priced Socioeconomic Policy** which is a **Terminated Policy** may elect to reinstate each such **Terminated Policy** in order to thereafter receive prospective coverage and relief pursuant to the terms of this **Settlement Agreement** with respect to each such policy, provided (1) the original insured is alive at the time of the reinstatement, and (2) the **Request for Reinstatement Information Form** is filed on or before the **Claim Form Due Date**.[40]

2. Any such **Class Member** described in the preceding paragraph may reinstate each such **Race-Distinct** or **Higher-Priced Socioeconomic Terminated Policy** for purposes of future coverage by paying to the Company, by cashier's check, money order, certified check or other immediately collectible funds, an amount equal to the greater of (a) the cash surrender value the **Terminated Policy** would have had if it had remained in full force until the **Implementation Date**[41] without any loans, surrenders, or other withdrawals of values, or (b) one-month's premium ("the Reinstatement Amount"). Any such **Class Member** must notify the Company of his or her wish to reinstate by returning a completed **Request for Reinstatement Information Form (Exhibit B)** to the **Mutual Savings Settlement Administration Center** on or before the **Claim Form Due Date**. No later than 21 days after the

---

any Race-Distinct or Higher-Priced Socioeconomic Life Insurance Policies, Accident Policies, Accident Indemnity Policies, Endowment Policies, or Merchandise Burial Insurance Policies of Class Members which, on or before the Eligibility Date, have been rescinded or canceled, have gone out of benefit for failure to pay required premiums, have been cash surrendered, have gone out of benefit under the terms of the policy, have gone out of benefit due to outstanding policy loans or loan interest of any kind, or have otherwise terminated without benefit on or before the Eligibility Date.

*Id.* at 8.

[40]The date "28 days after the Fairness Hearing, which is the deadline by which Claim Forms of Class Members must be received by the Mutual Savings Settlement Administration Center. This deadline will be strictly enforced." *Id.* at 4.

[41]"[T]he date on which the Company shall begin disbursement of the relief provided for herein, which shall be 56 days after the Effective Date." *Id.* at 6.

**Effective Date**, the Company will then notify the **Class Member** of the amount and procedures required to reinstate the Policy pursuant to this **§ III** and to what address payment must be directed. Such payment must be received and collected within 30 days of such notification or the **Class Member** shall be deemed to have waived any entitlement to reinstatement. Such reinstatement shall not require evidence of insurability.

3. Effective on the **Implementation Date**, each eligible **Class Member** who has elected to reinstate a **Terminated Policy** and has timely paid to the Company the required cash value or premium described above will receive **Increased Policy Benefit Relief** with respect to that policy identical to that set forth for the applicable policy type in **§ III A** for **In-Force Policies**. The coverage and benefits of a reinstated policy will be prospective only, and shall not afford any coverage for events, deaths, injuries, accidents or illnesses occurring while the policy was terminated. Following reinstatement, payment of premiums as and when due at the rate specified under the original terms of the policy as written will be required, and the consequences of failing to pay such premiums shall not be altered by this **Settlement Agreement**. The terms of coverage shall be identical to the terms of the Policy as originally issued, except that (1) Merchandise Burial Insurance Policies reinstated pursuant to this **Settlement Agreement** shall be deemed to have been reformed and converted to cash policies in accordance with *Gibson, et al. v. Mutual Savings Life Insurance Company*, CV-84-179J (Circuit Court of Limestone County, Alabama), effective upon the **Implementation Date**; and (2) the coverage period shall be that stated in the policy as originally issued, except that the coverage period for any **Reinstated Policy** other than an **Endowment Policy** shall be no less than two years from the **Reinstatement Date**.

4. **Persons** who fail to strictly comply with the reinstatement deadlines and procedures set forth above will be deemed to have waived all rights to reinstatement hereunder.

15

**E. Estate Policies**[42] **and Matured Policies.**[43] (**Race-Distinct** and **Higher-Priced Socioeconomic Policies** as to Which Insured Died or Policy Matured No Later Than the **Implementation Date**).

In some cases, the insured under a **Race-Distinct** or **Higher-Priced Socioeconomic Policy** covered by this **Settlement Agreement** may have died while the policy was **In-Force** and had a death claim paid on or before the **Implementation Date**. For purposes of this **Settlement Agreement**, such **Race-Distinct** or **Higher-Priced Socioeconomic Policies** are referred to as "**Estate Policies**." In the case of Endowment Policies, which under their terms pay the **Contractual Endowment Benefit** as of a **Maturity Date** specified in the Policy, the **Maturity Date** may have been reached (*i.e.*, the Policy may have matured) while the **Race-Distinct** or **Higher-Priced Socioeconomic Endowment Policy** was still **In-Force**, as a result of which an endowment benefit was paid on or before the **Implementation Date**. Such a matured **Endowment Policy** is referred to for purposes of this **Settlement Agreement** as a "**Matured Policy**." If this Settlement is finally approved and becomes effective, then except as otherwise provided herein, the following relief will be afforded with respect to the **Estate** and **Matured Policies**:

For each **Estate Policy** and **Matured Policy** where the insured died and had a death claim paid on or before the **Implementation Date**, or the Policy matured <u>and</u> a claim was paid on or before the **Implementation Date**, if this Settlement is finally approved and becomes effective, the Company will, on or about the **Implementation Date**, and subject to the remainder of this paragraph and the terms and conditions of § **IV**, below, send the eligible **Class Member** (or his or her heir(s), estate, beneficiary, or other relative appearing to be equitably entitled to receive the benefit as determined by the Company and

---

[42]"[A] Race-Distinct Policy or Higher-Price Socioeconomic Policy as to which the insured died while the policy was In-Force and a death claim has been paid on or before the Implementation Date." *Id.* at 6.

[43]"[A]n Endowment Policy that remains In-Force to the Maturity Date stated in the policy, as to which the Maturity Date is a date prior to the Implementation Date and the endowment benefit is paid prior to the Implementation Date." *Id.* at 7.

approved by **Class Counsel** in good faith) an amount up to 25 percent of the **Contractual Death Benefit** previously paid under each such eligible **Estate Policy** which is a **Race-Distinct** Life Insurance Policy; up to 25 percent of the **Contractual Endowment Benefit** previously paid with respect to each such eligible **Matured Policy** which is a **Race-Distinct Endowment Policy**; up to 25 percent of the **Original Wholesale Merchandise Burial Cost Obligation** for each such eligible **Estate Policy** which is a **Race-Distinct** Burial Policy; up to 25 percent of any Contractual Accidental Death Benefit previously paid with respect to any **Accident Policy** which is a **Race-Distinct Accident Policy**; up to 25 percent of the benefits previously paid under any other type of **Estate** or **Matured Policy** which is a **Race-Distinct Policy**; up to 11.7 percent of the **Contractual Death Benefit** with respect to each such eligible **Estate Policy** which is a **Higher-Priced Socioeconomic** Life Insurance Policy; up to 11.7 percent of the **Contractual Endowment Benefit** of each such eligible **Matured Policy** which is a **Higher-Priced Socioeconomic Endowment Policy**; up to 11.7 percent of any Contractual Accidental Death Benefit previously paid with respect to any eligible **Higher-Priced Socioeconomic Accident Policy**; up to 11.7 percent of the **Original Wholesale Merchandise Burial Cost Obligation** of each such eligible **Estate Policy** which is a **Higher-Priced Socioeconomic Merchandise Burial Policy**; and up to 11.7 percent of the benefits previously paid under any other type of **Estate** or **Matured Policy** which is a **Higher-Priced Socioeconomic Policy**. Provided, however, that with respect to **Estate Policies** or **Matured Policies** where the insured died or the policy matured <u>and</u> a claim was paid on or before December 31, 1989, the eligible **Class Member** (or his or her heir(s), estate, relative or beneficiary) shall additionally be required to first submit a timely and valid claim form in accordance with **§§ V (B), (C),** and **(D)** below in order to be eligible to receive such relief, and if they fail to do so, will be deemed to have waived all entitlement to such benefits hereunder, notwithstanding any other provision of this **Settlement Agreement**; and provided further, however, that Matured Endowments which are unpaid shall be enhanced on the **Company's** books by the amounts specified above pending payment or escheat, as the case may be.

In support of the request for approval of the proposed settlement, defendant

submitted the affidavit of Garry Grove, an actuarial consultant for Mutual Savings,

explaining the methodology for determining the amounts of enhancement for race-

distinct and socioeconomic policies.[44] Grove testified that because the class includes

holders of (or those with a legal interest in) policies issued during the early part of the

Twentieth Century through the 1980s, it is impossible to determine with precision the

number of "terminated" policies[45] encompassed by the class definition.[46] Even so, he

estimated the total number of in-force and terminated policies falling within the class

to be at least 1,077,360, reasoning as follows:

> It is known that [the number of] identifiably race-distinct Industrial
> policies that had been issued or assumed by Mutual Savings and were
> still shown as being in force in the Company's master files as of
> December 31, 2003 was 98,309. The in-force policies as of that same
> date identified as dually priced on the basis of socioeconomic factors
> totaled 81,251. Thus, the total number of in-force policies encompassed
> by the settlement class as defined in the Stipulation of Settlement is
> 179,560. Based upon my knowledge of industrial insurance in general
> and the business of Mutual Savings in particular, my experience and
> training as an actuary, and my general knowledge of typical historical
> issue volumes, lapse rates and death rates in the lines of business at
> issue, it is my best judgment and opinion that the number of terminated
> policies included in the class is at the very least five times the number
> of in-force policies included in the class, or at least 897,800, and that
> this estimate is a very conservative estimate. Based on this estimate, it

---

[44]Doc. no. 111.

[45]*See supra* note 39.

[46]Doc. no. 111 ¶ 3, at 2.

18

is my best judgment and opinion that there are at least 1,077,360 in-force and terminated policies which are within the class definition in this case.[47]

Grove next engaged in various calculations to arrive at the policy enhancement

percentages agreed to by the parties, and detailed his methodology as follows:

I was asked to calculate a differential between Mutual Savings issued or acquired policy premiums for dual priced insurance plans, or for comparable plans which carried different premiums.  Generally, those dual-price policy plans are of two categories:  those based on racially distinct mortality tables, and those based on a variety of socioeconomic underwriting considerations.  *The higher priced policies are called* "regular" *and the lower priced are called* "standard." . . .

In accomplishing this task, I utilized Mutual Savings historical records for the policy groups determined to have issued on a dual rate system derived either from race-specific mortality tables or socioeconomic factors, and applied sound actuarial and accounting principles to reach my conclusions. . . .

In studying and comparing the [race-distinct and socioeconomic] policies, there were numerous differences among the varying plans. The [race-distinct and socioeconomic] policies are widely dispersed among many plan codes, and many of those codes have relatively few policies in force. In addition, many did not have a directly comparable plan that carried a different premium.  Therefore, I determined that a direct comparison of the most similar, dually priced plan would yield the most reliable results. The largest numbers of policies which utilized race-distinct mortality tables fell within fifteen dually priced plans that were directly comparable to one another. That is, other than premium pricing, the policies were parallel in most terms, conditions, and benefits.[48]

Grove then calculated the premium differential for those "fifteen dually priced

---

[47]*Id.*

[48]Doc. no. 111 ¶¶ 5-7, at 2-3 (paragraph numbering omitted) (emphasis supplied).

19

[policy] plans," and converted the premiums charged (which included both monthly and weekly premiums) to a uniform standard "Weekly Premium Equivalent" ("WPE"), which made it possible to compare policy premiums. Grove calculated the total amount of insurance coverage and, using the WPE for each type of policy plan, determined an average premium for each $1,000 of insurance purchased at those rates for those policies in force as of December 31, 2001, and December 31, 2002. From that data, he calculated that, for the year ending December 31, 2001, the average weekly premium for each $1,000 of insurance coverage purchased at the lower "standard" rate was $0.4764, while the average weekly premium rate charged for each $1,000 of coverage purchased at the higher, "regular" rate was $0.6215, yielding a premium differential of $0.1451 (or 30% higher than the premium charged white policyholders). For the year ending December 31, 2002, the average weekly premium for "standard" policies was $0.7523, and $0.9121 for "regular" policies, yielding a premium differential of $0.1598 (or 21% higher than the premium charged white policyholders).

Grove employed the same methodology with respect to socioeconomic policies. He found that the majority of socioeconomic policies "fell within six policy types that had directly comparable policies issued at different premium rates."[49] The percentage

---

[49]Doc. no. 111 ¶ 12, at 4.

20

differential between the "standard" and "regular" policies was 14% for each of the years ending December 31, 2001, and December 31, 2002.

The proposed settlement relief is subject to both a minimum guarantee and maximum total benefit to the class of $5,000,000. In particular, the settlement relief for in-force, reduced paid-up, extended term, and reinstated policies is to be funded by Mutual Savings through increased policy reserves.[50] The relief for estate and matured policies will be paid in the form of additional policy benefits on previously paid claims.[51] The increased reserves and the additional policy benefit payments shall not exceed a maximum aggregate of $5,000,000,[52] and if the aggregate amount determined to be due exceeds (or is less than) $5,000,000, the settlement relief will be proportionally reduced or increased to reach the $5,000,000 cap.[53] Furthermore,

> [i]n the event the aggregate cost of Settlement Relief . . . would otherwise be greater than or less than $5 million, then the Settlement Relief for each eligible policy otherwise provided for in § III [of the Stipulation of Settlement] shall be adjusted such that the percentage increase in Contractual Death Benefit, Contractual Endowment Benefit, Original Wholesale Merchandise Burial Cost Obligation or any other past or future benefit stated in the policy for each otherwise eligible In-Force, Reduced Paid-Up, Extended Term, and Reinstated Policy and the additional policy benefit payments for each otherwise eligible Estate and Matured Policy will be multiplied by the following factor: $5 million

---

[50]Stipulation of Settlement § IV.1, at 18.
[51]*Id.*
[52]*Id.*
[53]*Id.* § IV.2, at 19.

21

divided by the total of all Estate and Matured Policy relief <u>and</u> all In-Force, Extended Term, Reduced Paid-Up, and Reinstated policy reserve increases, calculated without regard to the $5 million maximum described above.[54]

The total *cost* of the proposed settlement to Mutual Savings is estimated to be

$9,421,000. In an affidavit submitted in support of the proposed settlement, Ronald

Koch, who is Senior Vice President, Treasurer, and Chief Financial Officer of Mutual

Savings, explained that valuation as follows:

> As of June 30, 2004, Mutual Savings has statutory admitted assets[55] of $425 million with $2.7 billion of life insurance in force....
>
> As of December 31, 2003, statutory capital and surplus[56] of

---

[54]Stipulation of Settlement § IV.3, at 19.

[55]"An asset that by law may be included in evaluating the financial condition of an insurance company." *Black's Law Dictionary* 126 (8th ed. 2004).

[56]The Alabama Code defines "statutory capital and surplus" as follows:

STATUTORY CAPITAL AND SURPLUS. The combination of capital and surplus. As used in this definition, these terms shall have the following meanings:

a. *Capital*. At any particular time, the sum of (i) the par value of all shares of the insurer having a par value that have been issued, (ii) the amount of consideration received by the insurer for all shares of the insurer without par value that have been issued, except any part of the consideration therefor as may have been allocated to surplus in a manner permitted by law, and (iii) any amounts not included in clauses (i) and (ii) of this subdivision as have been transferred to capital of the insurer, whether upon the issue of shares as a share dividend or otherwise, minus all reductions from the sum as have been affected in a manner permitted by law.

b. *Surplus*. The excess of the net admitted assets of an insurer over its capital. As used in this definition, "net admitted assets" means the excess of admitted assets of an insurer over its liabilities.

Ala. Code § 27-2B-2(14) (1975) (1998 Replacement Volume).

Mutual Savings was approximately $31.2 million. Without regard to the $7 million surplus note which was funded to Mutual Savings on December 30, 2003 and borrowed by Primesco, Mutual Savings' capital and surplus at December 31, 2003 was $24.2 million. Capital and surplus as of June 30, 2004 was $31.0 million ($24.0 million without surplus note). The debt of Mutual Savings' holding company, Primesco Inc., as of December 31, 2003, totaled $80.2 million. The debt covenants require capital and surplus of at least 300 percent of Authorized Control Level Risk Based Capital[57] to be maintained, which equals approximately $13 million at December 31, 2003 in order to avoid being in default on its loan.

I was asked to estimate the overall cost of this settlement

_____

[57]This term refers to the "risk-based capital system" developed by the National Association of Insurance Commissioners ("NAIC"):

The risk-based capital system uses a formula that establishes the minimum amount of capital necessary for an insurance company to support its overall business operations, considering its size and risk profile. That amount is then compared to the company's actual statutory capital to determine whether a company is technically solvent. The formula results, in combination with the authority granted in the state's Risk-Based Capital for Insurers law, allows [sic] state regulators to intervene in a timely manner when a company fails to meet these minimum standards. Companies failing to meet the minimum capital standard developed by the formula are subject to increasingly stringent regulatory intervention, depending upon the degree to which they fail the minimum standard.

. . . .

The NAIC's risk-based capital system, in effect, limits the amount of risk a company can take on by requiring higher amounts of capital for bearing higher amounts of risk. The risk factors for the NAIC's risk-based capital formula, which produces a Regulatory Minimum Risk-Based Capital, focuses on four major areas: asset risk, liability or underwriting risk, business risk and miscellaneous risk.

Brian K. Atchinson, *The NAIC's Risk-Based Capital System*, 2 NAIC RESEARCH Q. 1 (Oct. 1996), *available at www.naic.org/research/RQ/oct96.pdf* (last visited November 4, 2004). *See also* Ala. Code § 27-2B-2(11)(c) (1975) (1998 Replacement Volume) ("'Authorized control level RBC [risk-based control]' means the number determined under the risk-based capital formula in accordance with the RBC instructions.").

preliminarily approved by the court, including fees and administrative expenses. Based upon the information available to Mutual Savings, the estimated total cost is as follows:

| | | |
|---|---|---|
| • | Class member payments and policy enhancement costs: | $5,000,000 |
| • | Plaintiff attorney fees: | 2,350,000 |
| • | Defendant attorney fees: | 1,232,000 |

- Administration of settlement: (Direct Costs)
  Equipment (microfiche readers and
  computers)                                             62,000
  Personnel                                              395,000
  Postage, telephone, printing, advertising    382,000

                                    TOTAL      $9,421,000

These figures represent estimates based on actual, direct, identifiable costs of the settlement and its administration. The total does not include indirect costs such as computer programming and computer usage time in setting up the database used by settlement administrative staff, in hours of legal, executive, accounting or other company personnel time and effort, nor does it include lost investment income that would have been earned had these expenses and settlement payments not been incurred.[58]

The total *value* of the settlement to the class, exclusive of attorneys' fees and

administrative costs, is estimated to be $9.25 million, as determined by Terry Long,

an expert retained by plaintiff to analyze insurance, actuarial, statistical, economic,

and financial issues pertaining to the settlement.[59] "The total value reflects the total

---

[58]Doc. no. 114 (paragraph numbering omitted).

[59]Doc. no. 107 (Plaintiff's Evidentiary Submission in Support of Final Approval of Proposed

amount of the additional benefits expected to be paid to Class Members without recognition of the timing of the payments and the time value of money."[60]

According to Mutual Savings, the settlement provides significant relief to policyholders while ensuring that the company remains solvent, thereby protecting future benefits for holders of those policies that have not yet matured.

Finally, the parties have agreed to a class-wide release, and dismissal of all class claims with prejudice.[61]

## II. DISCUSSION

Notice of a settlement must be given to class members. Fed. R. Civ. P. 23(e). Rule 23(c)(2)(B) provides specific notice requirements where, as here, a class is certified under Rule 23(b)(3):

> For any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must concisely and clearly state in plain, easily understood language:
>
> - the nature of the action,
>
> - the definition of the class certified,
>
> - that a class member may enter an appearance through

---

Settlement, Final Certification of the Class and an Award of Attorneys' Fees and Reimbursed Expenses), Ex. B (Affidavit of Terry Long), at 4.

[60]*Id.*

[61]Stipulation of Settlement § VIII.

25

counsel if the member so desires,

- that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded, and

- the binding effect of a class judgment on class members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).

The stipulation of settlement called for notice to be provided to potential class members in the following manner:

1. Subject to **Court** approval, beginning no later than 81 days before the **Fairness Hearing**, the Company shall send the **Class Notice Package** (**Exhibit 1**) by United States Postal Service mail, postage prepaid, to those Named Insureds (or their heirs, estates, descendants or beneficiaries) having an address associated with a **Race-Distinct** or **Higher-Priced Socioeconomic Policy** in the **Company's** electronic records and, in cases of separate pending litigation against the Company asserting claims subject to this **Settlement**, also by certified mail, return receipt requested to all legal counsel known to represent any **Class Member** in any such separate pending litigation. The Company will pay for the costs associated with producing and mailing the **Class Notice Package**.

2. The Class Notice shall:

(a) inform **Class Members** that, if they do not exclude themselves from the Class, they will be eligible to receive relief under the proposed settlement;

(b) contain a short, plain description of the background of the **Action**, the **Class** and the proposed settlement;

(c)     describe the proposed benefits outlined herein;

(d)     specify the procedures and time by which **Class Members** desiring to Opt Out from the **Class** or exclude their policies from the **Settlement** may do so;

(e)     state that any relief to **Class Members** is contingent on the Court's final approval of the proposed **Settlement**;

(f)     provide the text of the **Release**, and inform **Class Members** that as to any policies not timely and properly excluded from the **Settlement** they will be deemed to have consented to the **Release** if this **Settlement Agreement** is approved and becomes effective;

(g)     inform **Class Members** that they may exclude their policies from the **Settlement** by submitting a written exclusion request postmarked by the **Exclusion Date**, but will thereby forfeit all benefits to which they may otherwise have been entitled under the Settlement;

(h)     inform each **Class Member** that he or she may, if he or she desires, object to the proposed settlement by filing and serving a written statement of objection no later than the **Objection Deadline**, and if such an objection is timely and properly served, the objecting **Class Member** may also state therein that he or she wishes to appear and be heard at the **Fairness Hearing** (either in person or through counsel at his or her sole expense);

(i)     remind any **Class Member** that any judgment entered with respect to the **Settlement Agreement**, whether favorable or unfavorable to the **Class**, shall include, and be binding on, all **Class Members** who have not been excluded from the **Class**, even if they have objected to the proposed **Settlement Agreement** and even if they have any other claim, class lawsuit or proceeding pending against the Company;

(j)     notify **Class Members** of the information to be supplied by them and the procedures to be complied with by them in order to be eligible for relief hereunder;

(k)     conform to all applicable requirements of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Alabama Constitution, the Rules of the **Court** and any other applicable law, all in the manner and form agreed upon by the Parties and approved by the **Court**; and

(l)     be approved by the **Court** before mailing.

The preliminary approval order entered on June 7, 2004, ordered that notice be provided to all class members by the following means:

(a)     The Company shall use its best efforts to cause notice to be given to all persons identified as members of the Class, in accordance with the Stipulation of Settlement. Mailing of notice must begin not less than 81 days prior to the Fairness Hearing. The Company also shall use its best efforts to retain an address search firm for the purposes and within the times set forth in the Stipulation of Settlement, cause summary notice to be published in the newspapers listed in the Stipulation of Settlement beginning not less than 70 days prior to the Fairness Hearing, and cause distribution of the Notice Card as provided in the Stipulation of Settlement, and two consecutive weeks in each weekly publication designated in the Stipulation of Settlement.

(b)     The Company shall in all respects comply with the Stipulation of Settlement with regard to the method, manner, form, content, mailing, publication, and distribution of the Class Notice Package, the Publication Notice, and the Notice Card, and shall perform all obligations required by the Stipulation of Settlement to be performed prior to the Fairness Hearing. The Company and Class Counsel are authorized to perform the administrative functions assigned to each of them in the Stipulation of Settlement.[62]

The stipulation of settlement identified forty-four newspapers in Alabama, Georgia, Florida, and Mississippi in which notice of the proposed class action

---

[62]Doc. no. 99 (Preliminary Approval Order) ¶ 12, at 7-8.

settlement was to be published.[63]   On June 21, 2004, Mutual Savings moved for

approval to substitute publication of the notice in *USA Today*, a newspaper of

national circulation, in lieu of five of the forty-four newspapers identified in the

stipulation of settlement, because each was no longer in business, or did not publish

during the relevant time period, or did not respond to defendant's request that a notice

be published.[64]   The motion was granted on June 22, 2004, and the parties were

ordered to publish notice of the proposed settlement in the following publications:

*The Montgomery Tuskegee (AL) Times; The Mobile (AL) Register; The Anniston (AL)*

*Star; The Hattiesburg (MS) American; The Tuscaloosa (AL) News; The Montgomery*

*Advertiser; The Tri-State (TN) Defender; The Mobile (AL) Beacon; The Decatur (AL)*

*Daily; The Atlanta Daily World; The Dothan (AL) Eagle; The Enterprise (AL)*

*Ledger; The Jackson (MS) Advocate; The Birmingham Times; The Atlanta Inquirer;*

*The Mississippi Link; The Savannah Herald; The Tennessee Tribune; Speakin' Out*

*News* (published in Huntsville, Alabama); *The Troy (AL) Messenger; The Selma (AL)*

*Times-Journal; The Tallahassee Democrat; The TimesDaily* (published in Florence,

Alabama); *The Greene County (AL) Democrat*; *The Meridian (MS) Star; The Rome*

*(GA) News-Tribune; The Opelika-Auburn (AL) News; The Pensacola News Journal;*

*The Columbus (GA) Ledger-Enquirer; The Gadsden (AL) Times; The Huntsville*

---

[63]Stipulation of Settlement, Ex. I.

[64]Doc. no. 100 (Motion for Approval of Substitution of Notice Publication).

*Times; The Atlanta Voice; The Birmingham News; The Birmingham Post-Herald; The Northeast Mississippi Daily Journal; The LaGrange (GA) Daily News; The Savannah Tribune; The Columbus (GA) Times; The Memphis Silver Star News;* and *USA Today.* Further, the court directed that: for each newspaper distributed on a daily basis, notice was to be published on Friday, June 18, 2004, and Friday, June 25, 2004; and, for each newspaper distributed on a weekly basis, notice was to be published one time during the week of June 21, 2004, and one time during the week of June 28, 2004.[65] The published notice summarized the proposed settlement and provided an address and telephone number from which to obtain a more detailed notice and claim forms.

Additionally, the published notice, notice package, and other documents relating to the settlement were posted on Mutual Savings' internet website.

The notice program was managed by the Mutual Savings Settlement Administration Center in Decatur, Alabama, under the supervision of class counsel. The Administration Center was responsible for mailing notice packages and for disseminating settlement information to potential class members. The Administration Center used the computer records of Mutual Savings to mail notice packages to those

---

[65]Doc. no. 101. Although the motion to substitute publication of the notice in *USA Today* was not filed until June 21, 2004, the notice appeared in the June 18, 2004 edition of *USA Today. See* doc. no. 115 (affidavit of Dawn Walden).

30

class members who could be identified, and retained a research firm to update addresses where necessary. The Administration Center mailed 170,000 notice packages. In addition, Mutual Savings' debit route agents personally delivered approximately 150,000 summary notice "cards" which contained instructions for obtaining more detailed information about the settlement from the Administration Center. The Administration Center also responded to telephone inquiries from potential class members, providing further information as requested, and processed exclusion requests and claim forms.

In the opinion of this court, the mailed, published, and delivered notices were reasonably calculated under all of the circumstances to: inform interested parties of the essential terms of the proposed settlement; explain how (and where) additional information on the detailed terms of settlement could be obtained; and, afford class members reasonable opportunity either to exclude themselves from the settlement class, or to present objections to the terms of settlement. The notices satisfactorily conveyed to class members all information relevant to an informed decision. The court, therefore, finds that notice to the class accorded constitutional due process and complied with the requirements of Federal Rule of Civil Procedure 23(c)(2)(B).

No class members objected to the proposed settlement, although nearly 10,000 attempted to exclude themselves from the settlement class ("opt-out"). Mutual

Savings determined that most of those opt-out requests pertained to policies that were not within the class definition, and contended that others did not comply with the filing requirements set forth in the court-ordered notice. The parties filed a joint motion for judicial determination of the validity of the attempted, but contested, opt-out requests.[66] Thereafter, K. Stephen Jackson, P.C., and Garrison Scott, P.C. ("Opt-Out Plaintiffs") each filed a motion entitled "Opt-Out Plaintiffs' Motion to Allow Discovery, Set Briefing Schedule[,] and Set Hearing in Relation to Class Plaintiffs' and Defendant's Joint Motion for Judicial Determination as to Validity of Defective Opt-Outs."[67] The court entered an order on October 6, 2004, declaring invalid those exclusion requests that Mutual Savings had determined not to be within the class definition, and directing Mutual Savings to respond to the motion filed by counsel purporting to represent the opt-out plaintiffs.[68] On November 3, 2004, the parties filed a stipulation that "all of the purported Exclusion Requests heretofore received which identified policies meeting the Class Definition, or which supplied information from which the Company has been able to determine relate to a policy meeting the Class Definition . . . may be deemed valid Exclusion Requests."[69] In all, the number

---

[66]Doc. no. 125.

[67]Doc. nos. 128 & 131.

[68]Doc. no. 132.

[69]Doc. no. 139.

of valid opt-out requests totaled 4,040.[70]

In accordance with the court-ordered notice to the class, a fairness hearing was conducted on August 30, 2004, in Huntsville, Alabama. Two class members attended the hearing, but did not object to the settlement. The court heard oral argument from class counsel and counsel for defendant, and received evidence pertaining to the issue of whether the proposed settlement was fair, reasonable, and adequate.

## A.    Class Certification

Federal Rule of Civil Procedure 23 governs the certification of class actions. District courts are required to conduct a "rigorous analysis" of that rule's requirements, even when presented with a request for settlement-only class certification. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620, 117 S. Ct. 2231, 2248, 138 L. Ed. 2d 689 (1997).

> The safeguards provided by the Rule 23(a) and (b) class-qualifying criteria, we emphasize, are not impractical impediments — checks shorn of utility — in the settlement class context. First, the standards set for the protection of absent class members serve to inhibit appraisals of the chancellor's foot kind — class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness.
>
> Second, if a fairness inquiry under Rule 23(e) controlled certification, eclipsing Rule 23(a) and (b), and permitting class designation despite the impossibility of litigation, both class counsel and court would be disarmed. Class counsel confined to settlement

---

[70]*Id.*

negotiations could not use the threat of litigation to press for a better offer, . . . and the court would face a bargain proffered for its approval without benefit of adversarial investigation . . . .

Federal courts, in any case, lack authority to substitute for Rule 23's certification criteria a standard never adopted — that if a settlement is "fair," then certification is proper . . . .

*Id.* at 621-22, 117 S. Ct. at 2248-49.

This court extensively analyzed the issue of whether plaintiff had satisfied the class certification criteria in the memorandum opinion entered on November 1, 2002, and concluded that the prerequisites of Rule 23(a) had been met, and that the proposed class could be certified under subsections (b)(2) and (b)(3).[71] The parties now have stipulated to a different, settlement-only class definition, but that litigation fact — negotiated at arms' length with the aid of a mediator — does not change the court's previous conclusion that certification of a class is warranted.

Even so, some aspects of this court's previous opinion should be revisited, especially with respect to certification of a class under Rule 23(b)(2).[72] In particular, upon further reflection, and in view of the recent opinion of the Fifth Circuit reviewing issues similar to those presented here, the court has concluded that its

---

[71]*See* doc. no. 76 (Memorandum Opinion, entered on November 1, 2002), at 8-40.

[72]Certification of a class under Rule 23(b)(2) is permissible where the prerequisites of Rule 23(a) are met, and "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).

34

finding that the relief sought by plaintiff in the form of disgorgement and restitution

of past premium overcharges was "equitable" in nature was unnecessary to the court's

decision.[73] Discussion of the issue of whether the relief sought by plaintiff should be

characterized as "equitable" focused on plaintiff's subjective intent in bringing this

action (the focus propounded by Mutual Savings and adopted by some courts[74]),

rather than examining whether the predominant relief sought was injunctive, which

is the approach approved by the Eleventh Circuit in *Murray v. Auslander*, 244 F.3d

807 (11th Cir. 2001).  In *Murray*, the Court stated:

> Because the Eleventh Circuit has not yet established specific criteria for
> determining when monetary damages are incidental to equitable relief,
> we look to a Fifth Circuit case for guidance.  In *Allison v. Citgo
> Petroleum Corp.*, [151 F.3d 402 (5th Cir. 1998),] the court explained:
>
>> By incidental, we mean damages that flow directly from liability
>> to the class *as a whole* on the claims forming the basis of the
>> injunctive or declaratory relief. . . .  Ideally, incidental damages
>> should be only those to which class members automatically would
>> be entitled once liability to the class (or subclass) as a whole is
>> established. . . .  Liability for incidental damages should not . . .
>> entail complex individualized determinations.  Thus, incidental
>> damages will, by definition, be more in the nature of a group
>> remedy consistent with the forms of relief intended for (b)(2)

---

[73]*See* doc. no. 76 (Memorandum Opinion, entered on November 1, 2002), at 23-29.

[74]*See, e.g., Molski v. Gleich*, 318 F.3d 937, 950 (9th Cir. 2003) (expressly rejecting *Allison*
and instead "focus[ing] on the language of Rule 23(b)(2) and the intent of the plaintiffs in bringing
the suit"); *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 163-64 (2d Cir. 2001) (stating
that Rule 23(b)(2) certification is appropriate only where "reasonable plaintiffs would bring the suit
to obtain the injunctive or declaratory relief sought" and "the injunctive or declaratory relief sought
would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits").

35

class actions.

*Murray*, 244 F.3d at 812 (quoting *Allison*, 151 F.3d at 415). The Eleventh Circuit held that, because the plaintiffs in *Murray* — a putative class of developmentally disabled Medicaid participants — sought "compensatory damages" for their alleged pain, suffering, mental anguish, and humiliation, they did not seek damages as a "group remedy," and "they would not be automatically entitled [to damages] even if Defendants' liability to the class is established." 244 F.3d at 812. For that reason, the Eleventh Circuit held that the class claims for damages predominated over the claims for equitable relief, and certification of the damages claims was inappropriate under Rule 23(b)(2).

In a recent case that provided the Fifth Circuit an opportunity to amplify its *Allison* analysis, that Court observed that "equitable" monetary relief, while not strictly an oxymoron, "has been limited to the context of title VII backpay, a remedy designated by statute as 'equitable.'" *In re Monumental Life Insurance Company,* 365 F.3d 408, 418 (5th Cir. 2004). *Monumental Life* was an action nearly identical to this one. It involved a putative class challenge to life insurers' allegedly racially discriminatory practice of charging higher premiums and paying lower benefits to African-American policyholders. In the course of reviewing the district court's denial of class certification, the Fifth Circuit declined to decide whether plaintiffs' claim for

36

restitution was an "equitable" remedy or a "legal" one,[75] instead applying the

principles enunciated in *Allison* to evaluate whether the restitution claim

predominated over the request for injunctive relief. *Monumental Life,* 365 F.3d at

418. The Court ultimately held that, consistent with *Allison*, damages could be

determined on a class-wide basis, such that certification under Rule 23(b)(2) was not

precluded. *Monumental Life*, 365 F.3d at 419.

> [A]ssuming that unlawful discrimination is found, class members automatically will be entitled to the difference between what a black and a white paid for the same policy. Not coincidentally, such damages flow from liability in much the same manner that an award of backpay results from a finding of employment discrimination.

*Id.* The Court further explained:

> We are well aware that, as *Allison* qualified, the calculation of monetary damages should not "entail complex individualized determinations." Although it is arguable that the construction of thousands of restitution grids, though based on objective data, involves the sort of complex data manipulations forbidden by *Allison*, we read *Allison* to the contrary. The policy variables are identifiable on a

--------------------------------------------------------------------

[75]The Fifth Circuit stated:

It would be mistaken to presume that because backpay — a remedy readily calculable on a classwide basis — is compatible with a rule 23(b)(2) class, any other remedy designated as equitable may automatically piggyback a claim for injunctive relief. To be sure, equitable monetary remedies are less likely to predominate over a class's claim for injunctive relief, but this has more to do with the uniform character of the relief rather than with its label. Therefore, rather than decide whether plaintiffs' claim for restitution is legal or equitable in nature, we apply *Allison* and examine whether the claim predominates over the request for injunctive relief.

*In re Monumental Life*, 365 F.3d 408, 418 (5th Cir. 2004).

> classwide basis and, when sorted, are capable of determining damages
> for individual policyowners; none of these variables is unique to
> particular plaintiffs. The prevalence of variables common to the class
> makes damage computation "virtually a mechanical task." *Alabama v.*
> *Blue Bird Body Co.*, 573 F.2d 309, 326-27 (5th Cir. 1978) (quoting
> *Windham v. Am. Brands, Inc.,* 565 F.2d 59, 68 (4th Cir. 1977)).

*Id.* at 419-20 (footnotes and some citations omitted). The *Monumental Life* Court

also found significant the fact that "the information necessary to determine disparities

between, on the one hand, dual rate and dual plan policies, and on the other hand,

plans sold to whites," could be culled from data kept by the defendants in the normal

course of business. *Id.* at 420.

Before reaching the *Allison* analysis, however, it must be determined whether

the proposed class members are properly seeking injunctive relief. *See Monumental*

*Life*, 365 F.3d at 416 ("The question whether the proposed class members are

properly seeking [injunctive relief] is antecedent to the question whether that relief

would predominate over damages.").

As noted above, the records maintained by Mutual Savings indicate that

179,560 race-distinct and socioeconomic policies remain in force, and Mutual

Savings has presented expert affidavit testimony that the total number of in-force and

terminated policies that fall within the class definition is estimated to be

approximately 1,077,360. While the proportion of in-force policies to terminated

policies does not constitute "most" of the class, neither is it negligible — particularly in view of the decades-long, clandestine pricing policy at issue. Therefore, the court finds that "the proportion [of class members continuing to pay discriminatory premiums] is sufficient . . . that the class as a whole is deemed properly to be seeking injunctive relief." *Monumental Life*, 365 F.3d at 416.

Turning now to the *Allison* analysis, the court observes that factors identified by the Fifth Circuit in *Monumental Life* as counseling in favor of certification under Rule 23(b)(2) also are present here. Class members are "automatically entitled to the difference between what a black and a white paid for the same policy," and that difference in fact has been calculated using standardized formulas based upon information kept by Mutual Savings in the normal course of business. *See Monumental Life*, 365 F.3d at 419-20. No subjective evidence was or will be required to determine each class member's claim for damages. Accordingly, the court again concludes, albeit for different reasons, that certification under Rule 23(b)(2) is appropriate.

Another issue that bears on certification of the class under both subsections 23(b)(2) and 23(b)(3) is the question of whether individualized hearings must be conducted to determine whether a particular class member's claim is barred by the statute of limitations. The Fifth Circuit held in *Monumental Life* that the question of

39

"whether plaintiffs were provided constructive notice [of the defendants' discriminatory practices in pricing insurance] is an issue that can be decided on a classwide basis." 365 F.3d at 421. As discussed in the November 1, 2002 memorandum opinion granting conditional class certification, the court concludes that Mutual Savings did not establish, at least for purposes of class certification, that its allegedly discriminatory dual rate system was widely known. *See United Klans of America v. McGovern*, 621 F.2d 152, 154 (5th Cir. 1980)[76] ("Where . . . events receive widespread publicity, plaintiffs may be charged with knowledge of their occurrence.").

Therefore, with the exceptions noted above, the court incorporates by reference herein its prior findings and conclusions as to the propriety of class certification of plaintiff's claims, and finds that they are equally applicable to the stipulated class for the purpose of the proposed settlement.

Based upon the foregoing, the stipulations of the parties, and the totality of the record before this court, the court finds that certification of the proposed class for settlement purposes is appropriate, and final certification for purposes of this settlement agreement is granted to a class defined as:

---

[76]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

All natural persons who ever purchased, paid for, owned, were insured under, or had any ownership, beneficiary, or other legal interest of any kind in any Race-Distinct or Higher-Priced Socioeconomic Life Insurance Policy, Accident Policy, Endowment Policy, or Merchandise Burial Insurance Policy issued or assumed by Mutual Savings Life Insurance Company and insuring a member of a Racial Minority.[77]

## B.    The Standards for Reviewing a Proposed Class Settlement

It is well settled that "in order to approve a settlement, the district court must find that it 'is fair, adequate and reasonable and is not the product of collusion between the parties.'" *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) (quoting *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir. 1977)).  Another district court in this circuit succinctly distilled the relevant standards for the court's review of class action settlements as follows:

[T]he Court must be guided by "the strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement." *Bennett v. Behring*, 737 F.2d 982, 986 (11th Cir. 1984). Furthermore, settlements of class actions are "highly favored in the law and will be upheld whenever possible because they are means of amicably resolving doubts and preventing lawsuits." *Bennett v. Behring Corp.*, 96 F.R.D. 343, 348 (S.D. Fla. 1982), *aff'd*, 737 F.2d 982 (11th Cir. 1984) (quoting *Miller v. Republic Nat. Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir. 1977)).

While approval of a class action settlement is within the Court's discretion, the Court shall not confer approval without scrutiny.

Rather, in order to protect the interests of absent class members,

---

[77]*See supra* notes 25-30 for definitions of the terms used in this description of the certified class.

the court must independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interests of those whose claims will be extinguished.

2 Herbert B. Newberg, *Newberg on Class Actions*, § 11.40 (1985). It is the Court's duty to determine the possible existence of fraud or collusion and whether the proposed settlements are fair, adequate and reasonable. *Bennett*, 737 F.2d at 986. In analyzing whether the proposed settlements protect the interests of absent class members, the Court must consider:

(1) the stage of the proceedings at which the settlement was achieved;

(2) the likelihood of success at trial;

(3) the range of possible recovery;

(4) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable;

(5) the complexity, expense and duration of litigation; and

(6) the substance and amount of opposition to the settlement.

*Id.* The burden of proving the fairness of the settlement is on the proponents. *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1126 (7th Cir. 1979).

The Court should take into account not only the presentations of counsel, but also other sources, "including the comments of class representatives and class members, the judge's own knowledge of the case obtained during pretrial proceedings, and information provided by persons who in unusual cases may be appointed by the court as special masters . . . to assess the settlement." *Manual for Complex Litigation* § 30.42 (2d ed. 1985). In determining whether to approve a proposed

settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. "[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (citing *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975)); *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir. 1978), *cert. denied*, 439 U.S. 1115, 99 S. Ct. 1020, 59 L.Ed.2d 74 (1979). It is essential that the Court not examine the settlement as if defendants had been found liable for violation of the [civil rights] laws. *See, e.g., City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455-56 (2d Cir. 1974) ("It cannot be over-emphasized that neither the trial court in approving the settlement nor this Court in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underline the merits of the dispute"); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("'[I]nherent in compromise is a yielding of absolutes and an abandoning of highest hopes'") (quoting *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D.N.Y. 1972)). Finally, the Court may only approve or disapprove the settlements as presented; the Court is not free to impose any modifications on the parties. *Manual for Complex Litigation* § 30.41.

*In re Domestic Air Transportation Antitrust Litigation*, 148 F.R.D. 297, 312-13 (N.D. Ga. 1993).

### 1.    Fraud or collusion

There is not a scintilla of evidence suggesting that the proposed settlement is the product of fraud, collusion, or otherwise improper conduct. Instead, the record demonstrates that the settlement was negotiated by capable, experienced counsel, in good faith, and at arms' length, following an extensive, lengthy, and difficult process supervised by an experienced mediator. Substantial discovery had been completed

in connection with the class certification motion, enabling the parties to fairly assess the risks and rewards of further litigation. Negotiations did not even begin until a provisional decision on class certification had been made, nearly three years after this action was filed. The parties have represented to the court that the class action settlement was reached through arms' length negotiations over the course of several months, and that it was negotiated in an adversarial manner following substantial factual investigation, extensive legal analysis, expert investigation, and professional mediation. Accordingly, the court finds no evidence of fraud or collusion in the settlement negotiations, or the resulting proposed settlement.

## 2. Fairness of settlement

Based on the following review of all applicable factors, the court finds that the proposed settlement is fair, adequate, reasonable and, accordingly, is due to be approved. In making these findings, the court does not rule, and does not intend to imply how it would rule, on the merits of the claims set forth in the complaint, or defendant's defenses thereto. Rather, the following discussion constitutes an assessment of the reasonableness of compromise under all of the circumstances of the case.

### a. Stage of the proceedings

The proposed settlement was reached more than four years after this action was

commenced, following extensive discovery (both formal and informal) and provisional disposition of plaintiff's motion for class certification. Both parties retained experts, and submitted their affidavit testimony in support of or in opposition to the motion for class certification. These facts suggest that the proceedings were fairly advanced, and that the parties had sufficient opportunity to evaluate the strengths and weaknesses of the case. The court concludes that ample evidence of record provided the parties and the court a sound basis to evaluate the proposed settlement.

### b. Likelihood of success at trial

Despite the documented existence of Mutual Savings' decades-long, dual-rate, pricing practices, there is obvious risk that plaintiff may not prevail in her claims on behalf of the class against defendant. To establish liability, plaintiff would have to demonstrate by a preponderance of evidence that Mutual Savings intentionally discriminated against African Americans by charging higher premiums for insurance than similarly situated Caucasians were charged, solely based on race. Mutual Savings also contends that plaintiff would have to establish that the company: marketed its policies in such a manner as to conceal from African Americans that they were paying higher premiums than Caucasians; used flawed mortality tables to further conceal its discriminatory practices; and, withheld benefits to which class members

45

were entitled. Mutual Savings contends that there is a question whether monetary relief may be awarded where, as here, the discrimination at issue may have been compelled, approved, or permitted by state law. *See LeBlanc v. Southern Bell Telephone & Telegraph Co.,* 333 F. Supp. 602, 610-11 (E.D. La. 1971). Furthermore, Mutual Savings has raised other affirmative defenses, such as the applicability of the McCarran-Ferguson Act, the so-called "Filed Rate Doctrine,"[78] the law of survivorship with regard to claims of deceased policyholders, the statutes of limitation, and *res judicata*, as potential bars to the class claims.

Mutual Savings additionally contends that there is considerable doubt whether the insurance practices at issue are actionable under §§ 1981 and 1982. The company emphasizes that no court has held that risk classification based on demonstrated actuarial differences in life expectancy by race constitutes discrimination prohibited by § 1981. *Cf. Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans v. Norris,* 463 U.S. 1073, 1087 n.17, 103 S. Ct. 3492, 3500 n.17, 77 L. Ed. 2d 1236 (1983) ("[O]ur judgment [that Title VII prohibits the practice of offering a male employee the opportunity to obtain greater monthly annuity benefits than could be obtained by a similarly situated female employee] will in no way

---

[78]"[T]he filed rate doctrine recognizes that where a legislature has established a scheme for . . . rate-making, the rights of the rate-payer in regard to the rate he pays are defined by that scheme." *Taffet v. Southern Co.*, 967 F.2d 1483, 1490 (11th Cir. 1992).

preclude any insurance company from offering annuity benefits that are calculated on the basis of sex-segregated actuarial tables."); *id.* at 1103-05, 103 S. Ct. 3509-10 (Powell, J., concurring in part and dissenting in part) ("Sex-based mortality tables reflect objective actuarial experience.    Because their use does not entail discrimination in any normal understanding of that term, a court should hesitate to invalidate this long-approved practice on the basis of its own policy judgment."); *Los Angeles Department of Water & Power v. Manhart*, 435 U.S. 702, 724, 98 S. Ct. 1370, 1383, 55 L. Ed. 2d 657 (1978) (Blackmun, J., concurring in part) ("[T]here is nothing arbitrary, irrational, or 'discriminatory' about recognizing the objective and accepted disparity in female-male life expectancies in computing rates for retirement plans."); *N.A.A.C.P. v. American Family Mutual Insurance Co.*, 978 F.2d 287, 290 (7th Cir. 1992) ("Risk discrimination is not race discrimination."); *Manufacturers Hanover Trust Co. v. United States,* 775 F.2d 459, 460 (2d Cir. 1985) ("The gender-based mortality tables realistically reflect the fact that men and women have different average life expectancies, and the government's use of these averages for determining values in estate taxation does not create an unacceptable risk of discriminating against those who are not within the statistical norm."). Likewise, Mutual Savings argues that there is no precedent for a finding that such risk classification violates 42 U.S.C. § 1982.

47

Mutual Savings further asserts that there is an issue whether § 1981 liability exists based on post-formation conduct for contractual relationships entered into prior to enactment of the Civil Rights Act of 1991. *See Rivers v. Roadway Express,* 511 U.S. 298, 313, 114 S. Ct. 1510, 1519, 128 L. Ed. 2d 274 (1994); *Landgraf v. USI Film Products,* 511 U.S. 244, 293, 114 S. Ct. 1483, 1508, 128 L. Ed. 2d 229 (1994). Accordingly, there is at least a possibility that, but for this settlement, the class could not recover monetary relief for transactions dating back to the early years of the Twentieth Century.

Additionally, recovery of punitive damages by the class is speculative. "Under § 1981, punitive damages may be awarded 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Ferrill v. Parker Group*, 168 F.3d 468, 476 (11th Cir. 1999) (quoting *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 1628, 75 L. Ed. 2d 632 (1983)). Mutual Savings contends that plaintiff would have difficulty making such a showing in the face of evidence that reliance on race-based actuarial data was exempt from the reach of §§ 1981 and 1982, and was, at a minimum, condoned by state law during the time Mutual Savings priced its insurance based upon race.

Proving that policies sold at dual rates based upon socioeconomic factors

48

violated §§ 1981 and 1982 also would present difficulties, in view of the fact that a number of African American policy holders received more favorable rates under Mutual Savings' socioeconomic pricing structure.

For all of the foregoing reasons, the court concludes that plaintiff faces many significant obstacles to prevailing on the merits of her claims, and class recovery would be highly uncertain if this action were to proceed to a trial. Accordingly, the court finds that this factor weighs heavily in favor of approval of the proposed class settlement agreement.

### c.   Range of possible recovery

In assessing the settlement, the Court must also establish the range of possible damages that could be recovered at trial and then combine this assessment with plaintiff['s] likelihood of prevailing at trial and other relevant factors to determine whether the settlement falls at a point in the range that is fair to the class.

*In re Domestic Air Transportation Antitrust Litigation,* 148 F.R.D. 297, 319 (N.D. Ga. 1993). Here, the methodology employed by Mutual Savings' expert to determine the differential in premiums and benefits between those policies sold to African Americans and those sold to Caucasians is not just instructive, but persuasive.

Using actuarial methods, sound accounting principles, and Mutual Savings' records, Garry Grove examined the policies in question that remain in force, and determined that "[t]he largest number of policies which utilized race-distinct mortality

49

tables fell within fifteen dually priced plans that were directly comparable to one another."[79] From that information, he determined that the differential between policies sold to African Americans and those sold to Caucasians as of December 31, 2001 was 30%, and as of December 31, 2002 was 21%. Grove utilized a similar method to examine socioeconomic policies, and determined that the differential between the higher priced "regular" rated policies and the lower priced "standard" rated policies was 14% for both years. Plaintiff does not dispute the accuracy of these calculations.

The differential in benefits to be paid pursuant to the settlement is 25% for race-distinct policies, and 11.7% for socioeconomic policies. Thus, the proposed settlement closely approximates the maximum differential determined by Mutual Savings' expert.

There is, of course, no way of predicting the amount of a punitive damages award, were this action to proceed to trial. There is no question that such an award could reach tens of millions of dollars, or more. Even so, the court will not consider such an award in assessing the adequacy of the settlement. *See In re Dennis Greenman Securities Litigation*, 622 F. Supp. 1430, 1441 (S.D. Fla. 1985) ("Potential treble recovery (or, for the same reason, punitive recovery) should not be

---

[79]Doc. no. 111 (Affidavit of Garry Grove) ¶ 7, at 3.

50

superimposed as a yardstick for measuring the adequacy of a settlement, lest the settlement negotiation process be derailed from the start.").

### d. The point on or below the range of possible recovery at which a settlement is fair, adequate, and reasonable

Mutual Savings has submitted evidence, discussed *supra*,[80] that the total *value* of settlement to the class exceeds $9.25 million dollars, exclusive of attorneys' fees and administrative costs. Mutual Savings also has adduced evidence that it could not withstand a judgment exceeding the amount contemplated in the proposed settlement. Mutual Savings' debt covenants require at least a $13 million dollar surplus in order to avoid default and foreclosure. As of June 30, 2004, Mutual Savings had $24 million dollars in capital and surplus. The cost of the settlement, including enhanced benefits, cash payments, attorneys' fees, and administrative costs will leave Mutual Savings with only slightly more than the required surplus. From the foregoing, the court concludes that the settlement extracts the greatest benefit for the class without jeopardizing the future availability of insurance benefits the settlement seeks to preserve and enhance. To put the hay down where any goat can reach it, a greater award of damages following trial would be meaningless if Mutual Savings was forced into insolvency.

The court further concludes that the settlement is within the range of

---

[80]*See supra* text accompanying notes 58 and 59.

reasonableness. The enhancements or cash payments under the settlement fairly approximate the pricing differentials challenged, particularly when the risk of litigation is considered. To reach as many class members under the settlement as possible, defendant has agreed to compensate all known eligible class members automatically, and to compensate others who file claims. Moreover, the settlement allows for reinstatement and enhancement of eligible lapsed policies. All of these considerations lead the court to conclude that the relief provided to the class under the terms of the proposed settlement is fair, adequate, and reasonable.

### e. Complexity, expense, and duration of the litigation

This action undeniably is complex, as it involves issuance of more than a million insurance policies over a period spanning almost a century. While discovery has been conducted with respect to class certification, continued preparation for trial would be expensive and protracted.

A trial on the merits of plaintiff's claims would require extensive and expensive proof of actuarial and underwriting procedures. Expert testimony on complex actuarial methodologies would be mandatory, resulting in considerable outlays of time and expense to both parties.

Moreover, proceeding to trial would be detrimental to class members, many of whom are elderly. The trial itself likely would consume several months, and ensuing

52

appeals would further postpone conclusion of this action.

Accordingly, the court finds that the complexity, expense, and duration of continued litigation and possible (if not probable) appeals weighs in favor of the proposed settlement. *See, e.g., In re Metropolitan Life Derivative Litigation*, 935 F. Supp. 286, 294 (S.D.N.Y. 1996) (finding that "settlement would undoubtedly be in the best interest of all the parties," in light of the "effort and expense that would be required to take [the] case to and through trial"); *TBK Partners v. Western Union Corp.*, 517 F. Supp. 380, 389 (S.D.N.Y. 1981) (approving settlement where "further prosecution of [the] action . . . would entail for class members severe problems of proof dependent upon ancient documents and historical accounts covering at least 99 years of history, thereby raising serious questions as to authenticity, completeness, and admissibility").

### f.     Substance and amount of opposition to the settlement

There have been no objections to the proposed settlement, and relatively few requests for exclusion from the class when compared to the size of the class as a whole. As of early September, more than 14,000 claim forms had been submitted by persons seeking to participate in the settlement. While there are estimated to be more than one million policies encompassed by the class definition, only 4,000 policy holders or beneficiaries — *i.e.,* 0.4% of the class — asked to be excluded from the

53

settlement class. The court concludes, therefore, that the proposed settlement is

supported by the vast majority of class members, and that this factor counsels in favor

of approval of the settlement.

## 3. Summary of conclusions as to fairness, reasonableness, and adequacy of the proposed settlement

This court has reviewed the proposed settlement in light of the foregoing

standards, and makes the following findings and conclusions with regard to those

standards.

- ■ The settlement is fair, reasonable, and adequate. The relief provided (or made available to) each class member is substantial, and satisfies plaintiff's primary litigation objective of fairly redressing the challenged pricing and benefit differentials.

- ■ The amount of such relief and other terms of settlement, when balanced against the attendant risks of litigation, indicate the settlement is fair and reasonable.

- ■ The parties engaged in substantial *formal* discovery, and had more than sufficient information to assess the relative merits of claims and defenses.[81] This court is satisfied that, after years of substantial *formal* and *informal* discovery, counsel are fully aware of the relative strengths and weaknesses of this case.

- ■ Absent settlement, the class and defendant face considerable risk, uncertainty, and expense in litigation over class certification, liability, and remedial issues.

---

[81]*Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977) (also holding that discovery, in its most efficient utilization, *should be* totally extrajudicial; informality in the acquisition of relevant facts is desirable).

■   There is no evidence indicating the proposed settlement is the product
of fraud, duress, or collusion. That conclusion is demonstrated by a
number of factors, including:    the length and complexity of the
settlement agreement itself, and the trade-offs reflected therein; and, the
context in which agreement was reached (*i.e.,* following lengthy, formal
and informal discovery, contested class certification, and arms'-length
negotiations conducted by experienced attorneys, with the assistance of
a professional mediator).

■   All applicable requirements of Federal Rule of Civil Procedure 23 are
satisfied.

■   Although defendants have agreed to pay class counsel "reasonable"
attorneys' fees and expenses, the specific *amount* of such payments was
not negotiated by class counsel prior to agreement on the substantive
terms of settlement.[82]

■   The notice afforded the class was the best notice practicable under the
circumstances, and fully complies with all constitutional requirements
of due process and the Federal Rules of Civil Procedure.

■   The facts that there are no pending objections, a large number of claims
for settlement benefits, and that only a very small percentage of the
owners or beneficiaries of the total number of policies included in the
class requested exclusion from the settlement, strongly indicate that
class members as a group view the settlement as fair and adequate.

■   The proposed method of distributing settlement funds among class
members is a fair and reasonable method of approximating relative
amounts of equitable relief with due consideration for the risks and
uncertainties of litigation and the desirability of compromise.

■   The terms and scope of the release, dismissal, and injunctions
contemplated by the settlement are fair, appropriate, and consistent with
all applicable law, and are due to be fully enforced.

---

[82]*See Manual for Complex Litigation Fourth* § 21.7, at 335 (2004) ("[T]he simultaneous
negotiation of class relief and attorney fees creates a potential conflict.")

## C.   Incentive Awards

The remaining term of settlement that the court must scrutinize is the provision

for Glenda Carnegie and Ida Johnson, the original named plaintiffs, to be awarded

\$5,000, in addition to any relief each shall receive as a class member. The Eleventh

Circuit holds that "a disparate distribution favoring the named plaintiffs requires

careful judicial scrutiny into whether the settlement allocation is fair to the absent

members of the class," and that "a substantial burden falls upon the proponents of the

settlement to demonstrate and document its fairness." *Holmes v. Continental Can

Co.*, 706 F.2d 1144, 1147, 1148 (11th Cir. 1983).[83]   Even so, a disproportionate

distribution raises only an *inference* of unfairness, which

> may be rebutted by a factual showing that the higher allocations to
> certain parties are rationally based on legitimate considerations.
> Settlements entailing disproportionately greater benefits to named
> parties are proper only when the totality of circumstances combine to
> dispel the "cloud of collusion which such a settlement suggests."

*Id.* at 1148 (citations omitted).

When examining the totality of circumstances, courts review a wide range of

"legitimate considerations," including:

> (1) the actions taken by the class representatives to protect the interests
> of class members and others;  (2) whether those actions resulted in

---

[83]In *Holmes*, the Eleventh Circuit rejected a settlement in which eight named plaintiffs were
to receive approximately one-half of a \$43,775 lump-sum back-pay award made to a class of 126
persons with the remainder distributed among the other 118 members of the class.

56

substantial benefit to the class members; and (3) the amount of time and
effort spent by the class representatives in pursuing the litigation.

*Spicer v. Chicago Board Options Exchange, Inc.*, 844 F. Supp. 1226, 1266 (N.D. Ill.

1993).[84]   Other "legitimate considerations" which tend to dispel the "cloud of

collusion" are:

- ■ the general public policy in favor of amicable settlement of legal disputes, which is especially favored in discrimination cases;[85]

- ■ lack of objections by class members;[86]

- ■ the notoriety and personal difficulties encountered by class representatives.[87]

Each consideration is present in this case. Accordingly, this court finds that the

---

[84]Other cases discussing incentive awards for the efforts of, and risks incurred by, class representatives include: *White v. National Football League*, 41 F.3d 402, 408 (8th Cir. 1994); *Thornton v. East Texas Motor Freight*, 497 F.2d 416, 420 (6th Cir. 1974); *In re Southern Ohio Correctional Facility*, 175 F.R.D. 270, 275-76 (S.D. Ohio 1997); *Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995); *In re Domestic Air Transportation Antitrust Litigation*, 148 F.R.D. 297, 358 (N.D. Ga. 1993); *Enterprise Energy v. Columbia Gas Transmission*, 137 F.R.D. 240, 250 (S.D. Ohio 1991); *In re Dun & Bradstreet Credit Service Customer Litigation*, 130 F.R.D. 366 (S.D. Ohio 1990); and, *Huguley v. General Motors Corp.*, 128 F.R.D. 81, 85 (E.D. Mich. 1989), *aff'd*, 925 F.2d 1464 (6th Cir.), *cert. denied*, 502 U.S. 909, 112 S. Ct. 304, 116 L. Ed. 2d 247 (1991).

[85]*Women's Committee v. National Broadcasting Co.*, 76 F.R.D. 173, 181 (S.D.N.Y. 1977).

[86]*Id.*   In *Women's Committee*, the court noted that one class member objected by letter that she, too, should have been included as a named plaintiff "on account of her early activities in support of . . . efforts to eliminate sex discrimination at NBC." *Women's Committee*, 76 F.R.D. at 182.   The court stated: "We certainly have no control over the selection of parties plaintiff who choose to file a lawsuit, and in any event we note that she does not object specifically to any terms of the settlement, either as they apply to the class or to the named plaintiffs," but merely to the fact that she was not included as a named plaintiff. *Id.*   A second class member raised an unrelated, but meritless and untimely, objection which also was summarily dismissed by the court. *Id.*

[87]*Van Vranken*, 901 F. Supp. at 299.

57

additional incentive payments to the named plaintiffs are not disproportionate to the efforts they have undertaken on behalf of the class and the personal risks incurred thereby.

The record reflects that each plaintiff was required to provide responses to discovery requests, and to consult with class counsel in an effort to achieve relief for the class. In addition, Ida Johnson was required to devote a substantial amount of time to prepare for and provide lengthy and, at times, unavoidably personal deposition testimony. In view of the burden placed on the class representatives, and the results obtained, an award of $5,000 to each representative is fair and reasonable.

Moreover, the aggregate amount of the incentive awards ($10,000) constitutes two-tenths of one percent of the total settlement amount. If that sum is included in the total recovery for all class members, rather than paid to the named plaintiffs, the average award for each class member would increase by pennies at most.

Accordingly, the court finds that the additional incentive payments to the named plaintiffs are fair, insignificant in relation to the overall relief to the class as a whole, and not disproportionate to the efforts the representatives have undertaken on behalf of the class and the personal risks incurred thereby. The record reflects that each plaintiff had significant personal involvement in bringing to light those facts that culminated in this lawsuit, obligated themselves to participate in the litigation

58

process, and played a substantial role in achieving this result for the class. Given these and other efforts in advancing the litigation, it is fair and reasonable to accord the named plaintiffs this modest incentive award.

## III. PLAINTIFF'S APPLICATION FOR ATTORNEYS' FEES

Class counsel seek an award of attorneys' fees and reimbursement of expenses in the amount of $2.35 million. The class is represented by attorneys from six firms: Watson, Jimmerson, Givhan, Martin & McKinney, P.C., based in Huntsville, Alabama; Whatley Drake, LLC, based in Birmingham, Alabama; Lerach Coughlin Stoia & Robbins, LLP, based in San Diego, California; James, Hoyer, Newcomer & Smiljanich, P.A., based in Tampa, Florida; Bonnett, Fairbourn, Friedman & Balint, P.C., based in Phoenix, Arizona; and Parry Deering Futscher & Sparks, P.S.C., based in Covington, Kentucky.

The proposed settlement contains the following stipulation regarding attorneys' fees:

> Class Counsel jointly agree to make, and the Company agrees not to oppose, an application for the award of Attorneys' Fees and Expenses in the Action not to exceed an aggregate total of $2.35 million for all past, present and future fees, costs, expenses, and disbursements of all Class Counsel and their experts, staff and consultants combined. Any award made by the Court up to said amount will be paid by the Company within 10 days of the Implementation Date to Whatley Drake, L.L.C.[88]

---

[88]Stipulation of Settlement § IX ¶ 1, at 38.

The requested fees and expenses are to be paid in addition to the maximum, aggregate, class recovery of $5 million dollars in increased policy reserves for in-force policies and additional policy benefit payments for estate and matured policies. Stated differently, the award of fees and expenses to class counsel will not be deducted from, and thereby reduce, the total class recovery.

## A.   Attorneys' Fees under 42 U.S.C. § 1988(b)

Plaintiff claims that defendant discriminated against her and other class members on the basis of race, in violation of 42 U.S.C. §§ 1981 and 1982.[89] Congress has legislated that, where a party institutes suit under § 1981 or § 1982, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . . ." 42 U.S.C. § 1988(b).

A plaintiff entering into a settlement may qualify as a "prevailing party" under 42 U.S.C. § 1988(b). *See Smalbein v. City of Daytona Beach*, 353 F.3d 901 (11th Cir. 2003). The appropriate test is whether there is a "court-ordered . . . 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees." *Id.* at 904-05 (ellipses in original) (quoting *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598, 604, 121 S. Ct. 1835, 1840, 149 L. Ed. 2d 855 (2001) (in turn quoting

---

[89]Doc. no. 53 (third amended class action complaint), ¶¶ 66-76.

*Texas State Teachers Association v. Garland Independent School District*, 489 U.S. 782, 792-93, 109 S. Ct. 1486, 1494, 103 L. Ed. 2d 866 (1989))). For this test to be met, "there must be: (1) a situation where a party has been awarded by the court 'at least some relief on the merits of his claim' or (2) a 'judicial *imprimatur* on the change' in the legal relationship between the parties." *Smalbein*, 353 F.3d at 905 (quoting *Hewitt v. Helms*, 482 U.S. 755, 760, 107 S. Ct. 2672, 96 L. Ed. 2d 654 (1987)). Accordingly, a plaintiff may achieve a "material alteration" of her legal relationship with a defendant if she settles her claim "pursuant to an agreement that the district court then incorporate[s] into its order of dismissal and over which it retain[s] jurisdiction for the enforcement of its terms." *Smalbein*, 353 F.3d at 904. That is so because the private settlement agreement then "has the necessary judicial approval and oversight to be considered an alteration in the legal relationship of the parties warranting an award of attorney's fees under § 1988(b)." *Id.* at 905 (citing *Maher v. Gagne*, 448 U.S. 122, 129, 100 S. Ct. 2570, 2574-75, 65 L. Ed. 2d 653 (1980)).

Here, the proposed settlement agreement stipulates that "the Parties will seek and obtain from the Court a Final Judgment and Order Approving Settlement. In order for this settlement to become effective, the Final Judgment and Order must,

61

among other things . . . dismiss the Action with prejudice and on the merits."[90]  This

clearly satisfies the requirement of judicial approval of the agreement.  Moreover, the

stipulation of settlement provides that the court will retain jurisdiction for the purpose

of enforcing the terms of the settlement.   Accordingly, the court has no trouble

concluding that a "material alteration of the legal relationship" between the parties

will occur with the entry of a final judgment, and that plaintiff is a "prevailing party"

who may recover attorneys' fees under 42 U.S.C. § 1988(b).

### 1.    Lodestar analysis

The court must calculate a reasonable attorney fee award under 42 U.S.C. §

1988 by multiplying reasonable hourly rates times the number of hours reasonably

expended to arrive at an amount called the "lodestar."  *See, e.g., Norman v. Housing

Authority of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988).  The party

applying for attorneys' fees is responsible for submitting satisfactory evidence to

establish both (i) that the requested hourly rate is in accord with prevailing market

rates, and (ii) that the number of hours expended by the attorney is reasonable.  *Id.* at

1303.  The district court then must determine whether any portion of the lodestar

should be adjusted upwardly or downwardly.  *See, e.g., Hensley v. Eckerhart*, 461

U.S. 424, 434-35, 103 S. Ct. 1933, 1940-41, 76 L. Ed. 2d 40 (1983).  The court is

---

[90]Stipulation of Settlement § VIII(B), at 37-38.

guided in that process by twelve factors first announced in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). Those factors are: (1) the time and labor required to prosecute the case; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases.

### a.     Reasonable hourly rates

The first step in computation of the lodestar is to ascertain a reasonable hourly rate for plaintiff's attorneys. Class counsel submitted the following information regarding their respective hourly rates, which is grouped by firm membership:[91]

## WATSON, JIMMERSON, GIVHAN, MARTIN & McKINNEY, P.C. (Huntsville, Alabama)

| NAME | POSITION | HOURLY RATE |
|------|----------|-------------|
| Herman Watson, Jr. | Partner | $450.00 |

---

[91]*See* doc. no. 143 (Plaintiff's Evidentiary Submission in Support of Fees under 42 U.S.C. § 1988(b)); doc. no. 107 (Plaintiff's Evidentiary Submission). The data for hourly rates are scattered throughout these two submissions.

| Rebekah Keith McKinney | Partner | $300.00 |
| Suzanne C. Dorsett | Associate | $250.00 |
| Tara L. Helms | Associate | $250.00 |
| LaTasha Meadows | Associate | $250.00 |
| Eric J. Artrip | Associate | $250.00 |
| E.O. Wilborn | Investigator | $105.00 |
| Holly Bennett | Law Clerk | $90.00 |
| (unnamed) | Paralegal | $90.00 |

## WHATLEY DRAKE, LLC
### (Birmingham, Alabama)

| NAME | POSITION | HOURLY RATE |
|---|---|---|
| Joe R. Whatley, Jr. | Partner | $550.00 |
| Russell Jackson Drake | Partner | $550.00 |
| Peter H. Burke | Partner | $400.00 |
| Charlene P. Ford | Partner | $400.00 |
| Vivian Campbell | Associate | $350.00 |
| Othni J. Lathram | Associate | $300.00 |
| Richard Frankowski | Associate | $300.00 |
| E. Ashley Cranford | Law Clerk | $125.00 |
| B. Cloud | Law Clerk | $125.00 |
| Mary Ann Easterwood | Paralegal | $110.00 |
| Bonita Conley | Paralegal | $110.00 |
| Tyler Moffett | Paralegal | $110.00 |

| Bobbie Fletcher | Paralegal | $110.00 |
| Candice Hambric | Paralegal | $110.00 |
| Jeff Dalton | Paralegal | $110.00 |
| Katherine Gault | Paralegal | $110.00 |
| Mary Ramsey | Paralegal | $110.00 |
| IKON | Runner | $75.00 |

## LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS, LLP
### (San Diego, California)

| NAME | POSITION | HOURLY RATE |
|------|----------|-------------|
| Melvyn I. Weiss | Partner | $775.00 |
| John J. Stoia, Jr. | Partner | $610.00 |
| Theodore J. Pintar | Partner | $540.00 |
| Andrew W. Hutton | Partner | $350.00 |
| Elizabeth Bowman | Associate | $450.00 |
| James D. McNamara | Associate | $320.00 |
| Michelle Court | Associate | $320.00 |
| Leslie Hurst | Associate | $310.00 |
| Thomas R. Merrick | Associate | $285.00 |
| Jennifer MacPherson | Associate | $255.00 |

## BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.
### (Phoenix, Arizona)

| NAME | POSITION | HOURLY RATE |
|------|----------|-------------|
| Andrew S. Friedman | Partner | $395.00 |

| Van Bunch | Partner | $360.00 |
| Wendy J. Harrison | Partner | $350.00 |
| Craig Iha | Associate | $325.00 |
| William C. Wright | Associate | $325.00 |
| Guy Hanson | Associate | $295.00 |
| Bryan L. Laird | Associate | $295.00 |
| Kathryn A. Jann | Associate | $295.00 |
| Kenneth R. Sharratt | Paralegal | $115.00 |
| Stacey L. White | Paralegal | $115.00 |
| Rose K. Creech | Paralegal | $115.00 |
| Tracy Synan | Contract | $295.00 |
| David Mitchell | Contract | $295.00 |

### JAMES, HOYER, NEWCOMER & SMILJANICH, P.A.
### (Tampa, Florida)

| NAME | POSITION | HOURLY RATE |
| --- | --- | --- |
| Christa Collins | Partner | $475.00 |
| Les Garringer | Partner | $475.00 |
| Chris Hoyer | Partner | $475.00 |
| John Newcomer | Partner | $475.00 |
| Mike Peacock | Partner | $475.00 |
| John Yanchunis | Partner | $475.00 |
| Emily Peacock | Junior Partner | $375.00 |
| Geoff Parmer | Junior Partner | $375.00 |

| Andrew J. Meyer | Junior Partner | $375.00 |
| Mark Fistos | Junior Partner | $375.00 |
| Chris Casper | Junior Partner | $375.00 |
| Kathleen Knight | Junior Partner | $375.00 |
| Kendra Mancusi | Junior Partner | $375.00 |
| Sean P. Cronin | Associate | $300.00 |
| Allen McCreight | Associate | $300.00 |
| Amy P. Guinan | Associate | $300.00 |
| Elaine Stromgren | Associate | $300.00 |
| Laura Smith | Junior Associate | $265.00 |
| Louis Whitehead | Junior Associate | $265.00 |
| Frank Martelli | Investigator | $185.00 |
| Brooke Roberts | Investigator | $185.00 |
| Al Scudieri | Investigator | $185.00 |
| (unnamed) | Paralegal | $120.00 |

## PARRY, DEERING, FUTSCHER & SPARKS, PSC
### (Covington, Kentucky)

| NAME | POSITION | HOURLY RATE |
| --- | --- | --- |
| Ron Parry | Partner | $450.00 |
| David Futscher | Partner | $400.00 |
| Robert Sparks | Partner | $400.00 |
| Stephen Laber | Associate | $350.00 |
| (unnamed) | Paralegal | $145.00 |

### i. "Relevant legal community"

The Eleventh Circuit holds that "a reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman v. Housing Authority of the City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988) (citing *Blum v. Stenson*, 465 U.S. 886, 895-96 n.11, 104 S. Ct. 1541, 1547 n.11, 79 L. Ed. 2d 891 (1984)). A preliminary question is: what constitutes the "relevant legal community" for purposes of determining the prevailing market rate?

"The general rule is that the 'relevant market' for purposes of determining the reasonable hourly rate for an attorney's services is 'the place where the case is filed.'" *American Civil Liberties Union of Georgia v. Barnes*, 168 F.3d 423, 437 (11th Cir. 1999) (citing *Cullens v. Georgia Department of Transportation*, 29 F.3d 1489, 1494 (11th Cir. 1994)). This action was filed in the Northeastern Division of the Northern District of Alabama. Thus, the Northern District of Alabama is the relevant legal community. *See*, *e.g.*, *Lattimore v. Oman Construction*, 714 F. Supp. 1178, 1179 (N.D. Ala. 1988) ("The relevant market for legal services is the Northern District of Alabama, consisting of the thirty-one northernmost counties of the State."), *aff'd*, 868 F.2d 437 (11th Cir. 1989).

Class counsel argue, however, that "the relevant community in cases such as

68

this — a nationwide class action litigated by numerous attorneys from various jurisdictions — is a national one."[92] They contend that their respective, hourly rates should be evaluated in relation to a "national rate," rather than the market rate prevailing in the Northern District of Alabama. Class counsel cite the Second Circuit's decision in *In re "Agent Orange" Product Liability Litigation*, 818 F.2d 226 (2d Cir. 1987), as support for their contentions. The district court opinion in "*Agent Orange*," which the Second Circuit reviewed, supplied the underlying facts:

In 1979 a class action was commenced charging the United States government and a major portion of the chemical industry with deaths and dreadful injuries to tens of thousands of Vietnam veterans who came in contact with herbicides used in the war in Southeast Asia. The suit also claimed that as a result of the veterans' exposure, their children suffer [sic] severe birth defects. After five years of numerous motions and extensive discovery a tentative settlement was reached on the eve of trial.

*In re "Agent Orange" Product Liability Litigation*, 597 F. Supp. 740, 746 (E.D. N.Y. 1984). Following the proposed settlement, "over 100 attorneys and law firms filed [attorney fee] petitions, claiming tens of thousands of hours of work performed for the benefit of the class." "*Agent Orange*," 818 F.2d at 229. "Faced with a flood of fee petitions from counsel located in all regions of the country, the district court utilized national hourly rates for calculating the fee awards for each attorney." *Id.* at 231. The district court relied on five sources to determine a "national rate":

---

[92]Doc. no. 142 (Plaintiff's Memorandum), at 6.

> First, the court considered data compiled in the National Law Journal
> Directory of the Legal Profession (B. Gerson, M. Liss & P. Cunningham
> eds. 1984), a periodical that provided rate information concerning law
> firms of fifty or more attorneys throughout the country as of March
> 1983. Second, the court reviewed the submissions of counsel, in
> particular the defendants' Memorandum Concerning Plaintiffs'
> Lawyers' Applications for Attorneys' Fees and for Reimbursement of
> Expenses, which provided further information on national rates. Third,
> the court reviewed various surveys of law firm economics, dated 1980
> through 1984, and other periodicals relating to the manner in which
> firms bill their clients. Fourth, the court took notice of its own
> experience in setting fee awards in class actions. Finally, the district
> judge reviewed recent fee awards by other courts to understand more
> fully the manner in which other jurisdictions set appropriate rates. From
> an analysis of this data, the district court arrived at national hourly rates
> of $150 for partners, $100 for associates and $125 for law professors.

*Id.* (citations omitted). The Second Circuit affirmed the use of a national rate,

concluding that

> in an exceptional multiparty case such as this, where dozens of non-local
> counsel from all parts of the country are involved, public policy and
> administrative concerns call for the district court to be given the
> necessary flexibility to impose a national hourly rate when an adequate
> factual basis for calculating the rate exists.

*Id.* at 232. The Second Circuit cautioned, however, that use of national rates should

be limited to *exceptional* circumstances, and where there is "adequate evidentiary

basis on which to fix such rates." *Id*. at 233.

This court declines to address whether the circumstances of this case are so

exceptional as to warrant national rates, or whether it has an adequate evidentiary

basis upon which to determine such a rate. The court is not bound by Second Circuit precedent, but by the Eleventh Circuit's decision in *American Civil Liberties Union of Georgia v. Barnes*, 168 F.3d 423 (11th Cir. 1999).

In *Barnes*, fourteen plaintiffs filed a complaint in the Northern District of Georgia challenging the constitutionality of a Georgia statute that prohibited certain types of internet transmissions. After prevailing on the merits, plaintiffs sought reasonable attorneys' fees and expenses under 42 U.S.C. § 1988(b). Three of the five attorneys representing plaintiffs were based in Atlanta, Georgia, but two were based in New York City. *Id.* at 426. The Atlanta attorneys sought hourly rates of $165 and $185, but the two New York attorneys sought "New York rates" of $260 and $350 an hour, respectively. *Id.* at 436. The district court awarded the New York attorneys the higher rates, because their "'special expertise was essential to the case.'" *Id.* The Eleventh Circuit reversed, holding that the district court's award of higher fees to the New York attorneys was clear error. "If a fee applicant desires to recover the non-local rates of an attorney who is not from the place in which the case was filed, he must show a lack of attorneys practicing in that place who are willing and able to handle his claims." *Id.* at 437 (citing *Cullens v. Georgia Department of Transportation*, 29 F.3d 1489, 1494 (11th Cir. 1994)). The Court added:

> The district court clearly erred in awarding non-local rates without

71

finding that the plaintiffs had carried their burden of showing that there were no attorneys in Atlanta — the place where this case was filed — who were willing and able to handle their claims. Neither of the district court's reasons for awarding non-local rates even addresses that crucial question.

. . . .

The ultimate touchstone for fee awards under § 1988 is reasonableness . . . . We have never held that it is reasonable to award non-local attorneys' rates when competent local counsel were willing and able to handle the fee-applicant's claims. It is not.

*Barnes*, 168 F.3d at 437.

Here, class counsel did not submit evidence showing a lack of attorneys practicing in the Northern District of Alabama who were willing and able to handle this case. Even so, the court recognizes that class counsel from Kentucky, California, Arizona, and Birmingham were essential to the ability of Huntsville, Alabama counsel to prosecute this expansive and complex class action. In that respect, it is worth noting that the Eleventh Circuit in *Barnes* did state, although in *dicta*, that it did not "rule out the possibility that there might be a case where use of an attorney from a higher-rate market who had extensive prior experience with a particular factual situation could be justified because of efficiencies resulting from that prior experience." *Id.* at 438. This may be just such a case, but class counsel have not attempted to persuade this court that it is.

72

## ii. Reasonable hourly rates in the Northern District of Alabama

Movants bear the burden of producing satisfactory evidence that requested hourly rates are in line with prevailing market rates, and movants may meet this burden by producing either direct evidence of rates charged under similar circumstances, or opinion evidence of reasonable hourly rates. *See, e.g., Norman v. Housing Authority of the City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988).

Class counsel submit a 2003 *National Law Journal* survey documenting the hourly rates charged by partners and associates in the largest firms nationwide.[93] Firms based in Birmingham, Alabama are included in the survey, including Bradley, Arant, Rose & White, and Burr & Forman. Partners in the Bradley firm charge hourly rates between $210 and $365, and associates charge between $160 and $215. Partners at Burr & Forman charge between $225 and $375, and associates charge between $140 and $250.[94] Class counsel also submit a 2003 *National Law Journal* survey documenting the hourly rates charged by firms which set billing rates by "associate class."[95] No firms based within the Northern District of Alabama are listed in that survey. Class counsel do not offer these surveys as direct evidence of

---

[93]Doc. no. 143 (Plaintiff's Evidentiary Submission in Support of Fees under 42 U.S.C. § 1988(b)), Tab 2, Ex. A.

[94]*Id.*

[95]*Id.*, Ex. B.

prevailing market rates in the Northern District of Alabama.[96]  Instead, class counsel

request the court to compare their rates with those of other "national firms," based

outside of the Northern District of Alabama.

Class counsel also submit the affidavit of Nicholas Roth,[97] an attorney who

practices law in Decatur, Alabama, and who avers that he has "prosecuted and

defended complex litigation including class actions."[98]  He asks this court to consider

"that this is a complex, nationwide class action with attorneys from firms with

nationwide practices.  In these circumstances, the determination of a national fee is

appropriate to sufficiently reward the sophisticated work of the attorneys involved in

this case."[99]  Roth further states:

> My opinion is supported by my review of the reported rates in the
> National Law Journal for firms of similar caliber and from my personal
> knowledge of billing rates in other national class actions.  In 2003, for
> example, partners from firms with a nationwide practice routinely billed
> $600 or more for their non-contingent, risk free work.  See The National
> Law Journal, 12/1/03 NLJ 19, (Col. 1), December 1, 2003, attached as
> Exhibit A.  Associates in many of the same firms ranged from $130 to

---

[96]Obviously, doing so would undermine their requested hourly rates because most members of class counsel are requesting fees exceeding what partners and associates charge at the Birmingham-based firms.  The court notes that among class counsel, only Watson, Jimmerson, Givhan, Martin & McKinney, P.C., based in Huntsville, Alabama, charges fees within the same range as the Birmingham-based firms Burr & Forman and Bradley, Arant, Rose & White.

[97]Doc. no. 143 (Plaintiff's Evidentiary Submission in Support of Fees under 42 U.S.C. § 1988(b)), Tab 2.

[98]Doc. no. 109 (Plaintiff's Supplemental Evidentiary Submission), Roth affidavit, ¶ 1.

[99]Doc. no. 143 (Plaintiff's Evidentiary Submission in Support of Fees under 42 U.S.C. § 1988(b)), Tab 2, Roth affidavit, ¶ 4.

$450 per hour for their non-contingent, risk free work. *See* The National Law Journal, 12/1/3/ [sic] NLJ 21, (Col. 1), December 1, 2003, attached as Exhibit B.[100]

Roth's affidavit is not particularly helpful. First, the court has explained that hourly rates charged in the Northern District of Alabama are relevant, not "national rates." Second, Roth does not provide evidence of what firms with "sophisticated," "nationwide practices" charge for their services in the Northern District of Alabama. The *National Law Journal* surveys on which Roth bases his testimony list Birmingham-based firms which charge hourly rates far below those requested by class counsel from states other than Alabama.

Class counsel also submit the affidavit of Ralph I. Knowles, Jr., an attorney who has practiced in Atlanta, Georgia since 1990, but also in Alabama for many years before that.[101] He evaluated the hourly fees requested by Joe R. Whatley, Jr., and Herman Watson, partners at Whatley Drake, LLC, and Watson, Jimmerson, Givhan, Martin & McKinney, P.C., respectively. Knowles states that "lawyers in Atlanta with no more experience, skill and expertise than Whatley or Watson charge from $400 to $550 in even non-complex, non-contingent, contemporaneous hourly billing cases."[102] Knowles acknowledged, however, that he "cannot attest to 'normal hourly rates'

---

[100]*Id.*

[101]*Id.*, Tab 3, Knowles affidavit, ¶ 2.

[102]*Id.*, ¶ 11.

charged to clients by lawyers in Birmingham or Huntsville [who possess] the skill, experience, and reputation of the lawyers [involved in this case, and who have participated] in similar litigation where the fees are not contingent and are paid contemporaneously with the work done."[103] That is precisely the type of evidence that would be helpful to this court.

Each firm also submitted individual declarations, in which each declarant listed prior cases in which other courts had approved their requested hourly rates. The Eleventh Circuit observed in *Dillard v. City of Greensboro*, 213 F.3d 1347 (11th Cir. 2000), that "there is *some* inferential evidentiary value to the prior award, because in theory the prior court based the award on the market rate." *Id.* at 1355 (emphasis supplied). The shortcoming of the declarations submitted by class counsel, however, is that they do not cite a single case where a court sitting in the Northern District of Alabama approved their hourly rates. *See Schwarz v. Secretary of Health and Human Services*, 73 F.3d 895, 908 (9th Cir. 1995) ("While an attorney's prior fee award may bear on the selection of a reasonable fee in a later case, *particularly when the award was for work performed in the relevant community*, simply offering the prior award is not enough.") (emphasis supplied).

The partners practicing at Watson, Jimmerson, Givhan, Martin & McKinney,

---

[103]*Id.*

P.C., in Huntsville, Alabama, declare that their hourly rates were approved by the U.S. District Court for the Southern District of New York in *Thompson v. Metropolitan Life Insurance Company*, No. 005-071 (S.D.N.Y. Apr. 28, 2003).[104] While their hourly rates may have been reasonable in the context of the prevailing market rate in New York City, the court cannot assume that the same could be said of the Northern District of Alabama. The court also notes that the *Thompson* Court awarded attorneys' fees under the common fund doctrine, which does not require an evaluation of reasonable hourly rates.[105] The partners practicing at Whatley Drake, LLC, in Birmingham, Alabama, also did not cite any cases from the Northern District of Alabama approving their requested hourly rates. Instead, they cited cases from the Southern District of Florida, District of Maryland, Southern District of Illinois, and Northern District of Texas.[106] Class counsel from the Florida-based firm of James, Hoyer, Newcomer & Smiljanich, P.A., did cite cases in which the Supreme Court of Alabama had approved hourly rates for "senior partners and associates" in the firm,[107] but there is no indication that the work was performed in the Northern District of

---

[104]Doc. no. 143 (Plaintiff's Evidentiary Submission in Support of Fees under 42 U.S.C. § 1988(b)), Tab 1(B)(1), McKinney declaration, ¶ 4.

[105]*See id.* at Tab 1(B)(6)(C). Class counsel included the *Thompson* opinion in its supplemental evidentiary submission. The *Thompson* Court discusses its application of the common fund doctrine on pages 22 and 23 of the unpublished opinion.

[106]Doc. no. 143 (plaintiff's evidentiary submission in support of fees under 42 U.S.C. § 1988), Tab 1(B)(2), Ford declaration, ¶ 4.

[107]*Id.*, Tab 1(B)(5), Collins declaration, ¶ 4.

77

Alabama. The Kentucky-based firm known as Parry, Deering, Futscher & Sparks, PSC, cited eight cases in which courts had approved their hourly rates. The firm did not indicate which courts presided over those cases, however.[108] The California-based firm of Lerach, Coughlin, Stoia, Geller, Rudman & Robbins offered fourteen cases in which prior courts had approved its requested hourly rates.[109] No cases were in the Northern District of Alabama. The Arizona-based firm of Bonnett, Fairbourn, Friedman & Balint, P.C., cited cases from the Southern District of New York, District of Arizona, and Maricopa County, Arizona.[110]

The Eleventh Circuit has observed that "courts are often faced with inadequate fee applications." *Norman*, 836 F.2d at 1303. Under such circumstances, the district court may itself be "an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." *Id.* (citing *King v. McCord*, 707 F.2d 466, 468 (11th Cir. 1983)).

This court attempted to conduct such an independent review, but could discern no reliable method to evaluate the hourly rates charged by all attorneys, particularly those from states other than Alabama. This court, for example, is not familiar with

---

[108]*Id.*, Tab 1(B)(6), Parry declaration, ¶ 4.

[109]*Id.*, Tab 1(B)(3), Stoia declaration, ¶ 6.

[110]*Id.*, Tab 1(B)(4), Harrison declaration, ¶ 5.

78

the firm Bonnett, Fairbourn, Friedman & Balint, P.C., based in Phoenix, Arizona.

The firm submitted a firm biography, stating that:

> Bonnett, Fairbourn, Friedman & Balint, P.C. is an AV rated firm of 33
> lawyers. Our clients include many individuals and local businesses, as
> well as major national and international companies in a wide range of
> civil litigation in both federal and state courts. Bonnett, Fairbourn,
> Friedman & Balint, P.C. has represented plaintiffs and defendants in
> securities, antitrust, fraud, RICO and other commercial and tort
> litigation.

> The firm has developed a recognized practice in the area of class actions
> and is widely regarded as the preeminent firm in Arizona representing
> plaintiffs in class action proceedings. We have taken a leading role in
> numerous important actions on behalf of consumers and investors, and
> we have been responsible for many outstanding results that have yielded
> multi-million dollar recoveries for class members in Arizona and
> throughout the United States.[111]

The firm also submitted biographies of each attorney. The firm described one of its

associates, Craig Iha, as follows:

**Craig Iha    Associate              \$325/hour    With Firm: 4 years**

> CRAIG IHA worked primarily in the class action practice group.
> Mr. Iha received his B.A. degree from the University of Hawaii and
> received his law degree from the University of Colorado. He has been
> a member of the California Bar since 1999.[112]

The firm clearly enjoys an outstanding reputation in Phoenix, and has received an AV

rating from Martindale-Hubbell. Even so, there is no reliable method to evaluate

---

[111]Doc. no. 107 (plaintiff's evidentiary submission), Tab A(5), Ex. A.

[112]Doc. no. 143 (plaintiff's evidentiary submission in support of fees under 42 U.S.C. §
1988)), Tab 1(B)(4), Harrison declaration, ¶ 4.

whether Iha's hourly rate is reasonable. The statement that Iha "has worked primarily in the class action practice group" for four years gives no more than a hint of his skill, reputation, and experience as an attorney. This court would have been assisted greatly by additional evidence regarding Iha's career, and what comparable attorneys practicing in the Northern District of Alabama would command as an hourly rate.

In sum, class counsel did not satisfy their burden to produce evidence sufficient to justify an award of attorneys' fees under 42 U.S.C. § 1988(b).

## B.     Common Fund Doctrine

Class counsel request the court, in the alternative, to award attorneys' fees under the "common fund" doctrine. The general rule, sometimes called the "American Rule," is that attorneys are paid according to contract with their clients. *See* 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 14:1, at 504 (4th ed. 2002).[113] "The rule has a number of exceptions, however, pursuant to which courts may award attorney's fees to the prevailing party. Two significant exceptions are statutory fee-shifting provisions [including 42 U.S.C. § 1988(b)] and the equitable common fund doctrine." *Id.*

### 1.     Distinguishing common fund doctrine from statutory fee shifting provisions

[113]In many countries, the general rule, known as the "English Rule," is that a prevailing litigant is entitled to recover attorneys' fees from his or her opponent. 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 14:1, at 503-04 (4th ed. 2002).

The Eleventh Circuit explained the method for determining attorneys' fees

under § 1988(b) in *American Civil Liberties Union of Georgia v. Barnes*, 168 F.3d

423 (11th Cir. 1999), in the following manner:

> A reasonable attorney fees award under 42 U.S.C. § 1988 is "properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson*, 465 U.S. 886, 888, 104 S. Ct. 1541, 1544, 79 L. Ed. 2d 891 (1984). "This 'lodestar' may then be adjusted for the results obtained." *Loranger* [*v. Stierheim*], 10 F.3d [776,] 781 [(11th Cir. 1994)]. In addition, "all reasonable expenses incurred in case preparation, during the course of litigation, or as an aspect of settlement of the case may be taxed as costs under § 1988." *Dowdell v. City of Apopka*, 698 F.2d 1181, 1192 (11th Cir. 1983).
>
> The "fee applicant bears the burden of establishing entitlement and documenting the appropriate hours and hourly rates." *Norman* [*v. Housing Authority of Montgomery*], 836 F.2d [1292,] 1303 [(11th Cir. 1988)]. That burden includes "supplying the court with specific and detailed evidence from which the court can determine the reasonable hourly rate. Further, fee counsel should have maintained records to show the time spent on the different claims, and the general subject matter of the time expenditures ought to be set out with sufficient particularity so that the district court can assess the time claimed for each activity . . . . A well-prepared fee petition also would include a summary, grouping the time entries by the nature of the activity or stage of the case." *Id.* (citations omitted).

168 F.3d at 427. In contrast, the common fund doctrine

> allows a court to distribute attorney's fees from the common fund that is created for the satisfaction of class members' claims when a class action reaches settlement or judgment. The doctrine is grounded in the principles of quantum meruit and unjust enrichment, in two senses. First, the doctrine prevents unjust enrichment of absent members of the

class at the expense of the attorneys. It is meant to compensate the attorneys in proportion to the benefit they have obtained for the entire class (the fund), not just the representative members with whom they have contracted. Second, the doctrine prevents the unjust enrichment of absent class members at the expense of the class representatives. In the absence of the doctrine, only the present members, who hired the attorneys, would have to pay attorney's fees, while all the members, both absent and present, would enjoy the benefits of the settlement or judgment. The members who did not hire the attorneys would be unjustly enriched at the expense of those who did.

Before any potential for a fee from a common fund arises, there must be the creation of such a common fund by efforts of plaintiffs' counsel. Technically, plaintiffs have been successful when creating such a fund. As long as plaintiffs can demonstrate that it was their efforts that resulted in conferring this benefit on the class, they are entitled to a fee from that fund under equitable court powers, regardless of their posture as prevailing parties in whole or in part in the formal litigation or settlement thereof.

An attorney whose work creates a common fund is "entitled to a reasonable fee . . . taken from the fund." No general rule can be articulated on what is a reasonable percentage of a common fund. A district court may use its discretionary powers to determine what is a reasonable and fair award from a common fund, where the fund itself represents the benchmark from which reasonableness is measured.

4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 14:6, at 546-50

(4th ed. 2002) (footnotes omitted).

The Eleventh Circuit has held that, where the common fund doctrine applies,

the court must evaluate the reasonableness of attorneys' fees through a "percentage

of the fund approach." *Camden I Condominium Association v. Dunkle*, 946 F.2d 768,

774 (11th Cir. 1991) ("Henceforth in this circuit, attorneys' fees awarded from a

common fund shall be based upon a reasonable percentage of the fund established for

the benefit of the class. The lodestar analysis shall continue to be the applicable

method used for determining statutory fee-shifting awards."). *See also Blum v.*

*Stenson*, 465 U.S. 886, 900 n.16, 104 S. Ct. 1541, 1550 n.16, 79 L. Ed. 2d 891 (1984)

("Unlike the calculation of attorney's fees under the 'common fund doctrine,' where

a reasonable fee is based on a percentage of the fund bestowed on the class, a

reasonable fee under § 1988 reflects the amount of attorney time reasonably expended

on the litigation.").

One noted commentator explained the distinction between statutory fee-shifting

and common fund cases in the following manner:

> Civil rights and employment discrimination statutes authorize fees
> to the plaintiff who prevails either by judgment or by settlement without
> adjudication, unless "special circumstances" are present which would
> render such an award unjust in light of congressional goals underlying
> enforcement of civil rights.
>
> While most civil rights suits seek primarily injunctive and
> nonmonetary equitable relief, there are other actions, particularly
> employment discrimination class actions, where sizable monetary back
> pay recoveries are obtained in addition to injunctive relief. While such
> cases with large back pay class recoveries obtained as part of consent
> decrees *bear a superficial resemblance to common fund recoveries in
> class settlements, e.g., in antitrust and securities suits, a major
> difference between them is that fee awards in the employment
> discrimination [and civil rights] class settlements will be payable by the
> defendant over and above the back pay class recovery, while fee awards
> in the antitrust and securities class settlements will normally be payable
> out of the common fund recovered.*

This difference in the source of payment of fee awards exists because it is settled law in Title VII employment discrimination suits and in civil rights fee awards under 42 U.S.C. § 1988 that fee awards are authorized when litigation concludes by settlement without any formal adjudication on the merits.

4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 12:55, at 393-94 (4th ed. 2002) (emphasis supplied).

The proposed settlement agreement in this case does not create a "common fund" as defined above. The parties negotiated the maximum amount of attorneys' fees to be awarded class counsel as a term of the proposed settlement, to be paid by Mutual Savings in addition to the agreed-upon amount of the class recovery, effectively mirroring the § 1988 statutory fee-shifting scheme. Therefore, this is not a case in which plaintiff is petitioning the court for an award of fees *from the fund created by the settlement*. Class counsel acknowledge that this is not a typical common fund request. "Unlike the standard 'common fund' settlement, Mutual Savings will pay Class Counsel's fees and expenses in addition to and wholly apart from the relief to the Class."[114]

Class counsel's request raises difficult questions regarding the propriety of attorneys seeking fees under the common fund doctrine, when they may instead recover fees under a statutory fee-shifting provision, and the fee arrangement does not

---

[114]Doc. no. 107 (Plaintiff's Evidentiary Submission), Tab A, joint declaration of Watson and Whatley, ¶ 58.

comport with the traditional definition of a common fund. A three member panel of

the Ninth Circuit directly addressed this issue in *Staton v. Boeing Company*, 327 F.3d

938 (9th Cir. 2003), a case in which a class of African-American employees brought

suit against Boeing, alleging that the company's promotion, compensation, and career

development decisions were systematically discriminatory, and that Boeing created

and permitted a racially hostile work environment, all in violation of 42 U.S.C. §

1981 and state law. *Id*. at 945-46. The suit was commenced in June of 1998. Just

six months later, during November of 1998, class counsel and Boeing began

settlement negotiations. Class counsel had conducted virtually no formal discovery,

the district court had not certified a class, and Boeing had recently filed a motion to

dismiss plaintiffs' class claims. *Id*. at 946-47. "The negotiations nonetheless

proceeded rapidly for such a large class action at this early stage of litigation, with

the result that, in January 1999[, just eight months after commencement of the class

action suit,] Boeing and class counsel announced that they had agreed to settle the

lawsuit." *Id*. at 947.

The settlement agreement required Boeing, in part, to pay $7.3 million in

monetary relief to the class. *Id*. at 944, 948. The settlement additionally required

defendant to pay class counsel $4.05 million in attorneys' fees, separate from the

award to class members. *Id*. at 944-45. The district court certified the class and

85

approved the settlement in a single consent decree. *Id.* at 951. To assess the reasonableness of the attorneys' fees, the district court evaluated the amount of fees in proportion to the "common fund," which was created by totaling the amount of recovery to class members and the requested attorneys' fees. Class counsel did not attempt to justify their fees under 42 U.S.C. § 1988(b), which would have required the court to undertake the "lodestar" analysis. *Id.* at 965-66.

Two members of the Ninth Circuit panel that reversed the district court's approval of attorneys' fees noted that the settlement agreement did not create a traditional common fund. "Under regular common fund procedure, the parties settle for the total amount of the common fund and shift the fund to the court's supervision. The plaintiffs' lawyers then apply to the court for a fee award from the fund." *Id.* at 969 (citations omitted). The majority issued the following warning to district courts within the Ninth Circuit:

> When the ordinary procedure is not followed and instead the parties explicitly condition the merits settlement on a fee award justified on a common fund basis, the obvious risk arises that plaintiffs' lawyers will be induced to forego a fair settlement for their clients in order to gain a higher award of attorneys' fees. That risk is, if anything, exacerbated where, as here, the agreement provides for payment of fees by the defendant, as in a statutory fee-shifting situation, but the parties choose to justify the fee as coming from a putative common fund. Where that is the case, courts have to be alert to the possibility that the parties have adopted this hybrid course precisely because the fee award is in fact higher than could be supported on a statutory fee-shifting basis, yet the deal is so dependent upon class counsel receiving a greater-than-lodestar

amount of fees that the parties were not willing to give the court supervisory discretion to determine the distribution of the total settlement package between counsel and the class.

*Id.* at 970-71.

The dissenting member of the *Staton* panel argued that, in circumstances where

there was no suggestion of impropriety, attorneys should be permitted to apply for

fees under the common fund doctrine even when the fee structure was more akin to

fee-shifting principles.

My colleagues' problems with the attorneys' fees stem from getting lost in unfamiliar trees and a consequent failure to see the forest for what it is. This settlement promises clear future value to African-Americans working for one of our nation's largest and most important employers. Measured against this value, much of which is intangible, the modest attorneys' fees agreement appears to me on the record to be quite appropriate. As I have pointed out, it is a stand alone aspect of the settlement. In dollar terms, it does not subtract from the value of the settlement, which is only a small part of what the settlement accomplishes. The merits settlement itself was (1) free of collusion and chicanery, (2) generous in its opt-out provisions, (3) fair in its monetary provisions, (4) forthcoming in its look to the future, and (5) vigorously litigated. Nevertheless, the attorneys' fees issue ends up as the proverbial tail wagging the dog to death, even though the dog is not a dog at all, but a viable solution to a serious problem demanding prompt resolution. If the settlement itself were truly suspicious and indicative of a betrayal, then a different approach might be in order; but if the settlement stands, in my view, so do these fees. It may not match up perfectly with other methods of measuring whether fees are appropriate, but no matter whether fees here are low or high, they do not subtract from the relief obtained by the plaintiffs. My colleagues say that the method used in this case to determine attorneys' fees "allows too much leeway for lawyers representing a class to spurn a fair, adequate and reasonable settlement for their clients in favor of inflated attorneys'

fees." This problem is not part of this case, and I do not see how something that might have happened but did not must torpedo this hard-bargained positive outcome.

*Staton,* 327 F.3d at 985-86 (Trott, J., dissenting).

This court agrees that there must be heightened review when attorneys forgo the opportunity to recover fees under a fee-shifting statute, and instead attempt to justify their award on a common fund basis. Particularly in a case like *Staton,* where class counsel litigated the case for just eight months before reaching settlement, the monetary difference between an award under common fund principles and a fee-shifting statute may be staggering.

Those are not the facts presented by this case, however. Class counsel commenced this action on December 13, 1999. During the course of litigation, class counsel reviewed approximately 28,000 pages of documents, deposed the highest executives at Mutual Savings, investigated the history of Mutual Savings' business and policy pricing practices, and presented extensive briefs and other documents persuading this court to certify a class.[115] Class counsel did not commence settlement discussions until 2003, about three years after they had logged approximately 4,000 hours of partner, associate, paralegal, and other support staff effort.[116] If class counsel

---

[115] *See* doc. no. 143 (Plaintiff's Evidentiary Submission in Support of Fees under 42 U.S.C. § 1988(b)), Tab 1, joint supplemental declaration of Whatley and Watson, ¶¶ 6-9.

[116] *Id.*, ¶¶ 3, 10. Watson and Whatley state that as of November 10, 2004, class counsel had expended 5,115.17 hours of partner, associate, paralegal and support staff time. Class counsel

filed suit merely to reach a settlement as expeditiously as possible, and to earn a windfall under the common fund doctrine, they failed miserably in the attempt.

The court has reviewed the fairness of this settlement agreement in the preceding parts of this opinion, and there is no hint, much less a sign, of collusion between class counsel and Mutual Savings. Based on facts unique to this case, therefore, the court will entertain class counsels' petition for the award of attorneys' fees under common fund principles.

## 2.    Methodology

In *Camden I Condominum Association v. Dunkle*, 946 F.2d 768 (11th Cir. 1991), the Eleventh Circuit instructed district courts to adopt a "percentage of the fund approach" when evaluating attorneys' fees requested under the common fund doctrine. Pursuant to this methodology, "there is no hard and fast rule mandating a certain percentage of a common fund which may reasonably be awarded as a fee because the amount of any fee must be determined upon the facts of each case." *Id.* at 774.

Even so, the majority of common fund fee awards fall between 20% and 30% of the fund, and "district courts are beginning to view the median of this 20% to 30%

---

expended 752.25 partner hours, 86.90 associate hours, and 113.85 paralegal and law clerk hours during settlement negotiations. The court arrives at the figure of "approximately 4,000 hours" by subtracting the number of hours devoted to settlement from the total number of hours expended.

range, *i.e.*, 25%, as a 'bench mark' percentage fee award which may be adjusted in accordance with the individual circumstances of each case . . . ." *Id.* at 774-75. "'To avoid the problems and criticism of a common fund fee award being summarily granted as a percentage of the fund recovered without any findings supporting its reasonableness . . . courts are now supporting their percentage awards with particular findings showing factors considered.'" *Id.* at 775 (ellipses in original) (quoting Herbert B. Newberg, *Attorney Fee Awards* § 2.07 at 47 (1986)).

District courts may consider a myriad of factors in determining the appropriate percentage award. These factors include: (1) the time and labor required to prosecute the case; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases. *Camden I*, 946 F.2d at 772 n.3, and 775 (adopting twelve-factor method of determining court-awarded attorneys' fees, as enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)). Other relevant factors include:

90

(13) the time required to reach a settlement; (14) whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel; (15) any non-monetary benefits conferred upon the class by the settlement; and (16) the economics involved in prosecuting a class action. *Camden I*, 946 F.2d at 775. "In most instances, there will also be additional factors unique to a particular case which will be relevant to the district court's consideration." *Id.*

### a. Percentage of the fund

In calculating the "percentage of the fund," the court must first identify the total fund recovered on behalf of class members. Class counsel contend that the "aggregate Settlement benefits" totals approximately $11.96 million. This amount includes settlement benefits to class members, valued at $9.3 million,[117] plus $307,702.49 in class counsels' out-of-pocket expenses,[118] plus the $2.35 million in requested attorneys' fees and expenses. "The total of the fees and expenses will represent less than 20% of the aggregate Settlement benefits."[119]

A request for $2.35 million in attorneys' fees, expenses, and costs represents 19.6% of a fund totaling $11.96 million. This is a modest request, given the twenty to thirty percent average fee-range identified by the Eleventh Circuit. Class counsels'

---

[117]Doc. no. 107 (Plaintiff's Evidentiary Submission), Tab B, Long affidavit, ¶ 15.

[118]*Id.*, Tab A, joint declaration of Watson and Whatley, ¶ 67.

[119]Doc. no. 103 (Plaintiff's Brief in Support of Final Approval of Proposed Settlement) at 26.

request appears appropriate even if, for the sake of argument, the court adjusts the "common fund" to exclude the requested attorneys' fees, expenses, and costs. The total value of the settlement to class members is projected at $9.3 million.[120] A request for $2.35 million represents 25.2% of a fund totaling that amount. This is almost precisely the median, 25% benchmark identified and implicitly approved by the Eleventh Circuit.

## b.   Additional factors

The court now considers whether additional factors particular to this case either vindicate, or make suspect, class counsel's request.

As of November 10, 2004, class counsel have expended 5,115.17 hours of partner, associate, paralegal and support staff time to prosecute this case. In *Hensley v. Eckerhart*, 461 U.S. 424, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983), the Supreme Court noted that "complex civil litigation involving numerous challenges to institutional practices or conditions . . . is lengthy and demands many hours of lawyers' services." *Id.* at 436, 103 S. Ct. at 1941. Class counsel has engaged in just such concerted, sustained effort.

Class counsel also obtained excellent results for class members. The proposed settlement agreement affords class members monetary and injunctive relief, and

---

[120]Doc. no. 107 (plaintiff's evidentiary submission), Tab B, Long affidavit, ¶ 15.

permits individuals to opt-out of the settlement if they desire to continue individual claims against Mutual Savings. The agreement also ensures that class members will receive benefits in the near or immediate future, rather than face protracted litigation, with no guarantee of success. In *Hensley*, the Supreme Court stated that "where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Id.* at 435, 103 S. Ct. at 1940.

No class member has objected to the terms of the proposed settlement agreement, nor has a class member objected to class counsels' request for fees, expenses, and costs. Class counsel also undertook this action on a contingency basis, expending thousands of hours while bearing the risk of an unsuccessful result. The court is also aware that the Alabama-based members of class counsel are experienced, reputable, and able attorneys. The court is less familiar with members of class counsel based outside of Alabama, but their firm biographies suggest that they, too, are skilled.

For all of the foregoing reasons, the court finds that class counsels' request for $2.35 million in fees and expenses is reasonable as a percentage of the total benefits to class members, and it will be approved.

## IV. CONCLUSION

Accordingly, the parties' joint request for approval of the proposed settlement

is due to be granted in its entirety.  A separate order consistent with this memorandum

opinion will be entered contemporaneously herewith.

DONE this **23rd** day of November, 2004.

United States District Judge